# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN), *et al.* | § § § § | |
| Plaintiffs, | § | Civil Action No. 06-1521-RJL |
| | § | |
| v. | § | |
| | § | |
| FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA), | § § | |
| | § | |
| Defendant. | § | |

## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs, Association of Community Organizations for Reform Now (ACORN) and four individual Hurricane Katrina evacuees, hereby move pursuant to Federal Rule of Civil Procedure 65(b) and Local Rule 65.1, for a temporary restraining order requiring defendant to provide notices of terminations and denials of housing assistance benefits that contain a complete and intelligible explanation for the decision, adequate instructions as to how each evacuee may attempt to address the reasons for the decision, and sufficient time for evacuees to appeal. Plaintiffs also seek an order continuing current housing assistance to Katrina and Rita evacuees until such time as defendant provides such notices. The Court should grant the temporary restraining order for the reasons set forth in the accompanying memorandum of law.

A certificate of notice pursuant to Local Rule 65.1(a) and a proposed Order accompany this Motion.

Respectfully submitted,


*/s/ Michael T. Kirkpatrick*
Michael T. Kirkpatrick
    (DC Bar No. 486293)
      mkirkpatrick@citizen.org
Deepak Gupta
    (DC Bar No. 495451)
      dgupta@citizen.org
Brian Wolfman
    (DC Bar No. 427491)
      brian@citizen.org
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC  20009
(202) 588-1000
(202) 588-7795 (fax)

Robert W. Doggett
    (TX Bar No. 05945650)
      rdoggett@trla.org
Jerome W. Wesevich
    (TX Bar No. 21193250)
      jwesevich@trla.org
Texas RioGrande Legal Aid, Inc.
4920 North Interstate Highway 35
Austin, Texas  78751
(512) 374-2725
(512) 447-3940 (fax)

Dated: August 31, 2006          Attorneys for Plaintiffs

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSOCIATION OF COMMUNITY | § | |
| ORGANIZATIONS FOR REFORM | § | |
| NOW (ACORN), *et al.* | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 06-1521-RJL |
| | § | |
| v. | § | |
| | § | |
| FEDERAL EMERGENCY MANAGEMENT | § | |
| AGENCY (FEMA), | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiffs seek a temporary restraining order to avoid irreparable harm to evacuees of Hurricanes Katrina and Rita.

**INTRODUCTION**

Over a half-century of precedent holds that Due Process requires government agencies to provide "timely and adequate notice detailing the reasons for a proposed termination" of government benefits, *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970)*,* and that "when notice is a person's due . . . [t]he means employed must be such as one desirous of actually informing the [claimant] might reasonably adopt to accomplish it." *Jones v. Flowers*, 126 S.Ct. 1708, 1715 (2006) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950)).

Federal law provides up to 18 months of housing assistance benefits to disaster evacuees provided that evacuees remain qualified for those benefits under Section 408 of the Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5174(b), and its implementing regulations, 44 C.F.R. Part 206. FEMA uses a letter to notify disaster victims that it intends to terminate or deny

housing assistance benefits. (Compl. Exh. 1).[1] These termination letters contain a code and a cryptic phrase to reference the reason for FEMA's decision. (*Id*.). There is no cost or technological justification for FEMA's failure to include, in each of its termination or denial letters, a full description of the basis for its decision. (*Id*. at 15, 17; TRO Exh. 12 at 318-26 (describing FEMA's computer system); *see also* Part II.A.2., *infra* (discussing the notice burden on agencies)). FEMA's failure to provide an adequate description of the basis for its decisions prevents eligible survivors of hurricane disasters from effectively challenging FEMA's decisions to terminate or deny housing assistance benefits to which they are entitled. (TRO Exhs. 6-11).

FEMA has decided to discontinue housing assistance for thousands of evacuees as of August 31, 2006, subjecting them to eviction from their current housing. (TRO Exhs. 3, 6-11). In Houston alone, 3,528 evacuees will lose their assistance as of August 31, 2006, despite a request from the City of Houston for an extension. (TRO Exhs. 13-14). Other evacuees have already had their housing assistance discontinued after receiving insufficient notice of the reasons why FEMA terminated their assistance. (TRO Exh. 6-11). Plaintiffs are or represent affected disaster evacuees. (Compl. Exh. 1; TRO Exh. 6). Plaintiffs seek a temporary restraining order requiring FEMA to provide notices of terminations and denials of housing assistance benefits that contain a complete and intelligible explanation for the decision, adequate instructions as to how each evacuee may attempt to address the reasons for FEMA's decision, and sufficient time for evacuees to appeal.

---

[1]The factual record cited in this brief consists of four exhibits attached to Plaintiffs' original complaint, cited as "Compl. Exh. ___," and fourteen exhibits attached to this brief, cited as "TRO Exh. ___." Exhibits are authenticated in TRO Exh. 1. The brief cites page numbers as printed on lengthy exhibits, so that transcript page 434 is cited as page 434 even though only a few pages of the transcript are excerpted in the cited exhibit.

Plaintiffs also seek an order requiring FEMA to maintain its current level of housing assistance to Katrina and Rita evacuees until FEMA terminates assistance in accord with due process.

