**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSOCIATION OF COMMUNITY | § | |
| ORGANIZATIONS FOR REFORM | § | |
| NOW (ACORN), *et al.* | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 06-1521-RJL |
| | § | |
| v. | § | |
| | § | |
| FEDERAL EMERGENCY MANAGEMENT | § | |
| AGENCY (FEMA), | § | |
| | § | |
| Defendant. | § | |

# Exhibit 12

To Plaintiffs' Motion for a Temporary Restraining Order

1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF LOUISIANA

3                     NEW ORLEANS, LOUISIANA

4

5

6   BEATRICE B. McWATERS, ET AL    *    Docket 05-CV-5488-K
                                   *
7   versus                         *    February 23, 2006, 1:15 p.m.
                                   *
8   FEMA, ET AL                    *    Afternoon Session
    * * * * * * * * * * * * * * * *

9

10
                         TRANSCRIPT OF MOTION
11           FOR PERMANENT INJUNCTION HEARD BEFORE
             THE HONORABLE STANWOOD R. DUVAL, JR.
12               UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   For the Plaintiffs:          Schulte Roth & Zabel
                                  BY:  HOWARD O. GOLDNICK, ESQ.
17                                     DANIEL L. GREENBERG, ESQ.
                                       SENA KIM-REUTER, ESQ.
                                       JEFF SABIN, ESQ.
18                                919 Third Avenue
                                  New York, New York 10022
19

20                                Lawyers' Committee for Civil
                                    Rights Under Law
21                                BY:  JOHN C. BRITTAIN, ESQ.
                                  1401 New York Avenue NW
22                                Suite 400
                                  Washington, DC 20005
23

24                                JOHN K. PIERRE, ESQ.
                                  2900 West Fork Drive
25                                Suite 200
                                  Baton Rouge, Louisiana 70827

                         DAILY COPY

88

1   <u>APPEARANCES</u>:

2

    For the Defendants:            U.S. Department of Justice
3                                  BY:  W. SCOTT SIMPSON, ESQ.
                                        ELISABETH LAYTON, ESQ.
4                                  20 Massachusetts Avenue NW
                                   Washington, DC 20001
5

6                                  Office of General Counsel
                                   BY:  BARBARA D. MONTOYA, ESQ.
7                                       JORDAN S. FRIED, ESQ.
                                        KRISTIN SHEDD, ESQ.
8                                  500 C Street SW
                                   Washington, DC 20742
9

10  Official Court Reporter:       Toni Doyle Tusa, CCR
                                   500 Poydras Street, Room B-406
11                                 New Orleans, Louisiana 70130
                                   (504) 589-7778
12

13

14

15
    Proceedings recorded by mechanical stenography, transcript
16  produced by computer.

17

18

19

20

21

22

23

24

25

                              DAILY COPY

1                          <u>I N D E X</u>

2                                                          <u>Page</u>

3

4       DONNA M. DANNELS
            Direct Examination                            90
5           Cross-Examination                             160
            Redirect Examination                          161

6       PATRICIA B. MAULDIN
            Direct Examination                            162
7           Cross-Examination                             190

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              DAILY COPY

1                    <u>**AFTERNOON SESSION**</u>

2                     **(February 23, 2006)**

3              **THE DEPUTY CLERK:**  All rise.

4                    Court is in session.  Please be seated.

5              **MR. GREENBERG:**  Your Honor, I call Donna Dannels.

6                    (WHEREUPON, **Donna M. Dannels**, having been duly sworn,

7        testified as follows.)

8              **THE DEPUTY CLERK:**  Please state your full name and

9        correct spelling for the record.

10             **THE WITNESS:**  Donna Marie Dannels, D-A-N-N-E-L-S.

11                    **DIRECT EXAMINATION**

12       BY MR. GREENBERG:

13       **Q.**   Good afternoon, Ms. Dannels.  I'm going to start by saying

14       to you what I said to Mr. Hirsch when he was here, which is I

15       am going to be examining you closely on behalf of the class of

16       people that we represent.  I do know that there are many, many

17       dedicated people at FEMA who have done a great deal during this

18       storm and this crisis.  It's my obligation for us to focus on

19       those people who have not yet gotten what they need, but this

20       is not meant personally to you.  Having said that, could I ask

21       you your background, what you do for FEMA?