## FACTS

FEMA is the agency of the United States Government that administers disaster relief services for hurricane evacuees, including housing rental assistance payments. In 2005, pursuant to a presidential disaster declaration, FEMA determined that evacuees from Hurricanes Katrina and Rita qualify for housing rental assistance payments as essential services under Section 403 of the Stafford Act, 42 U.S.C. § 5170b, and began making payments to help meet evacuees' short-term housing needs. (Compl. Exhs. 2-4, TRO Exhs. 4, 14; www.fema.gov). Since February 2006, FEMA has attempted to transfer evacuees with continuing housing needs to its related Section 408 housing program, which provides up to 18 months of housing assistance to disaster evacuees provided that evacuees remain qualified for these benefits under the Stafford Act. (*Id.*; 42 U.S.C. § 5174(b); 44 C.F.R. Part 206). Over the past several months, FEMA has sought to terminate housing rental assistance benefits for thousands of low-income Katrina and Rita evacuees and has denied numerous applications for continued housing assistance under Section 408. (Compl. Exh. 1-4; TRO Exhs. 3-11, 13-14).

FEMA notifies evacuees of the termination or denial of rental assistance benefits by letter. (Compl. Exh. 1). FEMA's housing assistance termination or denial letters are generated by a computer program that merges each evacuee's name and address into a form letter, and also merges a code and phrase into each letter, purportedly to reflect FEMA's reason for terminating or denying housing benefits. (*Id.*; TRO Exh. 12 at 318-26). The code and phrase that FEMA merges into each letter are unnecessarily vague and unintelligible. (Compl. Exh. 1). In lieu of these codes and

3

phrases, FEMA could insert a narrative stating in plain language what the actual basis is for FEMA's decision to deny continued housing benefits.  (*Id*. at 15, 17; TRO Exhibit 12 at 318-26).

The experience of Plaintiff Joseph Douglas, whose correspondence from FEMA appears in Complaint Exhibit 1, illustrates the problem.  Mr. Douglas received a letter from FEMA dated March 24, 2006 that stated only the following to explain FEMA's decision in his case:

| CATEGORIES | DETERMINATION |
|---|---|
| Rental Assistance | IIO- Ineligible - Other |
| =============== | =========== |
| Total Grant Amount: | $0.00 |

After he appealed, FEMA sent him a letter dated May 25, 2006 stating:

| CATEGORIES | DETERMINATION |
|---|---|
| Rental Assistance | INC- Ineligible - No change on appeal, original ineligible status stands |
| =============== | =========== |
| Total Grant Amount: | $0.00 |

Then, on June 16, 2006, Mr. Douglas received two letters from FEMA—both saying he was eligible, but both awarding $0.00 in assistance:

| CATEGORIES | DETERMINATION |
|---|---|
| Rental Assistance | ENC- Eligible - No change on appeal, original eligible status stands |
| =============== | =========== |
| Total Grant Amount: | $0.00 |

After another appeal, Mr. Douglas received a letter from FEMA dated August 10, 2006:

| CATEGORIES | DETERMINATION |
|---|---|
| Rental Assistance | ENC- Eligible - No change on appeal, original eligible status stands |
| =============== | =========== |
| Total Grant Amount: | $0.00 |

4

Mr. Douglas was a live-in caretaker in New Orleans before the hurricane. After the disaster, he moved to San Antonio, Texas, and was receiving FEMA's temporary rental assistance through the city of San Antonio until his rental assistance was terminated. Mr. Douglas desperately needs rental assistance. After numerous attempts to determine the reason for the termination, he was told that the person he was taking care of in New Orleans applied for FEMA assistance as well, and two persons from the same pre-disaster household cannot receive assistance. Mr. Douglas no longer lives with the person he was caring for, and he does not know what to do to address the problem. Mr. Douglas's story is just one among many, but it demonstrates the manner in which many evacuees have become victims not only of a natural disaster but also of "Kafkaesque application procedures." *See Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 35 (D.C. Cir. 1997).

FEMA's own employees cannot and do not consistently interpret the codes used in FEMA's letters, and FEMA's use of codes instead of an actual statement of the reasons for each decision prevents disaster evacuees who qualify for housing assistance from effectively challenging FEMA's termination or denial decisions. (TRO Exhs. 5-11). FEMA's letters also fail to provide sufficient information about what steps, if any, evacuees can take to correct any deficiencies in their applications and receive benefits to which they are entitled. (Compl. Exh. 1).

FEMA will rely on letters—such as those reproduced in Exhibit 1 to the Complaint—to terminate housing assistance benefits for thousands of Hurricane Katrina and Rita evacuees on August 31, 2006, and to deny benefits to evacuees who have applied for a continuation of assistance. (TRO Exh. 3 ("Some 7,000 families in Texas who were displaced by Hurricane Katrina risk becoming homeless next week.")). On August 18, 2006, the City of Houston asked FEMA for a one-month extension of benefits for 3,641 Houston households projected to lose assistance. The City

5

explained that FEMA's own improvements to its eligibility screening practices resulted in converting 1,500 families from ineligible to eligible status within the last three weeks alone, and that additional time was needed to ensure that all evacuee families are properly considered. (TRO Exh. 13). In response, FEMA granted an extension to merely 113 households. (TRO Exh. 14).