22       **A.**   I am the acting deputy director of the recovery division,

23       which is responsible overall for the program that we are

24       talking about here.  On a nonacting permanent basis, I am chief

25       of the national processing service center operations.

1    **Q.**    Could you tell us what that last part means?

2    **A.**    Yes.  The NPSCs, as the acronym, are fixed site customer

3    contact centers where people can call and register, where we

4    take care of their home inspections, we process their claims,

5    and respond to any follow-up inquiries they have.

6    **Q.**    So I take it that you're a pretty high official within

7    FEMA?

8    **A.**    I guess that's based on opinion, but within the recovery

9    division I am.

10   **Q.**    I mean it more as having responsibility for things,

11   carrying out policy, even being involved in making policy; is

12   that right?

13   **A.**    Yes.

14   **Q.**    You have been a declarant in papers in this case?

15   **A.**    The last two, I believe.

16   **Q.**    You've attended court proceedings in this case before?

17   **A.**    In January.

18   **Q.**    So you're relatively familiar with these proceedings.  Are

19   you familiar with the administrative record that we received in

20   response to the decision of the magistrate?

21   **A.**    I would say I'm familiar with it, but not in detail.  It

22   is quite voluminous.

23   **Q.**    It was quite voluminous.  Do you have any idea how many

24   pages were involved, more or less?

25   **A.**    I don't, but it was several four-inch ring binders I do

```
 1                    UNITED STATES DISTRICT COURT.
                     EASTERN DISTRICT OF LOUISIANA
 2   ***************************************************************
     BEATRICE B. McWATERS, ET AL
 3
                                   Docket No. 05-CV-5488
 4   v.                            New Orleans, Louisiana
                                   Friday, February 24, 2006
 5
     FEMA, ET AL
 6   ***************************************************************
          TRANSCRIPT OF MOTION FOR PERMANENT INJUNCTION PROCEEDINGS
 7          HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
                     UNITED STATES DISTRICT JUDGE
 8                              (DAY II)


 9
     APPEARANCES:
10
     FOR THE PLAINTIFF:           SCHULTE ROTH & ZABEL
11                                BY:  HOWARD O. GODNICK, ESQ.
                                       DANIEL L. GREENBERG, ESQ.
12                                     SENA KIM-REUTER, ESQ.
                                       JEFF SABIN, ESQ.
13                                919 Third Avenue
                                  New York, New York 10022
14

15
                                  LAWYERS' COMMITTEE FOR CIVIL
16                                RIGHTS UNDER LAW
                                  BY:  JOHN C. BRITTAIN, ESQ.
17                                1401 New York Avenue, NW
                                  Suite 400
18                                Washington, D.C. 20005-2124

19

20                                JOHN K. PIERRE
                                  2900 West Fork Drive, Suite 200
21                                Baton, Rouge, Louisiana 70827

22

23
     FOR THE DEFENDANTS:          U.S. DEPARTMENT OF JUSTICE
24                                BY:  W. SCOTT SIMPSON, ESQ.
                                       ELISABETH LAYTON, ESQ.
25                                20 Massachusetts Avenue, NW
                                  Washington, D.C. 20001
```

DAILY COPY

1    <u>APPEARANCES CONTINUED</u>:

2

3    FOR FEDERAL EMERGENCY
     MANAGEMENT AGENCY:                  OFFICE OF GENERAL COUNSEL
4                                        BY:  BARBARA D. MONTOYA, ESQ.
                                              JORDAN S. FRIED, ESQ.
5                                             KRISTIN SHEDD, ESQ.
                                         500 C Street SW
6                                        Washington, D.C. 20742

7

8

9    Official Court Reporter:          Karen A. Ibos, CCR, RPR
                                        500 Poydras Street, Room HB-406
10                                      New Orleans, Louisiana 70130
                                        (504) 589-7776
11

12
          Proceedings recorded by mechanical stenography, transcript
13   produced by computer.

14

15

16

17

18

19

20

21

22

23

24

25

DAILY COPY

1

2                                  I N D E X

3                                                            PAGE/LINE:

4    WITNESSES FOR PLAINTIFFS:
     CAMERON L. EASTON
5
         Direct Examination by Mr. Greenberg                5/19
6        Cross-Examination by Ms. Layton                    17/5