FEMA knew that Plaintiffs would seek emergency injunctive relief if FEMA did not improve the notice provided in its letters. (TRO Exh. 5). FEMA's refusal to improve the notice in its termination letters will result in the loss of FEMA assistance for many evacuees, not because they are ineligible, but because they are uncertain of what the problem is and how to correct it. (TRO Exhs. 6-11, 13). Without FEMA housing assistance, numerous low-income evacuees will not be able to pay rent after August 31, 2006, and will be subject to eviction, causing widespread irreparable injury, including homelessness with its resulting harms to the health and welfare of thousands of evacuees and consequent fiscal burdens to state and local governments. (TRO Exhs. 7, 13).

## ARGUMENT

I.    **This Court Has Jurisdiction to Decide Plaintiffs' Constitutional Challenge To FEMA's Actions.**

FEMA has repeatedly asserted in prior litigation that the federal courts, by virtue of federal sovereign immunity, are without jurisdiction to consider constitutional challenges to its actions. The courts have uniformly rejected that argument, s*ee, e.g., Rosas v. Brock*, 826 F.2d 1004, 1008 (11th Cir. 1987); *McWaters v. FEMA*, 436 F. Supp. 2d 802, 813 (E.D. La. 2006); *Benzman v. Whitman*, 2006 WL 250527, at *25 (S.D.N.Y. 2006); *United Power Ass'n v. FEMA*, 2000 WL 33339635, at *4 (D.N.D. 2000); *Lockett v. FEMA*, 836 F.Supp. 847, 854 (S.D. Fla. 1993), and this Court should do the same.

First, Congress has explicitly waived sovereign immunity in federal court suits seeking relief other than money damages against federal agencies. *See* 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."). This waiver applies to *both* of the claims asserted in this lawsuit. "Though codified in the APA, the waiver applies to any suit, whether under the APA, § 1331, § 1361, or any other statute." Fallon, Meltzer and Shapiro, *Hart & Weschsler's The Federal Courts and the Federal System* 968-69 (5th ed. 2003) (noting that section 702's waiver, which was enacted in 1976, "has essentially mooted the question of the availablility of the defense of immunity" raised by pre-1976 Supreme Court cases); *see also* H.R. Rep. No.1656, 94th Cong., 2d Sess. 12-13, *reprinted in* 1976 U.S.C.C.A.N. 6121, 6133 (describing "the partial abolition of sovereign immunity brought about by this bill").

Second, although the section 702 waiver is inapplicable where some other statute explicitly withdraws jurisdiction, the Stafford Act is not such a statute. The Stafford Act's "no-liability" provision immunizes FEMA only from claims based on "a discretionary function or duty," 42 U.S.C. § 5148, and thus has no bearing on liability for failure to comply with the decidedly non-discretionary requirements of the U.S. Constitution. As the Eleventh Circuit has explained, although it may be unclear whether Congress may ever "prevent judicial review of unconstitutional agency action," "Congress had no such intention when it enacted [section 5148]. That statute prohibits judicial review of discretionary actions. There is no reason to believe that Congress ever intended to commit to an agency's discretion the question of whether or not to act constitutionally. The law

7

now, as when section 5148 was enacted, is that adherence to constitutional guidelines is not

discretionary; it is mandatory.  Accordingly, section 5148 does not deprive the federal courts of

jurisdiction of [the plaintiff's] constitutional claims."  *Rosas*, 826 F.2d at 1008; *accord McWaters*,

436 F. Supp. 2d at 813-814; *Benzman*, 2006 WL 250527, at \*25; *United Power Ass'n*, 2000 WL

33339635, at \*4; *Lockett*, 836 F.Supp. at 854.[2]

## II.    The Court Should Grant A Temporary Restraining Order.

Courts in this circuit weigh four factors in determining whether to grant emergency injunctive

relief: (1) the plaintiff's likelihood of success on the merits; (2) the prospective irreparable harm to

the plaintiff if relief is withheld; (3) potential harm to the other party if relief is granted; and (4) the

---

[2]Even if there were some doubt on this score, given the "strong presumption" in favor of
the availability of judicial review of executive-branch action, the doubt would have to be
resolved in favor of jurisdiction. *See Bowen v. Michigan Acad. of Family Physicians*, 476 U.S.
667, 681 (1986); *see Bartlett v. Bowen*, 816 F.2d 695, 699-708 (D.C. Cir. 1987).  That
presumption is especially strong in cases raising constitutional claims, because denying
individuals judicial review of such claims would raise a "serious constitutional question" given
the judiciary's central role in protecting constitutional rights.  *Bowen*, 476 U.S. at 681 n.12
("Congress cannot bar all remedies for enforcing federal constitutional rights."); *Campbell v.
Office of Personnel Management*, 694 F.2d 305, 307 (3d Cir. 1982) ("Congress cannot preclude
judicial review of allegedly unconstitutional agency action.").