7    PAMELA W. BRADIX:

8        Direct Examination by Ms. Kim-Reuter               27/8
         Cross-Examination by Ms. Layton                    44/3
9
     DOROTHY CRAFT
10
         Direct Examination by Ms. Kim-Reuter               53/9
11       Cross-Examination by Ms. Layton                    74/14
         Redirect Examination by Mr. Kim-Reuter             82/18
12
     MARYANN M. RUSS
13
         Direct Examination by Mr. Greenberg                84/18
14       Cross-Examination by Mr. Simpson                   90/15

15

16   WITNESSES FOR DEFENDANT:

17   DONNA M. DANNELS

18       Direct Examination by Mr. Simpson                  98/19

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                 (FRIDAY, FEBRUARY 24, 2006)

 3              (HEARING FOR PERMANENT INJUNCTION)

 4                          (DAY II)

 5

 6           MR. GODNICK:  Can I just say, you were not kidding about

 7   the parade, I think it went right through my room.

 8           THE COURT:  Well, I hope you caught something, not a cold,

 9   but some of the valuable items that are thrown.

10           MR. GREENBERG:  Good morning, your Honor.

11           THE COURT:  Good morning.

12           MS. LAYTON:  If I may.  Your Honor, just to renew our

13   continuing objection, we understand plaintiffs are calling a witness

14   whose a named plaintiff and we just renew our continuing objection

15   about going beyond the administrative record.

16           THE COURT:  That objection is preserved and the court is

17   going to allow you to call the witness.

18           MR. GREENBERG:  Thank you.  I call Cameron Eaton.

19           THE COURT:  Sheena, have you administered the oath?

20           THE DEPUTY CLERK:  Not yet, I think they wanted to talk

21   about two exhibit exhibits.

22           MR. GODNICK:  Apparently two exhibits that we used weren't

23   offered, your Honor.  Mr. Greenberg will offer them at this time.