The Supreme Court has sought to avoid that difficulty by repeatedly requiring that "where
Congress intends to preclude judicial review of constitutional claims its intent to do so must be
clear." *Demore* v. *Kim*, 538 U.S. 510, 517 (2003) (quoting *Webster* v. *Doe*, 486 U.S. 592, 603
(1988)); *see also Johnson* v. *Robison*, 415 U.S. 361, 367 (1974).  The Court requires that as long
as "an alternative interpretation of the statute" that preserves the jurisdiction of federal courts
over constitutional claims is "fairly possible," courts are "obligated" to adopt that interpretation.
*INS v. St. Cyr*, 533 U.S. 289, 300 (2001).  This obligation obtains even where the constitutionally
problematic interpretation might be "otherwise acceptable," *Edward J. DeBartolo Corp.* v.
*Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988), or "plausible,"
*Public Citizen* v. *Dep't of Justice*, 491 U.S. 440, 467 (1989), and the jurisdiction-preserving
construction will be adopted unless it is "plainly contrary" to congressional intent. *DeBartolo
Corp.*, 485 U.S. at 575.  The Stafford Act's language concerning "discretionary function[s] or
dut[ies]" falls far short of these standards.

interest of the public. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005); *Apotex, Inc. v. FDA*, 2006 WL 10301, at *7 (D.D.C. April 19, 2006). These factors "interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C. Cir. 1999). "A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). "If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* Here, all four factors weigh in favor of temporary injunctive relief.

### A.    Plaintiffs are Likely to Succeed on the Merits of Their Due Process Claim.

To establish that FEMA violates the Fifth Amendment's Due Process Clause, Plaintiffs must prove that: (1) they possess a property interest in housing assistance benefits that is protected by Due Process; and (2) FEMA's housing assistance termination and denial letters provide constitutionally insufficient notice of the reasons for FEMA's decisions and the opportunity for appeal. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("we are faced with what has become a familiar two-part inquiry: we must determine whether Logan was deprived of a protected interest, and, if so, what process was his due").

### 1.    Katrina and Rita Evacuees Have a Due Process Property Interest in FEMA Housing Assistance.

Thus far, the only court to have decided the question has concluded that "by virtue of the automatic, non-discretionary nature of FEMA's provision of assistance as found in both practice and the Stafford Act and its implementing regulations"—under which all Hurricane Katrina and Rita evacuees who meet FEMA's objective eligibility criteria are provided assistance—those evacuees

9

"have a constitutionally protected property interest in receipt of housing assistance." *McWaters v. Federal Emergency Management Agency*, 436 F.Supp.2d 802, 818 (E.D. La. 2006). Plaintiffs thus have a strong likelihood of success in demonstrating an identical property interest.

It is well-established that government benefits create constitutionally protected property interests if they are available as a matter of entitlement rather than mere expectation. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Thus, in *Goldberg v. Kelly*, 397 U.S. 254 (1970), the Court held that because people who met state eligibility standards automatically qualified for certain welfare benefits, those individuals had a property interest in those benefits. *Id.* at 262; *see also Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005) (property interest exists where rules and understandings "meaningfully channel[] official discretion by mandating a defined administrative outcome"). On the opposite end of the spectrum, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 125 S.Ct. 2796, 2803 (2005). Notably, however, a government program may create only a unilateral expectation of a government benefit at the outset, but then mature into an entitlement to that benefit as facts develop in the administration of the program. *See American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 60-61 (1999). To decide whether a benefit constitutes an entitlement, courts examine all rules or "understandings" that apply to the government's distribution of the benefit. *Roth,* 408 U.S. at 578; *Washington Legal Clinic*, 107 F.3d at 36-38.

10

*Washington Legal Clinic* is particularly instructive.  There, the D.C. Circuit addressed the analogous question of whether homeless families in the District of Columbia had an entitlement to municipally-provided shelter.  The court explained that the proper inquiry was

> whether homeless families meeting the statutory qualifications for shelter are entitled to receive it.  If so, as in *Goldberg*, eligible families would have a protected property interest in shelter.  But if not entitled to shelter because administrators would have discretion to choose among otherwise eligible families, they would have no constitutionally protected interest. . . .  If all families meeting these criteria receive[] shelter . . . applicants have a constitutionally protected entitlement to shelter.

*Id*. at 36.  The application of *Washington Legal Clinic* to this case is straightforward: The question is whether "hurricane disaster victims meeting the statutory qualifications for assistance are indeed automatically entitled to receive it" or whether "FEMA has discretion to choose whom to assist from among otherwise eligible persons."  *McWaters*, 436 F. Supp.2d at 816.  Under that standard, FEMA's lack of discretion in choosing to whom to provide housing assistance indicates that evacuees hold a constitutionally protected property interest in receiving FEMA's help if they qualify.  *See id.* at 817 ("[B]y FEMA's own admission, the agency has *no* discretion regarding provisions of Temporary Housing Assistance to eligible persons and families.") (emphasis in original).

Federal law plainly does *not* mandate automatic housing assistance for all disaster evacuees.  *See* 42 U.S.C. § 5174(b) ("The President *may* provide financial or other assistance under this section to individuals and households to respond to . . . disaster-related housing needs . . . ").  However, once the President declares a disaster, and Congress appropriates resources to meet evacuees' housing needs, and FEMA actually makes money available to meet evacuees' housing needs, then evacuees

11

are entitled to federal housing assistance if they meet FEMA's eligibility requirements.[3]  This is true

both as a matter of FEMA's understanding of the law, and of the law itself.