24           MR. GREENBERG:  One is the SBA loan application

25   Plaintiff's 4, it was marked as Plaintiff's 4 and Plaintiffs 9, and
```

1  Q.  Again, aside from Katrina, what is usually the timing, if you

2  know, particularly if it's an EFT, electronic funds transfer, what's

3  the timing of the person getting the EFT and finding out the purpose

4  of the deposit?

5  A.  Almost simultaneously.  The time that the NEMIS --

6        MR. GODNICK:  Your Honor, if I could ask for a time frame.

7  This is pre-Katrina, correct?

8        MR. SIMPSON:  Correct.

9        THE WITNESS:  At the time that the NEMIS system makes the

10 award determination, it generates a letter that immediately gets

11 mailed to the person and then it also sends the message to another

12 part of the organization for payment, they have to certify that.

13        Again, outside of the NEMIS system and outside of the

14 program office other people who are licensed to certify payments

15 certify it and then that payment is made.  So they happen pretty

16 much simultaneously.  Checks tend to arrive a little later than the

17 letters.

18 BY MR. SIMPSON:

19 Q.  I wanted to ask you a little bit more about NEMIS.  Can you tell

20 me for how long FEMA has been using that system?

21 A.  About ten years, I believe it came on line in '96.

22 Q.  Do you know anything, Ms. Dannels, about the capacity, the use

23 capacity for which NEMIS was designed?

24 A.  When it was designed in 1996 it was designed at a maximum to

25 take about 10,000 registrations a day and to have 300 users on it at

DAILY COPY                                                    319

1    a time.

2            If I can give context in Hurricane Katrina and Rita, we

3    were talking over 100,000 registrations a day and we had 3,000 users

4    on the system.

5            A large disaster when it was designed in '96, a very large

6    disaster was considered 50,000 registrations.  And right now we are

7    at I think about 3.2 or 3.3 million registrations in six months.

8    Q.  As a result of the circumstances that you described, the

9    additional use of NEMIS as a result of Hurricane Katrina, did the

10   agency experience any problems with NEMIS?

11   A.  Considerable.

12   Q.  Can you describe those?

13   A.  System slowness.  If there were too many user then to go from

14   one screen to another could take five minutes.  It would lock up,

15   the system would just simply lock up like in the processing centers

16   then IT would have to go around and shut every single computer down

17   and reboot it.  They kept issuing what they call patches, I liken

18   them to band aids, where they would have to take the system down for

19   two or three days to issue this patch to try to increase the

20   capacity and stabilize the system.  There were a variety of issues

21   just because of the load that was being put on the system that it

22   was not designed to handle.

23           Additionally, the system being designed ten years ago is

24   somewhat antiquated in its software now and it doesn't have a great

25   deal of flexibility built into it for us to be able to make a lot of

DAILY COPY

1    processing changes.  Again, because of how intricate the business

2    rules are, it's very difficult to decide that we are going to do

3    something entirely different than how the system was designed to do.

4    We just don't have the ability to go in and make those kinds of

5    adjustments.

6    Q.  Other than the patches that you mentioned, is FEMA doing

7    anything or preparing to do anything to try to resolve those

8    problems with NEMIS?

9    A.  Yes.  It has added considerable capacity, it has bought

10   different kinds of software.  As an example, we had a tremendous

11   problem with indexing documents that applicants would send in to us.

12   How it works is they mail them all to one location where they are

13   scanned in and then someone actually once the document is scanned

14   into NEMIS the person, someone then takes it and places it in the

15   applicant's file.

16        Let's say a request for recertification or their self

17   declaration form that they didn't use the funds for rent because

18   they never got the letter from us.  We were, as you mentioned in

19   your opening statement, working 24/7.  The problem was the indexing,

20   the documents wouldn't go where they were supposed to, they wouldn't

21   show up when they were indexed there.  The indexing would be very,

22   very slow.  IT would contact us and tell us to take users off the

23   symptom, they were afraid the system was going to crash.  We would

24   have indexers in working just overnight when we felt there was less

25   load on the system.

DAILY COPY

1          So we had a considerable backlog I would say for several

2     weeks of trying to index people's information into their files so

3     that we could work those cases.  And the agency pulled in the, at

4     the very top levels of the companies who owned the, who were under

5     contract with the different softwares, they called the executives of

6     those companies to have them have their best troubleshooters on site

7     with us to try to figure this out and fix those issues.

8          And it again comes back to capacity.  We have a system

9     that just simply wasn't designed to do what we were asking it to do.

10          As far as a long-term fix, the agency is, does have a plan

11     for sort of designing an entirely new system.  That will not be done

12     by next hurricane season, but they do assure me that the system is

13     more stable now than it was before, although we still are

14     experiencing delays and slowness.

15   Q.  Did those problems with NEMIS have any effect on FEMA's

16     processing of applications from victims of Hurricane Katrina?

17   A.  Tremendous impact.

18   Q.  Can you just describe those a little bit, please.

19   A.  It created a great deal of the pending category.  I think we've

20     heard from people even here who sent their documents in and were

21     told by agents on the phone to send them in again because they

22     couldn't see them in the file.  And that could very well be the case

23     that we did have them and we were just unable to have them indexed

24     into the file.

25          Something I should explain is the way that the processing

1    system works is it's virtual, so that while, in the system, so that

2    anyone in any of our locations can pull up anything in that file and

3    work the case.  So that if someone calls the 800 number and gets one

4    of our agents located in Texas, that person can, that Texas agent

5    can still pull that file up and talk to the person about that case

6    because it's virtual.

7         When we had problems with indexing, obviously they weren't

8    there and so then the help line agent would say, well, I don't see

9    it here so send it in again.  And there just were technology issues

10   that we could not get around anymore easily than I could get up and

11   walk through a solid wall.  They just were not immediate solutions

12   for them.

13        MR. SIMPSON:  Your Honor, if I could have just a moment to

14   gather the documents here.

15        THE COURT:  You may.

16        MR. SIMPSON:  Your Honor, I do like to use the ELMO some,

17   but with some of the documents I am going to be using if I could

18   approach the witness and hand it to her I think it would be good if

19   she could flip through it herself.

20        THE COURT:  Since we don't have a jury, that's okay.  But

21   if we had a jury you would have to get really good at using the

22   ELMO.

23        MR. GODNICK:  May I confer with counsel for a second?

24        THE COURT:  I assume I am going to have it a copy of it as

25   well?

DAILY COPY                                                       323

```
 1        (WHEREUPON, MR. GODNICK AND MR. SIMPSON HAD A DISCUSSION OFF

 2   THE RECORD.)

 3        (BACK ON THE RECORD.)