    FEMA administers the housing assistance provisions of the Stafford Act as an entitlement.

TRO Exh. 12 at 433:11 to 434:13 (Testimony of Donna Dannels, FEMA Acting Deputy Director of

the Recovery Division, and Chief of National Processing Service Center Operations).  FEMA's

official policy or "understanding" of the law for *Roth* purposes is, as a FEMA official recently put

it: "If they are eligible, we will pay."  *Id.* at 434:13; *see Perry v. Sindermann*, 408 U.S. 593, 599-601

(1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are

such rules or mutually explicit understandings that support his claim of entitlement to the benefit.");

*Washington Legal Clinic*, 107 F.3d at 225 (under *Roth* and *Perry*, "property rights may arise from

administrative 'rules or understandings.'") (quoting *Roth*, 408 U.S. at 577).  FEMA does not use any

subjective, discretionary factor in deciding who gets housing benefits.  *Id.* at 434:11-13.  That is why

FEMA resolves some 95% of all applications for assistance by computer without any human

interaction at all.  TRO Exh. 12 (Dannels Testimony) at 318:1 to 326:15; *McWaters*, 436 F.Supp.2d

at 818 ("[M]ost cases are *automatically* determined eligible or ineligible by the NEMIS computer

system, requiring no human intervention or approval such that eligible applicants essentially

'automatically qualify' for assistance and are then automatically paid via either computer generated

check or an electronic funds transfer.").  Thus, FEMA's actual treatment of housing assistance as an

---

[3]The eligibility requirements are listed in FEMA's publication entitled "Help After a Disaster, Applicant's Guide to the Individuals & Households Program."  *See* TRO Exh. 2 at 3-4. This Guide also explains: "If you are eligible for help, you should receive a U.S. Treasury/State check or notification of a deposit to your bank account within about ten days of the inspector's visit."  *Id.* at 15; *cf. Perry v. Sindermann*, 408 U.S. 593, 599-601 (1972) (college's official Faculty Guide was evidence relevant to demonstrating professor's property interest in tenure).

entitlement means that evacuees hold much "more than a unilateral expectation" of receiving housing if they qualify. By FEMA's own "understanding," evacuees have a legitimate claim of entitlement to housing assistance if they qualify. *See McWaters,* 436 F.Supp.2d at 818 ("FEMA admits that all persons meeting the impartial eligibility criteria are entitled to assistance, and all of them will receive it.").

FEMA administers its disaster housing assistance programs without discretion as to which eligible persons will receive benefits not only as a matter of official agency policy, but also because that is what Congress directed it to do: "[T]he distribution of supplies, the processing of applications, and other relief and assistance activities *shall* be accomplished in an equitable and impartial manner[.]" 42 U.S.C. § 5151(a). FEMA formally requires all of its employees and agents to comply with this directive, 44 C.F.R. § 206.11, and consequently acknowledges that following the declaration of a major disaster, FEMA "*shall* ... assist citizens and public officials in promptly obtaining assistance to which they are *entitled*." 44 C.F.R. § 206.42(5) (emphasis added). Congress not only requires FEMA to be impartial, but states numerous objective criteria that govern who is allowed to access housing assistance. *See* 42 U.S.C. § 5174. FEMA must create, publish and disseminate the criteria upon which it will base its eligibility decisions. 44 C.F.R. §§ 5.24-29. FEMA must also ensure an orderly and continuing means of assistance so that there are no gaps in assistance for those evacuees who are eligible for continuing assistance. 42 U.S.C. § 5121(b); 44 C.F.R. § 206.2. All of this law and policy denies FEMA employees any discretion in choosing whom to assist, creating a property interest that is protected by Due Process. *Kapps*, 404 F.3d at 113.

That 42 U.S.C. §§ 5151(a) and 5174 limit FEMA's discretion enough to create a constitutionally protected property interest is also shown by the fact that the relief sought by

Plaintiffs in this case—adequate notice of FEMA's actual reasons for refusing or terminating housing assistance—itself is necessary to determine whether FEMA has complied with these statutes. FEMA cannot comply with these statutes unless it can state an "equitable and impartial" basis for its application processing practices and for its actual assistance decisions.

### 2. FEMA Provides Constitutionally Inadequate Notice of its Reasons for Denying or Terminating Housing Assistance.

When a government acts against a constitutionally protected property interest—*i.e.*, by discontinuing or disallowing benefits— it must notify the affected individuals. The timing and the content of the required notice depend on the property interest involved. *Goldberg*, 397 U.S. at 267-68. The present motion focuses exclusively on the content of FEMA's housing assistance denial notices for Katrina and Rita evacuees, such as those reproduced in Complaint Exhibit 1.