 4            MR. GODNICK:  Thank you, your Honor.

 5            MR. SIMPSON:  Your Honor, what I have shown to the witness

 6   I can represent is what I passed up to the bench is a copy of one of

 7   the individuals who plaintiffs have had come testify today,

 8   Ms. Cameron Eaton.  This is a copy of her FEMA application file, and

 9   we have provided these to plaintiff's counsel.  Why don't I ask a

10   few questions of Ms. Dannels first.

11   BY MR. SIMPSON:

12   Q.  Ms. Dannels, I've handed you the document I just described.

13   Does this appear to be a FEMA application file?

14   A.  It does.

15   Q.  Can you turn to the fourth page.  At the top of the page it says

16   Federal Emergency Management Agency, MR-01 Comments Report.

17   A.  Yes.

18   Q.  And if you could tell me what that is, and the next several

19   pages are in that same tabular format, could you tell me what they

20   are, please?

21   A.  This is comments field when an applicant calls in and talks to

22   one of the agents on the phone, they record notes of that

23   conversation in those fields.  So this shows the dates -- I'm sorry,

24   it also shows the inspector comments that were made.  So it's event

25   dates, it's called an event log, and just summarizes all of the
```

1   various things that have occurred with that person's case.

2   Q.  Now, people in which components of FEMA can enter information

3   into these logs?

4   A.  In the processing centers.

5   Q.  In the NPSC's?

6   A.  Yes.

7   Q.  Anywhere else?

8   A.  On a very, very limited basis in the disaster recovery centers,

9   the DRC's, and those are generally only people who actually work for

10  us in the NPSC or who the NPSC has trained.

11  Q.  What's the purpose of having FEMA employees enter these contacts

12  into the files, the applicant's files?

13  A.  To have a record and so that other agents when the person calls

14  in can look back and see previous conversations and what has

15  occurred.  I'm sorry.  And also so that a case worker, not someone

16  talking to them on the phone, but a case worker processing the case

17  would make use of some of these fields as well.

18  Q.  When an applicant calls, are they routed, if they've called --

19  let's say the applicant calls for the second time.  Is the caller

20  routed to the same person that they talked to the first time?

21  A.  No, they aren't.  The only routing that we do is based on a

22  skill level and it depends on what the person presses when they call

23  the 800 number what they press; if they press the number to talk to

24  help line agent, then it goes to someone who is skilled in help

25  line.  But we had somewhere at the height of all of our phone

1    agency, we had 13,000 people on the phones.  And again we are

2    covering 24/7 so it would be difficult to be able to match one

3    person, one applicant up to one phone agent, it just would not be

4    possible.

5    Q.  So when a caller calls them a second time and the first FEMA

6    representative who talked to the applicant the first time the

7    applicant called and then the applicant calls again a second time,

8    is the person who takes the second call able to see any notes that

9    the first FEMA representative has put in the file?

10   A.  Yes.

11        MR. SIMPSON:  Your Honor, I would like to move to

12   introduce this as an exhibit, I think we have no objection.

13        MR. GODNICK:  No objection, your Honor.

14        THE COURT:  Let it be admitted.

15        THE DEPUTY CLERK:  What do you want to call it?

16        MR. SIMPSON:  Defendant's 1.

17   BY MR. SIMPSON:

18   Q.  I want to ask you a little more about the organizational

19   structure of FEMA.  Ms. Dannels, we already touched on this a bit.

20   You already told me about the NPSC'S.  Can you tell me, I hope you

21   haven't answered this already, can you tell me where applications

22   for assistance are actually processed?

23   A.  In the ether.

24   Q.  Can you explain that?

25   A.  It's virtual.  It's in a computer system.  I won't tell you

1   where that computer system is physically housed, the servers, but

2   it's processed virtually.

3   Q.  You mentioned that sometimes when a case cannot be auto

4   determined it has to go to someone to work on it manually, did you

5   use the term case worker?

6   A.  Yes.

7   Q.  Where are the case workers located?

8   A.  They are located in the four fixed site NPSC's, they are located