To decide whether notice is constitutionally sufficient, courts apply the familiar balancing test announced in *Mathews v. Eldridge*, 424 U.S. 319 (1976). That test considers three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335 (citing *Goldberg* , 397 U.S. at 263-71).[4]

---

[4]Alternatively, the Court has used the following test to decide whether notice is adequate: "[W]hen notice is a person's due . . . [t]he means employed must be such as one desirous of actually informing the [beneficiary] might reasonably adopt to accomplish it." *Jones v. Flowers*, 126 S.Ct. 1708, 1715 (2006) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950)); *see Dusenbery v. United States*, 534 U.S. 161, 167-68 (2002) (describing *Mullane*'s "more straightforward test of reasonableness under the circumstances" as appropriate for "questions regarding the adequacy of the method used to give notice."). The outcome here is the same under either standard and courts rely on both the *Mathews* and *Mullane* lines of cases in

The FEMA notices at issue here are deficient under *Mathews* and its progeny.  First, the private interest in the subsistence benefits at issue fall within in the highest category recognized by the Supreme Court.  *See Mathews*, 424 U.S. at 340-41 (where benefit discontinuation would "deprive an eligible recipient of the very means by which to live while he waits" for reconsideration, as in *Goldberg*, the private interest at stake is highest; the interest is less when retroactive restoration of benefits would not necessarily deprive the beneficiary of the means to live).  "[T]he importance of the private interest at stake is ... 'high'" when the consequences of an erroneous deprivation of the right may include "eviction" which jeopardizes each family's health, access to schools for their children, and ability to hold a job.  *Kapps*, 404 F.3d at 118.  After receiving the deficient FEMA notices challenged in this lawsuit, evacuees who have lost benefits have been subject to eviction proceedings.  TRO Exhs. 5-11.  The object of the present motion is to minimize the extent to which deficient notice results in the eviction of people who in fact remain qualified for FEMA housing assistance, but who have been erroneously denied that assistance.

Under the second *Matthews* factor, courts have consistently found that unnecessarily vague notices carry significant risk of erroneous deprivations of property interests, risks that more detailed notices will diminish:

> [N]otice of benefits determinations must provide claimants with enough information to understand the reasons for the agency's action.  [This] is a basic requirement of procedural due process.  Claimants cannot know whether a challenge to an agency's action is warranted, much less formulate an effective challenge, if they are not provided with sufficient information to understand the basis for the agency's action.

----

concluding that the government must provide adequate notice of its reasons for withholding benefits.

15

*Kapps*, 404 F.3d at 123-24 (internal citation omitted); *see also Ortiz v. Hazel*, 794 F.2d 889, 892-93

(3d Cir. 1986) ("[N]otices [that] failed to explain the reason for [the agency's] action or to present

calculations justifying that action" are constitutionally deficient; adequate "notice is necessary to

protect claimants against proposed agency action resting on incorrect or misleading factual premises

or on misapplication of rules to policies on the facts of particular cases"); *Dilda v. Quern*, 612 F.2d

1055, 1057 (7th Cir. 1980) (holding notice did not meet due process requirements because, "though

it states the ultimate reason for the reduction or cancellation of benefits, the notice fails to provide

the recipient with a breakdown of income and allowable deductions" such that "recipients could

determine the accuracy of the computations"); *In re Nissan Motor Corp. Antitrust Litig*, 552 F.2d

1088, 1103-05 (5th Cir. 1977) ("To satisfy [Due Process], it is not only necessary that the notice

reach the parties affected but that it convey the required information . . . Surely the best notice

practicable under the circumstances cannot stop with . . . generalities.  It must also contain an

adequate description of the proceedings written in objective, neutral terms, that, insofar as possible,

may be understood . . . ").

On their faces, the FEMA termination letters at issue in this case do not adequately

communicate FEMA's reasoning for withholding further housing assistance.  *See* Compl. Exh. 1.

When advocates have assisted evacuees in identifying FEMA's reasoning in individual cases, they

have often been able to address FEMA's concerns and have benefits restored.  TRO Exhs. 7-11, 13.

Moreover, FEMA itself admits that its housing eligibility determination procedures need to be

improved.  TRO Exh. 4 ("This difficult transition has created some communication and program

challenges that require immediate 408 assistance processing modifications."); Complaint Exh. 4

(FEMA concedes that "various concerns" with eligibility determinations indicate that an extension

16

of 403 assistance is appropriate, and that FEMA must "apply maximum attention to efforts" including "validation of [evacuees'] eligibility status."); *see also* TRO Exh. 13 (over the past three weeks, FEMA restored eligibility to 1,500 households previously deemed ineligible). For any and all of these reasons, a more detailed statement of FEMA's reasons for termination of housing benefits would diminish the risk of erroneous deprivations of the property interests at issue in this case.

The increased administrative and fiscal burdens that would be imposed by the additional notice procedures sought by Plaintiffs consist merely of printing the reasons that FEMA actually uses to deny benefits, and printing those reasons in a letter that FEMA already sends to evacuees. FEMA's current computer system is already capable of add a block of explanatory text to the termination letters that it sends to evacuees. *See* Compl. Exh. 1 at 15 (letter mailed to Plaintiff Burton on March 28, 2006, demonstrating that FEMA's computer system is currently capable of merging a block of explanatory text into its termination letters). In any event, such administrative burdens cannot outweigh the other *Matthews* factors, even when additional computer programming, paper, and ink are required to produce adequate notice letters. *Kapps*, 403 F.3d at 124-25; *Ortiz*, 794 F.2d at 894-95 & n.4. Nor can an agency discharge its obligation to provide adequate notice merely by referring claimants to a handbook or by providing a telephone number that a claimant may call to seek information concerning the reasons for the agency's action. *Kapps*, 403 F.3d at 125-26.[5]