9   in Texas, Puerto Rico, Maryland and Virginia.

10  Q.  In relation to the potential for an application to be kicked out

11  of auto determination and require manual processing, I think you

12  told us earlier that approximately 95% of applications, and I can't

13  remember exact terminology you used, in some disasters 95% of

14  applications are auto determined; is that right?

15  A.  That's correct.

16  Q.  Did that differ in relation to Katrina?

17  A.  Yes.  In fact, I am not sure that we could actually do, it would

18  be an apples and oranges kind of comparison because we have

19  manipulated the system so much with this disaster to try to make it

20  do things.  But clearly this was not anything like our typical

21  disaster where many, many, many, if not most applications could not

22  be auto determined.

23  Q.  Does it create a greater strain on FEMA's workload when an

24  application cannot be auto determined?

25  A.  Absolutely.  The number of skilled workers that we have trained

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3             NEW ORLEANS, LOUISIANA

4

5

6  BEATRICE B. McWATERS, ET AL    *    Docket 05-CV-5488-K
                                  *
7  versus                         *    February 24, 2006, 1:15 p.m.
                                  *
8  FEMA, ET AL                    *    Afternoon Session
   * * * * * * * * * * * * * * * *

9

10
                    TRANSCRIPT OF MOTION
11       FOR PERMANENT INJUNCTION HEARD BEFORE
         THE HONORABLE STANWOOD R. DUVAL, JR.
12            UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

16  For the Plaintiffs:          Schulte Roth & Zabel
                                 BY:  HOWARD O. GODNICK, ESQ.
17                                    DANIEL L. GREENBERG, ESQ.
                                      SENA KIM-REUTER, ESQ.
                                      JEFF SABIN, ESQ.
18                               919 Third Avenue
                                 New York, New York 10022

19

20                               Lawyers' Committee for Civil
                                  Rights Under Law
21                               BY:  JOHN C. BRITTAIN, ESQ.
                                 1401 New York Avenue NW
22                               Suite 400
                                 Washington, DC 20005

23

24                               JOHN K. PIERRE, ESQ.
                                 2900 West Fork Drive
25                               Suite 200
                                 Baton Rouge, Louisiana 70827

                        DAILY COPY

338

 1   <u>APPEARANCES</u>:

 2

     For the Defendants:          U.S. Department of Justice
 3                                BY:  W. SCOTT SIMPSON, ESQ.
                                       ELISABETH LAYTON, ESQ.
 4                                20 Massachusetts Avenue NW
                                  Washington, DC 20001
 5

 6                                Office of General Counsel
                                  BY:  BARBARA D. MONTOYA, ESQ.
 7                                     JORDAN S. FRIED, ESQ.
                                       KRISTIN SHEDD, ESQ.
 8                                500 C Street SW
                                  Washington, DC 20742
 9

10   Official Court Reporter:     Toni Doyle Tusa, CCR
                                  500 Poydras Street, Room B-406
11                                New Orleans, Louisiana 70130
                                  (504) 589-7778
12

13

14

15
     Proceedings recorded by mechanical stenography, transcript
16   produced by computer.

17

18

19

20

21

22

23

24

25

                              DAILY COPY

339

1                              <u>I N D E X</u>

2                                                          <u>Page</u>

3
DONNA M. DANNELS
4
        Direct Examination                        340
5
        Cross-Examination                         430
6
        Redirect Examination                      476
7
        Recross-Examination                       483
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                            DAILY COPY

1                      **AFTERNOON SESSION**

2                      **(February 24, 2006)**

3          **THE DEPUTY CLERK:**  All rise.

4              Court is in session.  Please be seated.

5          **THE COURT:**  All right, sir.

6          **MR. SIMPSON:**  Thank you, Your Honor.

7          **THE COURT:**  Hopefully you sampled some of the king