---

[5]Neither the availability of a telephone line nor the minimal additional information provided in the Applicant's Handbook (TRO Exh. 2) can cure FEMA's due process failures. This is so both because the information in the Handbook itself falls far short of providing an adequate explanation of the reasons for an action taken by FEMA, and because "it is common sense that a scheme which relies on beneficiaries to seek out basic information on why the agency took the action it did will result in 'only the aggressive receiv[ing] their due process right to be advised of the reasons for the proposed action.'" *Kapps*, 404 F.3d at 125-26 (quoting

In sum, Plaintiffs are likely to succeed on the merits of their due process claims because evacuees' basic subsistence interests are at stake, those interests will be better protected if FEMA explains the reasons for its decisions, and FEMA may easily modify its existing practices to provide adequate explanations for its housing assistance termination decisions.

### B.    Absent A Temporary Restraining Order, The Plaintiffs Will Suffer Irreparable Harm.

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). "Although the concept of irreparable harm does not readily lend itself to definition, the courts have developed several well known and indisputable principles to guide them in the determination of whether this requirement has been met." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). First, the injury must be imminent—that is, it must be "actual not theoretical," *id,* and cannot be "something merely feared as liable to occur at some indefinite time in the future." *Connecticut v. Massachusetts*, 292 U.S. 660, 674 (1931). Second, the injury "must be beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Both of those criteria are satisfied here.

At issue in this case is one of the most fundamental concerns for any human being—whether they and their families will have a roof over their heads. By denying or terminating housing

---

*Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974) (notice advising recipient "that he could learn the reason for the proposed reduction or termination of benefits by inquiring of his caseworker" failed to satisfy due process)). "The meek and submissive," by contrast, will "remain in the dark." *Id.; see Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir. 1980). "Such an outcome seems particularly likely where, as here, many . . . claimants face obstacles . . . which make the process of seeking further information difficult." *Kapps,* 404 F.3d at 126; s*ee, e.g., Gray Panthers v. Schweiker*, 652 F.2d 146, 168 (D.C. Cir. 1981).

assistance to the individual plaintiffs and to ACORN's members without constitutionally adequate notice, FEMA either already has or will in the imminent future force them into a nomadic existence, moving from shelter to shelter or left to manage for themselves on the streets. Every day without safe and secure housing the harm continues. The danger to the health, safety, and well-being for these plaintiffs, and the threat of homelessness, is constant.

This harm is thus certain and great, and is far from merely theoretical. Absent the temporary restraining order sought here—which would simply require FEMA to provide evacuees with an adequate explanation of the reasons for FEMA's termination or denial decisions and the steps, if any, that evacuees can take to change FEMA's decision—evacuees are left in a state of administrative limbo, uncertain of their status, uncertain of their opportunity to change their status, and uncertain of their ability to secure shelter in the immediate future. *See Reed v. Heckler*, 756 F.2d 779, 783 (10th Cir. 1985) (observing that where a person's ability to take care of basic needs such as shelter, food or medicine is on the line, "inadequate notice as to procedural rights . . . can cause irreparable harm while awaiting administrative review"); *see also Maxey v. Smith*, 823 F. Supp. 1321, 1328 (N.D. Miss. 1993) ("As a matter of law, federal courts at all levels have recognized that constitutional rights violations constitute irreparable harm."). As to those evacuees currently receiving assistance under Section 403 of the Stafford Act—a category that includes numerous ACORN members—FEMA has stated that, absent some court order to the contrary, it will cut off housing assistance starting on August 31, 2006. (Compl. Exhs. 3-4; TRO Exhs. 6, 13-14.) Having a fixed deadline by which the harm will occur absent court intervention takes the harm in this case outside the realm of being merely a theoretical event "at some indefinite time in the future." *Connecticut v. Massachusetts*, 292 U.S. at 674.

The harm at issue here is irreparable.  Courts have consistently recognized that the threat of losing housing or being homeless constitutes irreparable harm.  *See McNeil v. New York City Housing Auth.*, 719 F.Supp. 233, 254 (S.D.N.Y. 1989) ("The threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable injury, and satisfies the first prong of the test for preliminary injunctive relief."); *Mitchell v. United States Dept. Of Hous. & Urban Dev.*, 569 F. Supp. 701, 704-05 (N.D. Cal. 1983) (holding that the threatened harm to the plaintiff—eviction and a resulting inability to find housing—constituted irreparable harm justifying an injunction).  "It is axiomatic that wrongful eviction constitutes irreparable injury."  *Brown v. Artery Organization, Inc.*, 654 F.Supp. 1106, 1118 (D.D.C. 1987).  Here, as in *Brown*, many of the evacuees, if they are evicted, "will have to attempt to relocate in new areas, find new jobs, and change schools for their children in mid-year."  *Id.*   "One significant consequence may be to force these generally low-income individuals and families to spend their limited funds and to waste long periods of time every day on transportation," while others "will be forced to move into sub-standard housing in order to avoid homelessness.  And some may wind up completely homeless."  *Id.*

Even if money damages were available to these Plaintiffs, monetary relief could not adequately compensate them for the stress, indignity, and danger of being forced from their homes without a viable housing alternative.  "These plaintiffs suffer irreparably if they must live in inadequate, often health endangering housing for *any* period of time as a consequence of" FEMA's inadequate procedures.  *See Johnson v. U.S. Dept. of Ag.*, 734 F.2d 774, 789 ( 11th Cir. 1984).