8    cake in New Orleans.  Unfortunately, I try to keep away from

9    it.  People send it to us.  There are some really good king

10   cakes.

11             (WHEREUPON, **Donna M. Dannels**, having been duly sworn,

12   testified as follows.)

13                      **DIRECT EXAMINATION**

14   BY MR. SIMPSON:

15   **Q.**   I think we were talking about FEMA's departure from HUD's

16   rental rates.  You told us that in Louisiana you have gone to

17   120 percent of HUD's October rates?

18   **A.**   Yes.

19   **Q.**   Is FEMA permitted to depart from HUD's rates even more

20   than that, even more than 120 percent?

21   **A.**   Yes.

22             **THE COURT:**  Just a quick question while Mr. Simpson

23   is on this.  The regulations don't mention HUD, do they?

24             **THE WITNESS:**  No, they don't.

25             **THE COURT:**  It's simply a decision made by FEMA to

                            DAILY COPY

1  **Q.**   Do you know if, in fact, that specific one played on the

2  radio?

3  **A.**   No.

4  **Q.**   Do you know if that specific PSA, if it played on the

5  radio, what regions of the country it played in?

6  **A.**   Not all of the regions.  In the impacted regions.

7  **Q.**   So we have no idea, we have no evidence that, in fact,

8  that PSA was heard by anyone other than the folks who have been

9  in this courtroom today and perhaps the woman who made the

10  recording and the technicians; isn't that right?

11  **A.**   No, I don't believe.  I think the record would show where

12  it was played.

13  **Q.**   But you don't know?

14  **A.**   No, I personally don't know.  In fact, that's not part of

15  my job to know that.

16  **Q.**   Thank you.  Earlier you testified what the criteria was

17  for temporary housing assistance, 408 assistance.  I don't mean

18  to characterize your testimony, but generally let me see if I

19  get it right.  You had to have lived in an area that was

20  declared a disaster; is that right?

21  **A.**   Uh-huh.

22  **Q.**   Your home needed to have been rendered uninhabitable or

23  inaccessible; is that right?

24  **A.**   For rental assistance?

25  **Q.**   For rental assistance.

1  A.    Yes.

2  Q.    I think another criteria is there is no insurance to cover

3  you, correct?  You don't have any sort of living expense

4  insurance; is that right?

5  A.    That's correct.

6  Q.    Are those the criteria as you understood it?

7  A.    It has to be your primary residence.

8  Q.    Anything else?

9  A.    Could be.  Those are the ones I remember off the top of my

10 head.

11 Q.    Best of your understanding, if you satisfied every one of

12 those criteria, were you entitled to temporary housing

13 assistance?

14 A.    Are you talking about rental assistance?

15 Q.    Yes.

16 A.    Yes.  There may be others in the regulation that I'm not

17 recalling.

18 Q.    Let's assume there were.  That's my understanding of what

19 exists, what we have just articulated.  If you met those

20 criteria and any others that may be in the regulation, to give

21 it the benefit of the doubt, you had an entitlement to that

22 temporary housing assistance, correct?

23 A.    If you met that criteria and we, in fact, could confirm

24 and verify it, you would be eligible for that assistance.

25 Q.    Not only eligible, but you're entitled to it, correct?  If

434

1  you're eligible, you're going to get it?

2  A.   You're eligible is what our regulations say.

3  Q.   You are at FEMA.  If you're eligible, from your

4  experience, are you going to get it?

5  A.   Yes.

6  Q.   So, therefore, you're entitled to it, correct?

7          MR. SIMPSON:  Asked and answered, argumentative.

8          THE COURT:  I guess the question is:  Do you have the

9  discretion not to pay?

10  BY MR. GODNICK:

11  Q.   Do you have the discretion not to pay?  If someone meets

12  every one of those criteria --

13  A.   No.  If they are eligible, we will pay.

14  Q.   You talked earlier about budget cuts within FEMA and,

15  again, not to characterize your testimony, but just to

16  reference it.  These were budget cuts that impacted FEMA over

17  what period of time?

18  A.   I will say from my memory -- this is 2006 -- past three

19  years, anyway.

20  Q.   At least from your perspective, you understood that those

21  budget cuts were having an impact on FEMA, correct?

22  A.   Oh, clearly.

23  Q.   And FEMA's readiness, correct?

24  A.   Clearly.

25  Q.   FEMA's ability to update systems, correct?