20

**C.    The Threatened Injury to the Plaintiffs Outweighs Any Damage That The Injunction Could Conceivably Cause FEMA.**

The harm to Plaintiffs and ACORN members absent a TRO is homelessness and the consequent impact on their health, safety and well-being.  The temporary relief sought by Plaintiffs will require FEMA to prolong its housing program only as long as FEMA needs to provide adequate notice and an opportunity to challenge each termination or denial.  It will require FEMA to mail a full explanation of the reasons for its decision to each evacuee.  Under these circumstances, the scale tips strongly in favor of the Plaintiffs.  *See Johnson v. United States Dept. of Agric.*, 734 F.2d 774, 789 (11th Cir. 1984) ("relative harm to the government from granting a preliminary injunction pales when compared to the serious injury class members suffer when they are forced from their homes.").

**D.    The Proposed Emergency Injunction Would Serve The Public Interest.**

Courts more readily grant equitable relief that would promote the interests of large segments of the public as opposed to situations where only private interests are involved.  *California v. American Stores Co.*, 495 U.S. 271, 295 (1990) (citing *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 552 (1937)).  Because constitutional requirements are presumed to express the public interest, to the extent that Plaintiffs establish a substantial likelihood of success on the merits, the public interest factor weighs heavily in their favor.  *See O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) (holding that "issuance of a preliminary injunction would serve the public's interest in maintaining" procedures that comply with constitutional requirements); *Llewelyn v. Oakland County Prosecutor's Office*, 402 F.Supp. 1379 (E.D. Mich. 1975) ("[T]he fact that this is constitutionally required precludes this court from finding otherwise; since it may be assumed that the Constitution is the ultimate expression of the public interest."); *see*

*also Galper v. U.S. Shoe Corp.*, 815 F.Supp. 1037, 1044 (E.D. Mich. 1993) (where the harm at issue is an eviction that could disrupt the lives of many people, the public interest favors an injunction). Finally, plaintiffs respectfully ask the Court to take judicial notice that the public outcry in the aftermath of Hurricanes Katrina and Rita shows an enormous public interest in, and desire for, orderly administration of relief for vulnerable disaster victims. That interest that would be served by the proposed injunction.

## CONCLUSION

Despite the thousands of disaster evacuees who are affected, the millions of dollars at stake, and the months that FEMA had to prepare notices that comply with fifty years of consistent case law, FEMA declined to do so and instead provided notice that is as deficient as it is unjustified. FEMA must be charged with correcting the problems that it has created. Plaintiffs' proposed temporary restraining order is the appropriate means of beginning this effort.

Respectfully submitted,

*/s/ Michael T. Kirkpatrick*

_____
Michael T. Kirkpatrick
    (DC Bar No. 486293)
      mkirkpatrick@citizen.org
Deepak Gupta
    (DC Bar No. 495451)
      dgupta@citizen.org
Brian Wolfman
    (DC Bar No. 427491)
      brian@citizen.org
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC 20009
(202) 588-1000
(202) 588-7795 (fax)

Robert W. Doggett
    (TX Bar No. 05945650)
    rdoggett@trla.org
Jerome W. Wesevich
    (TX Bar No. 21193250)
    jwesevich@trla.org
Texas RioGrande Legal Aid, Inc.
4920 North Interstate Highway 35
Austin, Texas 78751
(512) 374-2725
(512) 447-3940 (fax)

Dated: August 31, 2006         *Attorneys for Plaintiffs*

23

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSOCIATION OF COMMUNITY | § | |
| ORGANIZATIONS FOR REFORM | § | |
| NOW (ACORN), *et al.* | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 06-1521-RJL |
| | § | |
| v. | § | |
| | § | |
| FEDERAL EMERGENCY MANAGEMENT | § | |
| AGENCY (FEMA), | § | |
| | § | |
| Defendant. | § | |

**CERTIFICATE OF NOTICE PURSUANT TO LOCAL RULE 65.1(a)**

I, Robert W. Doggett, one of the counsel for plaintiffs, hereby certify that I have served a copy of the complaint, the motion for a temporary restraining order and memorandum in support thereof, the exhibits, a proposed order, and this certificate on the following counsel by electronic mail:

Kristen Shedd, FEMA's counsel's office (kristen.shedd@dhs.gov)

Barbara Montoya, FEMA's counsel's office (barbara.montoya@dhs.gov)

Mark Brooks, FEMA's counsel's office (mark.brooks1@dhs.gov)

I also certify that I have consulted with counsel for the defendant, Kristen Shedd, and she indicated to me that she would forward all pleadings filed and sent by Plaintiffs to additional counsel as selected by defendant.

I also certify that defendant will be served as required by the Federal Rules of Civil Procedure.

*/s/ Robert W. Doggett*
_____
Robert W. Doggett