UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF COMMUNITY | ) | |
| ORGANIZATIONS FOR REFORM | ) | |
| NOW (ACORN), et al., | ) | |
| | ) | |
|        Plaintiffs, | ) | |
|        v. | ) | Civil Action No. 06-1521-RJL |
| | ) | |
| FEDERAL EMERGENCY | ) | |
| MANAGEMENT AGENCY, | ) | |
| | ) | |
|        Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF**

## TABLE OF CONTENTS

**PAGE**

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    The Stafford Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Section 403 Public Assistance Program . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The Section 408 Individuals and Households Program . . . . . . . . . . . . . . . . . . . 5

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    Hurricane Katrina . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   The Section 403 Apartment Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  The Transition from Section 403 to Section 408. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.   FEMA's Notification and Appeals Process and Outreach Efforts for Applicants
      Determined Ineligible for Section 408 Assistance . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Section 408 Eligibility Determination Notices and Appeals Process  . . . . . . . . 10

    B.    Subsequent Outreach Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    Mr. Kenneth Leach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.    Mr. Joseph Douglas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.    Ms. Doris Mitchell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D.    Ms. Latonya Burton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.    The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims  . . . . . . . . . . . 17

A.    Plaintiffs' Claims are Barred by Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . 17

B.    ACORN Lacks Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i.    Plaintiff ACORN Lacks Standing to Sue on Behalf of its Members . . . . 21

ii.    ACORN Also Lacks Standing to Sue On Its Own Behalf . . . . . . . . . . . 24

a.    ACORN Has Alleged No Legally Cognizable Injury to
Its Ability to Function as an Organization . . . . . . . . . . . . . . . . . 24

b.    ACORN's Organizational Interests Are Not Within the
Zone of Interests Protected by the Stafford Act . . . . . . . . . . . . . 26

II.    Plaintiffs Would Not Be Entitled to Preliminary Injunctive Relief Even If
Their Claims Were Within The Jurisdiction Of The Court . . . . . . . . . . . . . . . . . . . . . 27

A.    Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success
on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.    Plaintiffs Have Not Satisfied The Irreparable Harm Requirement . . . . . . . . . . 36

C.    The Preliminary Relief Requested Here Would Harm Defendant
And The Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## STATEMENT OF THE CASE

Plaintiffs – the four individual Hurricane Katrina evacuees identified infra and one

nonprofit entity, the Association of Community Organizations for Reform Now ("ACORN") –

filed this action on August 29, 2006.  Plaintiffs' complaint alleges that the Federal Emergency

Management Agency ("FEMA") violated plaintiffs' due process rights by failing to provide

specific, comprehensive explanations for why it determined that plaintiffs were ineligible for

housing assistance under Section 408 of the Stafford Act, 42 U.S.C. § 5174 et seq., and failing to

provide adequate notice of plaintiffs' right to appeal such determinations.  Compl. ¶ 5, 26-53.

Plaintiff ACORN alleges that it has been injured "because [it] has spent, and will continue to

spend, its limited resources to help evacuees overcome the notice barriers placed before them by

FEMA unless the relief sought in this lawsuit is granted."  Id. ¶ 4.  Plaintiffs assert claims under

the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act, and seek

declaratory and injunctive relief requiring defendant FEMA to, inter alia, provide a detailed,

written basis for any decision to terminate or deny housing assistance to any person.

The complaint also alleges that "[o]n August 31, 2006, thousands of families [would]

lose federal housing assistance and be subject to eviction under state law unless FEMA's illegal

housing assistance termination procedures are corrected."  Id. ¶ 24.  On August 31, ostensibly to

address this concern, plaintiffs filed a Motion for Temporary Restraining Order ("Pls.' Mot. for

T.R.O.") [Docket No. 3], seeking, on an emergency basis, relief similar to that sought in their

complaint, as well as housing assistance to evacuees of Hurricanes Katrina and Rita "until such

time as defendant provides such notices and opportunity to appeal."  Pls.' Mot. for T.R.O.,

1

[Proposed] Temporary Restraining Order.[1]

Plaintiffs' assertions notwithstanding, this case presents a straightforward question for the Court's consideration: whether FEMA provided plaintiffs the procedural due process safeguards to which they are entitled when it notified them that they were not eligible for temporary housing assistance under Section 408.  The essential facts of the case are equally straightforward: plaintiffs, who were evacuated from New Orleans in the aftermath of Hurricane Katrina, received free emergency shelter provided by FEMA under Section 403 of the Stafford Act, 42 U.S.C. §5170(b) et seq., from September 2005 through much of this year.  Ultimately, FEMA determined that it could no longer continue to fund Section 403 emergency shelter for Hurricane Katrina evacuees, and began to transition all evacuees who met the eligibility requirements of Section 408 into the longer-term temporary housing provided under that program.

The procedural safeguards employed by FEMA during this transition ensured that all evacuees, including plaintiffs, were afforded due process.  First, FEMA provided each plaintiff a prompt, concise written notification of their eligibility status under Section 408 and the basis for that determination.  Second, FEMA provided each plaintiff the opportunity to appeal an adverse determination; the eligibility notification letters identified the substantive requirements for submitting appeals as well as all necessary procedural information.  Finally, FEMA employed additional outreach efforts to ensure that Section 408 applicants were afforded the maximum opportunity to satisfy the eligibility requirements for that program; in Texas alone, these efforts

---

[1]  In a telephone hearing on the evening of August 31, 2006, the Court denied plaintiffs' Motion for Temporary Restraining Order, converted it into a motion for preliminary injunctive relief, and set oral argument on the motion for September 15, 2006.

reduced the number of ineligible evacuee households by more than 80 percent over a six-month period.  Thus, under Matthews v. Eldridge, plaintiffs were afforded all of the procedural protections to which they were entitled.

This conclusion is determinative of plaintiffs' request for preliminary injunctive relief. Because plaintiffs cannot establish a likelihood of success on the merits on the sole claim before the Court here, they are not entitled to the mandatory injunction they seek, an order requiring FEMA to overhaul its Section 408 notification procedures and extend the provision of emergency shelter assistance to an indeterminate number of evacuees for an indeterminate period.  Further, plaintiffs cannot satisfy the other requisite elements of preliminary injunctive relief, a showing of imminent, irreparable harm, and a showing that the injunction would serve the public interest and would not harm the government's interest.

Further, the Court lacks subject matter jurisdiction over all or some of the claims plaintiffs assert.  First, all of plaintiffs' claims are barred by sovereign immunity, as the actions they  challenge constitute discretionary agency functions based on public policy-based exercises of reasonable and experienced judgment.  In addition, the claims asserted by plaintiff ACORN are outside the Court's subject matter jurisdiction because ACORN possesses neither direct nor representative standing to assert such claims.

For each of those reasons, and as discussed herein, the Courts should deny plaintiffs' request for preliminary injunctive relief.

3

## STATUTORY AND REGULATORY BACKGROUND

I.    THE STAFFORD ACT

The mission of FEMA, as set forth in the Robert T. Stafford Disaster Relief and

Emergency Assistance Act ("Stafford Act") and corresponding regulations, is to "assist the

efforts of the . . . States in expediting the rendering of aid, assistance, and emergency services,

and the reconstruction and rehabilitation of devastated areas" affected by disasters.  42 U.S.C.

§ 5121; see Pub. L. No. 100-707, 102 Stat. 4689 (1988).  In this case, the two relevant provisions

of the Stafford Act are 42 U.S.C. § 5170(b) ("Section 403") and 42 U.S.C. § 5174 ("Section

408").  Sections 403 and 408 provide different types of assistance; the former is for emergency

shelter, while the latter provides longer-term rent assistance.  Receipt of Section 403 assistance is

neither a prerequisite for, nor a guarantee of, receipt of Section 408 assistance.

A.    The Section 403 Public Assistance Program.

Section 403 of the Stafford Act authorizes the President, through FEMA, to provide

short-term "assistance essential to meeting immediate threats to life and property resulting from a

major disaster."  Id. § 5170b(a).  Following a major disaster declaration, assistance authorized

under the Section 403 Public Assistance ("PA") Program may be provided directly to States,

local governments, and certain private non-profit facilities that provide essential services of a

governmental nature, including emergency shelter.  See 42 U.S.C. §§ 5170b, 5170b(a); see also

42 U.S.C. § 5192.  FEMA may provide Section 403 assistance through grants, or it may perform

the work directly through direct Federal assistance.  See 42 U.S.C. §5170a, 5170b, and 5192.

The emergency shelter for Hurricane Katrina victims that has been provided under the Section

403 Public Assistance program has been provided by grant assistance, with grants issued to

4

affected cities and states.  Declaration of Donna M. Dannels ("Dannels Decl.") ¶ 60.

> **B.    The Section 408 Individuals and Households Program.**

Under Section 408 of the Stafford Act, the President, through FEMA, may provide temporary "[h]ousing assistance" to "individuals and households who are displaced from their predisaster primary residences or whose predisaster primary residences are rendered uninhabit-able as a result of damage caused by a major disaster." Id. § 5174(b)(1).  Section 408 permits two types of temporary housing assistance — "[f]inancial assistance" and "[d]irect assistance" — the first being funds "to rent alternate housing accommodations," and the second being "temporary housing units," which may be provided "because of a lack of available housing resources" for rental.  Id. § 5174(c)(1).

Unlike Section 403, individuals must apply for assistance under Section 408.  To qualify for temporary housing assistance under Section 408, applicants must demonstrate, inter alia, that their primary residences have been rendered uninhabitable by a major disaster and that they are unable to meet their housing needs through other sources, such as insurance.  42 U.S.C. § 5174(b); 44 C.F.R. § 206.110(h); 44 C.F.R. § 206.113(b)(1); 44 C.F.R. §206.113(b)(6).

The Stafford Act also prohibits "duplication of benefits."  42 U.S.C. § 5155. To that end, FEMA is statutorily obligated to ensure that no one receives assistance for any part of a loss that is covered by "any other source." Id.  Thus, for example, FEMA regulations require an applicant for Section 408 assistance to apply for insurance proceeds to cover any insured loss, and the regulations state that assistance "for one temporary . . . residence" will generally be provided for each "pre-disaster household." 44 C.F.R. §§ 206.113(a), 206.117(b)(1)(i)(A), (ii)(B).  This last provision is known as the "Shared Household Rule."  However, in response to the enormity of

the catastrophe caused by Hurricane Katrina, see infra, FEMA modified the Shared Household Rule to allow the provision of Section 408 assistance for more than one residence from the same pre-disaster household, provided that: (1) the household had been displaced by Katrina; and (2) members of the household were living in different geographical locations from one another as a result of Katrina.  Dannels Decl. ¶ 43.

## FACTUAL BACKGROUND

### I.    HURRICANE KATRINA.

Section 403 emergency shelter assistance is ordinarily provided for a brief period immediately following a disaster.  Dannels Decl. ¶ 54.  Because of the unique nature of the Katrina disaster, however, including an unprecedented number of evacuees and lack of viable housing in the hurricane-damaged areas, FEMA made Section 403 assistance available for an extended period.  Id. ¶¶ 60.  With approximately 185,000 Katrina evacuees relocating throughout the United States, most of whom were unable to return to their pre-disaster residences for extended periods, FEMA recognized that its traditional method for providing emergency shelter assistance to individuals under Section 403 would not be sufficient.  Id. ¶¶ 59-60.  Accordingly, FEMA developed programs unique to the Hurricane Katrina disaster, including reimbursement to States and local governments for their out-of-pocket costs of providing interim shelter to evacuees via rental vouchers and/or direct lease agreements with landlords.  Id. ¶ 61.

From a technical standpoint, Hurricane Katrina presented formidable challenges for FEMA.  Generally, requests for disaster assistance are handled in one of two ways: (1) through FEMA's National Processing Service Centers ("NPSCs"), which may be reached through a toll-free number; or (2) through FEMA's website.  Id. ¶ 26.  After an applicant has submitted an

6

assistance request through one of these methods, his or her application is transferred into the

National Emergency Management Information System computer system ("NEMIS").  Id. ¶¶ 30-

32.  NEMIS then runs the application through a series of "business rules" to compare the

collected data against the eligibility requirements for the type of assistance requested, ultimately

generating a fully automated initial eligibility determination in approximately 95 percent of all

cases.  Id. ¶ 32.  Prior to Katrina, the largest number of calls to FEMA's NPSCs during a

hurricane season was 4 million over a five-month period, with 64,464 calls coming on the 2004

hurricane season's busiest single day.  Id. ¶ 27.  During the first forty days of the Hurricane

Katrina response effort alone, however, the NPSCs processed more than 4 million calls, which

averaged out to 100,000 calls per day.  Id.  On the highest-volume day, September 27, 2005, the

NPSCs answered 197,037 incoming calls.  Id.  At the height of the Hurricane Katrina response

effort, FEMA activated a total of nineteen call centers and put 13,000 call center agents on duty.

Id.  The normal staffing for the NPSCs is approximately 1,600 employees.  Id.

## II.    THE SECTION 403 APARTMENT PROGRAM.

In light of the scale of the Katrina disaster, the number of those affected by it, and the

absence of available housing in the affected areas, FEMA was compelled to substantially modify

the operation of the Section 403 program.  Under the Section 403 Apartment Program created for

the first time in response to Hurricane Katrina, FEMA entered into agreements with state and

local governments that authorized those entities to enter into lease agreements with landlords

and/or provide rental vouchers to evacuees to give to the landlords.  Id. ¶ 61.  The state and local

governments then entered into apartment leases with landlords, with the state and local

governments acting as parties or guarantors, and then submitting requests for reimbursement to

FEMA.  Under the Section 403 Apartment Program, FEMA provides no benefits directly to evacuees living in the apartments.  Furthermore, evacuees did not have to meet any eligibility criteria in order to obtain housing in Section 403 apartments.  Id. ¶ 56.

## III.    THE TRANSITION FROM SECTION 403 TO SECTION 408.

In February 2006, FEMA determined that it no longer could continue Section 403 assistance as modified for Katrina evacuees.[2]  FEMA thus determined that evacuees who were in Section 403 housing and were eligible for the Section 408 program were to be transitioned into the latter program.  Dannels Decl.  ¶ 71.  Those evacuees receiving Section 403 assistance who did not qualify for Section 408 assistance would continue receiving housing assistance through March 31, 2006.  Id. ¶ 74.

To achieve its goal of phasing out Section 403 assistance and transitioning those applicants who were eligible for Section 408 assistance into the latter program, FEMA contracted with a private company, Corporate Lodging Consultants ("CLC"), to negotiate with individual landlords leasing units to evacuees under the Section 403 program and to act as a payment agent for the direct payment of funds under Section 408.  Id. ¶¶ 69-70.  FEMA forwarded the names of those who had been determined to be eligible for Section 408 assistance to CLC for conversion from Section 403 to Section 408.  Id. ¶ 70, 86.

In March 2006, FEMA sent letters to evacuees in Section 403 apartments notifying them regarding their eligibility for Section 408 assistance.  Id. ¶ 72-74.  Letters sent to those deemed eligible for Section 408 assistance informed them of the documentation they would need to

---

[2]  FEMA regulations state that the timeline for completing a project funded by Section 403 emergency assistance is six months.  44 C.F.R. § 206.204(c).  Based on extenuating circumstances, FEMA may extend the deadline an additional six months.

provide to receive Section 408 relief.  Id.  ¶ 73.  Letters to those deemed ineligible for Section 408 assistance informed them of that fact and provided them thirty days to vacate their FEMA-funded residence.  Id.  ¶ 74.

On March 26, 2006, FEMA issued a Disaster Specific Guidance ("DSG"), to effect conversion from Section 403 to Section 408, making clear that the state and local governments had primary responsibility for the transition.  Id. ¶¶ 76-78.  The DSG provided a process by which  FEMA could inform state and local governments of the names of those Section 403 evacuees who were eligible for transition to Section 408 relief, and those who were not eligible.  Id. ¶ 79.  The DSG also explained that, barring an extension, FEMA would not reimburse state or local governments for Section 403 costs after May 31, 2006.  Id. ¶ 89.  However, the DSG permitted extensions of Section 403 assistance if: (1) FEMA did not provide state and local governments with lists of ineligible and eligible tenants in sufficient time to accomplish a thirty-day notice to evacuees determined to be ineligible for Section 408 assistance, and their landlords; or (2) a state or local government could provide reasons why it could not provide the notices to landlords and evacuees within the time frame designated.  Id.

Ultimately, FEMA extended its deadlines several times.  Id. ¶¶ 91-94.  Sixteen local government and eligible charities nationwide – including Houston, Austin, and San Antonio – requested extensions beyond the initial May 31, 2006 deadline to June 30, 2006.  Id. ¶ 91.  FEMA granted each of those requests.  Id.  Subsequently, several Texas jurisdictions  requested additional extensions to July 31, 2006.  Id. ¶ 92.  FEMA granted every request that satisfied the DSG's guidelines.  Id.

On July 26, 2006, FEMA extended the entire Section 403 program until August 31,

9

2006, for those state and local governments still participating.  Id. ¶ 93.  On August 18, 2006, the

City of Houston requested a fourth extension, through September 30, 2006, for households that

had been determined ineligible for Section 408 assistance.  FEMA granted this request for 113

households that appeared to be potentially eligible for Section 408 assistance.  Id. ¶ 94.


IV.    **FEMA's Notification and Appeals Process and Outreach Efforts for Applicants Determined Ineligible for Section 408 Assistance.**

A.    **Section 408 Eligibility Determination Notices and Appeals Process.**

FEMA provided multiple sets of notices to all applicants for Section 408 assistance

determined to be ineligible for the program to ensure that they understood the basis for FEMA's

determination, as well as the process for appealing determinations with which they disagreed.

The Section 408 determination process is almost fully automated to ensure that eligibility

determinations are made – and assistance provided to eligible applicants – as soon as possible.

Dannels Decl. ¶¶ 32-34.  Within that largely automated format, the eligibility notification

procedure involves two basic steps: (1) providing disaster victims with a full package of

informational materials as soon as possible after a disaster declaration; and (2) subsequent

communications with disaster victims, using a standard letter template to ensure fast response

times.  Id. ¶¶ 36-37.

As step one of this approach, when an evacuee initially contacts FEMA to request

disaster assistance, FEMA provides that evacuee an Applicant Guide, titled "Help After A

Disaster."  Id. ¶¶ 28-29.  The Applicant Guide contains an overview of the Section 408 program

and the types of assistance available under the program.  Id. ¶ 29.  Among other information, the

10

Applicant Guide includes information regarding eligibility requirements and explanations for each potential basis for a determination that an applicant is ineligible.  Id.  In addition, the Applicant Guide provides specific information regarding the process for appealing adverse eligibility determinations, including instructions on what substantive information to include in the written appeal, where to send the appeal, and the time limitations for submitting an appeal.  See Applicant Guide at 10-11 (Attached at Tab B to Dannels Decl.); Dannels Decl. ¶ 29.

As step two of this approach, FEMA transmits standardized letters to applicants explaining their Section 408 eligibility status and the basis for that determination.  Dannels Decl. ¶¶ 36-37.  Each such letter contains an eligibility code and provides a brief explanation for what the code means.  Id.  In addition, each letter explicitly references the Applicant Guide for more detailed explanations of the bases cited for an ineligibility determination:

> For a more detailed explanation of this decision, please refer to "HELP AFTER A DISASTER", the FEMA Applicant's Guide which was mailed to you after you applied for assistance.  The section entitled "If You Are/Are Not Eligible for Help" (pages 6-9) explains the reasons which support our decision.  You may also access "HELP AFTER A DISASTER" online at **www.fema.gov/about/process**.

See Applicant Guide at 10-11; Dannels Decl. ¶ 41.

Finally, each letter states that if the applicant disagrees with FEMA's determination as to his or her eligibility for Section 408 assistance, the applicant may appeal at any time within sixty days of the date of the eligibility letter.  See, e.g., Compl. Ex. 1 (Letter to Joseph W. Douglas of January 10, 2006).  In that regard, each letter also refers the recipient to an attached "notices" page, which provides the following details regarding the appeals process:

11

8.      Filing an Appeal: To file an appeal, you must:

Explain in writing why you feel FEMA's decision is wrong.  Send any new or additional information that you have to show the Appeals Officer that you are eligible for this money.  Be sure to include your FEMA Application Number, shown at the top of this letter, when you write to FEMA.

Mail your letter and the documents to FEMA Appeals Officer, National Processing Service Center, P.O. Box 10055, Hyattsville, MD 20782-7055. Your appeal must be postmarked within 60 days of the date of this letter. Appeals will not be accepted after this date.

See, e.g., Dannels Decl., Tab C (Super Letter Template).[3]

---

[3]  The conversion from Section 403 to Section 408 caused at least one significant administrative problem.  For technical reasons, FEMA's NEMIS computer system could not simply process applicants deemed eligible for Section 408 assistance from Section 403 to Section 408.  Thus, FEMA had to print letters to be delivered to its contractor, CLC, along with a request for CLC to convert eligible applicants' leases from Section 403 to Section 408.  Dannels Decl. ¶ 86.  To address this shortcoming, NPSC staff were instructed to print "work around" letters to convey the necessary information to CLC and bypass the NEMIS problem.  These "work around" letters would contain the codes typically used to respond to disaster applicants on appeal – either "ENC – Eligible No Change" or "INC – Ineligible No Change" – with an award amount of $0. In this fashion, FEMA was able to convert disaster applicants from Section 403 to Section 408 and "transport" eligible applicants to CLC for the conversion.  Id.  These ENC and INC letters were for administrative purposes only, and were not intended to be mailed to applicants for Section 408 assistance, despite their characterization as "letters."  Id. ¶ 87.

In some instances, however, rather than being destroyed as intended, the ENC and INC "work around" letters were inadvertently mailed to disaster assistance applicants.  Id. ¶ 88. These letters may have resulted in confusion among some disaster applicants, as they did not list any  reason for the ENC or INC determination, or a dollar amount for an award if the letter was "ENC – Eligible."  Id.  FEMA was unable to determine from NEMIS which disaster applicants had received the inadvertently mailed "work around" letters.  Id.  Thus, FEMA instructed its toll-free helpline agents to work with any disaster applicant who called with questions concerning an ENC or INC letter by conducting a review of the applicant's case file on the spot.  Id.  These spot reviews would entail determining the basis for the applicant's eligibility status and advising the applicant of that basis.  Id.

**B.    Subsequent Outreach Efforts.**

In the period leading up to the termination of the Section 403 Apartment Program, FEMA employed multiple outreach efforts beyond its standard appeals process to ensure that applicants for Section 408 assistance were afforded the maximum opportunity to satisfy the eligibility criteria for that program.  Dannels Decl. ¶ 101.  In Texas alone, these efforts reduced the number of ineligible evacuee households by approximately 23 percent over a six-month period, from roughly 14,265 households in April 2006 to fewer than 10,989 by September 6, 2006.  Id. ¶ 112.

Specific efforts undertaken by FEMA in this regard included repeated reviews of the files of applicants who had been determined ineligible on the basis of insufficient damage, duplicate requests by more than one member of the same pre-disaster household, or failure to submit required forms or signatures.  Dannels Decl. ¶¶ 106-08.  In many instances, FEMA staff contacted applicants directly to request the submission of required forms that had not previously been submitted, inform the applicants of required documentation that was missing from their applications, or schedule reinspections of their pre-disaster dwellings to determine the extent of damage.  Id. ¶¶ 106-09.  When FEMA caseworkers succeeded in contacting ineligible applicants, they reviewed the applicants' case files with them in an effort to find bases for finding the applicants eligible, if possible, for Section 408 assistance.  Id.

FEMA also used the media to conduct outreach.  For example, FEMA issued press releases to approximately 575 daily and weekly newspapers in Texas to emphasize the need for Katrina evacuees to communicate with FEMA about their cases.  Id. ¶ 103.  During August 2006, FEMA also recorded and aired four public service announcements released to approximately 230

13

television stations and 250 radio stations, each stating a variation of the following message:

> Are you a hurricane evacuee receiving FEMA rental assistance?  Have you been
> notified your rental assistance will end soon?  Help FEMA help you.  Call 1-800-
> 621-FEMA with your housing history…a long-term housing plan…and send copies
> of rent receipts.  FEMA wants to help but we need your help.

Id.  FEMA also translated its media into Vietnamese and Spanish and distributed the translated

message to the appropriate audiences.  Id.

## V.    PLAINTIFFS.

Each of the four individual plaintiffs – Mr. Kenneth Leach, Mr. Joseph Douglas, Ms.

Doris Mitchell, and Ms. LaTonya Burton – was determined ineligible for Section 408 assistance,

and each alleges that he or she was denied due process of law.  See Compl. ¶¶ 5, 26-53.  Plaintiff

ACORN alleges that it has been injured "because [it] has spent, and will continue to spend, its

limited resources to help evacuees overcome the notice barriers placed before them by FEMA

unless the relief sought in this lawsuit is granted.  Id. ¶ 4.

### A.    Mr. Kenneth Leach.

On September 9, 2005, Kenneth Leach applied to FEMA for disaster assistance.  On

September 15, 2005, FEMA approved Mr. Leach for Expedited Assistance in the amount of

$2,000.  On September 16, 2005, FEMA provided Mr. Leach with a copy of the Applicant Guide.

Dannels Decl. ¶ 113( c).  On February 27, 2006, FEMA mailed to Mr. Leach its determination

that he was ineligible for assistance under the Section 408 program.  See Compl. Ex. 1 (Letter to

Kenneth Leach, February 27, 2006).  The February 27, 2006, letter also referred Mr. Leach to an

attached set of notices regarding his rights of appeal and other important information.  The letter

explained that Mr. Leach was entitled to appeal FEMA's determination, described the necessary

information to be included in the appeal, and identified the address and deadline for submission of the appeal letter, if any.  This information was also contained in the notice attached to the letter.

Plaintiffs' complaint attaches five letters from FEMA to Mr. Leach.  Compl. Ex. 1. Inexplicably, at least three of the letters are incomplete as submitted by plaintiffs, and none of the letters attached provides the notice that was provided to Mr. Leach with each eligibility notice letter from FEMA.

      **B.**    **Mr. Joseph Douglas.**

Mr. Douglas applied for Section 408 rental assistance on September 9, 2005.  Dannels Decl. ¶ 113(b).  On September 15, 2005, FEMA approved an award of $2,000 in expedited rental assistance for Mr. Douglas.  Id.  On September 16, 2005, FEMA provided Mr. Douglas a copy of the Applicant Guide by mail.  Id.  On January 10, 2006, FEMA transmitted to Mr. Douglas its determination that he was ineligible for assistance under the Section 408 program, along with an attached set of notices regarding his rights of appeal and other important information.  Id.  The letter of January 10, 2006, identified "Insufficient Damage" as the basis for Mr. Douglas' Section 408 ineligibility.  The letter also explained that Mr. Douglas was entitled to appeal FEMA's determination, described the necessary information to be included in the appeal, and identified the address and deadline for submission of the appeal letter, if any.  Id.  This information was also contained in the notice attached to the letter.  Id.

Plaintiffs' complaint attaches five letters from FEMA to Mr. Douglas.  Compl. Ex. 1. Several of the letters to Mr. Douglas attached to the complaint appear to be missing the notice pages that were provided to Mr. Douglas with each eligibility determination, although two letters

do provide such notice pages.

C.    **Ms. Doris Mitchell.**

On September 7, 2005, Doris Mitchell applied for assistance.  On September 9, 2005, FEMA approved Ms. Mitchell for Expedited Assistance in the amount of $2,000.  On September 20, 2005, FEMA provided Ms. Mitchell with a copy of the Applicant Guide.  Dannels Decl. ¶ 113(d).  On January 9, 2006, FEMA transmitted to Ms. Mitchell its determination that she was ineligible for assistance under the Section 408 program, along with an attached set of notices regarding his rights of appeal and other important information.  Id.  The January 9 letter to Ms. Mitchell identified the code "W69D" as the basis for Ms. Mitchell's ineligibility, meaning that her application had been withdrawn because she had not provided the required signature or supporting documents.  Id.  The letter also explained that Ms. Mitchell was entitled to appeal FEMA's determination, described the necessary information to be included in the appeal, and identified the address and deadline for submission of the appeal letter, if any.  Id.  This information was also contained in the notice attached to the letter.  Id.

Plaintiffs' complaint attaches two letters from FEMA to Ms. Mitchell.  Compl. Ex. 1. For some reason, each of the letters is incomplete as provided by plaintiffs, and neither of the letters attached provides the notice that was provided to Ms. Mitchell with each eligibility notice letter.

D.    **Ms. Latonya Burton.**

On August 31, 2005, Latonya Burton applied for assistance.  On September 9, 2005, FEMA approved Ms. Burton for Expedited Assistance in the amount of $2,000; on September 25, 2005, FEMA approved Ms. Burton for an additional $2,358 in rental assistance.  Dannels

Decl. ¶ 113(a).  On October 10, 2005, FEMA provided Ms. Burton with a copy of the Applicant

Guide.  Id.  On November 7, 2005, FEMA transmitted to Ms. Burton its determination that she

was ineligible for assistance under the Section 408 program, along with an attached set of notices

regarding his rights of appeal and other important information.  Id.  The letter of November 7,

2005, identified "Insufficient Damage" as the basis for Ms. Burton's ineligibility.  Id. The letter

also explained that Ms. Burton was entitled to appeal FEMA's determination, described the

necessary information to be included in the appeal, and identified the address and deadline for

submission of the appeal letter, if any.  Id.  This information was also contained in the notice

attached to the letter.  Id.

　　　Plaintiffs' complaint attaches two letters from FEMA to Ms. Burton.  Compl. Ex. 1.

Again, like the letters provided for the other plaintiffs, neither of the letters attached  provides the

notice that was provided to Ms. Burton with each eligibility notice letter.


## ARGUMENT

**I.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS.**

### A.    Plaintiffs' Claims are Barred by Sovereign Immunity.

　　　The United States is immune from suit, except where it has consented to be sued.

United States v. Mitchell, 445 U.S. 535, 538 (1980).  Sovereign immunity bars both statutory

causes of action and claims arising from alleged violations of Constitutional rights.  Lynch v.

United States, 292 U.S. 571, 582 (1934); Bartlett v. Bowen, 816 F.2d 695, 722 (D.C. Cir. 1987).

The bar of sovereign immunity also extends to actions seeking injunctive relief.  See United

Tribe of Shawnee Indians v. United States, 253 F.3d 543, 547 (10th Cir. 2001).  Unless Congress

17

has expressly waived sovereign immunity, claims against the United States are thus outside the subject matter jurisdiction of federal courts. F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994).

In cases challenging government action, plaintiffs bear the burden of establishing not only that Congress has waived the United States' sovereign immunity, but that such a waiver encompasses their claims. See Lundeen v. Mineta, 291 F.3d 300, 304 (5th Cir. 2002). Such a waiver "must be unequivocally expressed in the statutory text . . . and will not be implied." Lane v. Peña, 518 U.S. 187, 192 (1996) (citations omitted). Further, the waiver of sovereign immunity must "be strictly construed, in terms of its scope, in favor of the sovereign." Id. Here, neither of the statutes that plaintiffs cite as sources of the Court's subject matter jurisdiction – the Stafford Act and the Administrative Procedure Act ("APA") – contains waivers that would encompass plaintiffs' claims.

Under limited circumstances, the APA waives the United States' sovereign immunity. However, the APA specifically states that it does not provide review of agency action to the extent that "statutes preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1), (2). The Stafford Act does not waive the United States' sovereign immunity; rather, it provides that the federal government "shall not be liable" for any claim based on a federal agency's or employee's "exercise or performance of or the failure to exercise or perform a discretionary function or duty." 42 U.S.C. § 5148. Congress included this language to ensure that if "mistake[s]" were made in the administration of federal disaster relief, "the Government may not be sued . . . [and] that there shall be no liability on the part of the Government." See 96 Cong. Rec. 11895, 11912 (1950) (statement by chairman of House Public Works Committee). As explained by the United States Court of Claims:

18

> This provision, on its face, clearly precludes federal governmental liability for its action or inaction in providing disaster relief. . . . Congress clearly manifested its intent to raise a statutory barrier to judicial review . . . . Additionally, the emergency assistance given under the Act constitute[s] a gratuity. Liability should not be imposed on the federal government for discretionary acts or omissions of its agencies or employees in distributing benefits under such gratuitous programs.

Ornellas v. United States, 2 Cl. Ct. 378, 379-80 (1983).

In determining whether actions performed by FEMA fall within this provision, courts have employed a two-part test. First, the court examines "whether the act involves an element of judgment or choice." Dureiko v. United States, 209 F.3d 1345, 1351 (Fed. Cir. 2000) (citations omitted); see also Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392, 399 (1998) (citing Berkovitz v. United States, 486 U.S. 531, 536-37 (1988)).[4] An agency action "does not involve an element or judgment or choice if it is mandatory, i.e., if a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." See Dureiko, 209 F.3d at 1351 (citations and internal punctuation omitted); Sunrise Village, 42 Fed. Cl. at 399 ("The first prong is satisfied when a choice or judgment is involved in the performance of that function, and that choice or judgment is not tempered by a statute, regulation or policy which mandates a particular course of action."). If, however, the agency's actions involved an element of judgment or choice, the court moves to the test's second prong, which addresses "whether that judgment is of the kind that the discretionary function exception was designed to shield." Dureiko, 209 F.3d at 1351 (citations omitted). Under this test, the court examines whether the governmental actions and decisions at issue were "based on considerations of public

---

[4] In Dureiko, the court concluded that the discretionary function exception did not bar a breach of contract claim against FEMA because the contractual terms mandated FEMA's course of conduct. See id. at 1353. Here, by contrast, Plaintiffs do not allege that they have entered into a contract with FEMA.

19

policy." Id. (citations omitted).

Plaintiffs' sole factual claim in this case – that defendant did not provide sufficiently clear statements explaining why certain plaintiffs had been determined ineligible for Section 408 temporary rental assistance or describing how those plaintiffs could appeal such determinations – falls squarely within the Stafford Act's discretionary function exception. The actions challenged obviously involve some degree of "judgment or choice." FEMA is responsible for fashioning a system to communicate with various audiences about disaster assistance, particularly with those individuals affected by a disaster and requiring assistance quickly. However, potential disaster applicants are typically unaware of FEMA's programs prior to needing assistance, so FEMA has a competing goal of educating disaster applicants about FEMA programs. To educate disaster applicants about disaster assistance, FEMA developed the Applicant Guide to be sent to applicants immediately upon registration. Dannels Decl. ¶ 29. Then, FEMA determined in its discretion that the most efficient manner of providing notice of each decision pertaining to disaster applicants' applications would be to allow NEMIS, FEMA's computer system, to automatically process disaster applications (a process called "auto determination"). Id. ¶ 30. It takes an average of five to ten days to auto-determine a disaster applicant's request for assistance; comparatively, it takes an average of thirty days to process the application manually. Id. ¶¶ 32, 34. Notably, this degree of judgment was not tempered by any statutory guidance – or even any statutory requirement to provide notice in the first place. See McWaters v. FEMA, 436 F. Supp. 2d 802, 819-22 (E.D. La. 2006). Thus, the actions challenged here involve the exercise of judgment "not tempered by a statute, regulation or policy which mandates a particular course of action." The first prong of the discretionary function test therefore is satisfied here. Sunrise

<u>Village</u>, 42 Fed. Cl. at 399.

As to the second prong of the Stafford Act's discretionary function exception, the manner and extent of the notice provided to applicants for Section 408 disaster assistance is "grounded in social, economic, and political policy."  <u>See</u> <u>Sunrise Village</u>, 42 Fed. Cl. at 399. FEMA's decision to adopt a standardized system for determining eligibility for Section 408 disaster assistance reflected a policy determination to emphasize speed in responding to requests. Dannels Decl. ¶¶ 30, 32, 34.  Importantly, that policy judgment was not tempered by any limitation in the Stafford Act or in FEMA's regulations; nor was it mandated by either authority.

In view of the above, it is therefore clear that plaintiffs' challenge is an attack on the procedure FEMA employed to decide whether to approve applications for Section 408 assistance and to notify disappointed applicants of their status.  Because these clearly are discretionary acts, they are encompassed by the discretionary function exceptions of the Stafford Act and the APA, and the Court therefore lacks subject matter jurisdiction over Plaintiffs' claims.  The Court should therefore dismiss Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(1).

**B.    ACORN Lacks Standing.**

**i.    Plaintiff ACORN Lacks Standing to Sue on Behalf of its Members.**

To possess standing to sue as a representative of its membership, ACORN must satisfy three elements.  First, ACORN must identify actual members who have suffered an injury "of the sort that would make out a justiciable case had the members themselves brought suit."  <u>Warth v. Seldin</u>, 422 U.S. 490, 511 (1975).  Second, ACORN must show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  <u>United</u>

Food & Commerical Workers Local 751 v. Brown Group, Inc., 517 U.S. 544, 553 (1996)

(quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).  Third,

ACORN must show that "the interests it seeks to protect are germane to [its organizational]

purpose."  Id. (quoting Hunt, 432 U.S. at 343).  ACORN fails to meet at least the second and

third of these tests here.

      When it was filed, the complaint did not name as a plaintiff a single member of

ACORN,  let alone any member who has suffered a concrete injury fairly traceable to the notice

policy used by FEMA for communicating Section 408 eligibility determinations.  However, on

Friday, September 8, 2006, plaintiffs filed a set of supplemental exhibits in support of their

motion for preliminary injunctive relief [Docket No. 5].  This submission attached thirty-five

declarations from persons identifying themselves as members of ACORN who alleged that they

had received eligibility notifications from FEMA that they did not understand.  Irrespective of

whether this belated submission satisfies the first test for representative standing, it does not cure

the other fundamental problems that are fatal to ACORN's claim of representative standing here.

      Assuming that ACORN has properly identified one or more individual members with

potentially justiciable claims for relief, resolution of that claim would require the participation of

such individuals.  Associational standing does not exist in situations where "claims are not

common to the entire membership, nor shared by all in equal degree," but where, instead,

"whatever injury may have been suffered is peculiar to the individual members concerned, and

both the fact and extent of the injury would require individualized proof."  Lake Mohave Boat

Owners Ass'n v. Nat'l Park Serv., 78 F.3d 1360, 1367 (9th Cir. 1996) (citing Warth, 422 U.S. at

515-16, and Associated Gen. Contractors, Inc. v. Coal. for Econ. Equity, 950 F.2d 1401, 1408

(9th Cir. 1991)).  ACORN cannot and does not contend that every one of its members is a Katrina

evacuee whose application for Section 408 assistance was denied.  That fact alone is sufficient to

dispose of ACORN's standing argument.  Id.  However, even if ACORN could legitimately

make such a contention, individual participation would be necessary here to determine, inter alia,

whether an ACORN member who was deemed ineligible for Section 408 assistance had received

notice of his or her eligibility status or had been timely advised of his or her appeal rights.  Such

questions are central to the resolution of the claim asserted by every person who, like the

individual plaintiffs, alleges that he or she was denied due process by FEMA.  Thus, for

numerous reasons, the "individual participation of each injured party" would be "indispensable to

proper resolution of the case."  Warth, 422 U.S. at 511.

    As to the third element necessary to establish associational standing, ACORN has not

alleged that the representation of individuals who have applied, and been deemed ineligible, for

Section 408 assistance is germane to its organizational purpose.  According to the complaint,

ACORN works in more than 75 cities "to improve housing conditions for the economically

disadvantaged, increase community safety, secure living wages for all workers and improve the

quality of local schools."  Compl. ¶ 4.  In addition, ACORN alleges that its "overall mission and

purpose" is "to advocate for fair government treatment of its members, including protecting their

rights to housing benefits."  Id.  Finally, ACORN alleges that it operates the "ACORN Katrina

Survivor's Association."  Id.  This is a particularly broad and diffuse set of organizational goals.

However, ACORN's stated goals do not focus on advocating for their members who have been

denied housing assistance by FEMA; ACORN certainly does not allege with any specificity

exactly how it works to protect its members' housing benefits, or what particular quality makes it

23

suited as an organization to do so. Further, the fact that ACORN operates a "Katrina Survivor's Association" does not suggest that it is particularly engaged in or equipped for advocating on behalf of members who have been denied housing assistance by FEMA. The issues in this case are therefore not germane to ACORN's self-described mission, at least not in any way distinguishable from the goals of any other group interested in housing issues.

### ii.    ACORN Also Lacks Standing to Sue On Its Own Behalf.

For an organization to bring suit on its own behalf, it "must, like any other plaintiff, satisfy the constitutional and prudential considerations of standing." <u>J.L. v. Social Sec. Admin.</u>, 971 F.2d 260, 268 n.8 (9th Cir. 1992). Here, ACORN fails both tests. First, ACORN has not alleged any concrete injury to itself that is fairly traceable to the eligibility notifications provided by FEMA and likely to be redressed by a judgment in its favor. As a result, ACORN lacks Article III standing. Second, ACORN's interests are not within the zone of interests protected or regulated by the Stafford Act. Therefore, even if ACORN could demonstrate constitutional standing, its claims should be dismissed as a prudential matter.

### a.    ACORN Has Alleged No Legally Cognizable Injury to Its Ability to Function as an Organization.

An organization may sue on its own behalf only if the challenged conduct directly conflicts with the organization's mission and has directly harmed its ability to provide its services. As with individuals, the injury suffered by the organization cannot be conjectural, hypothetical, speculative or abstract; it must be "'certainly impending.'" <u>National Treasury Employees Union v. United States</u>, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 158 (1990)). Furthermore, the organization's actual or threatened injury

must be "fairly traceable to the alleged illegal action and likely to be redressed by a favorable

court decision." Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir.1990).

The leading decision on an organization's standing to sue in its own right is Havens

Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982). In Havens, the plaintiff was a nonprofit

organization whose purpose was "to make equal opportunity in housing a reality in the Richmond

Metropolitan Area." Id. at 368. The organization sued the owner of an apartment complex for

engaging in racial steering in violation of the Fair Housing Act. Id. The organization alleged

that the defendant's illegal housing practices frustrated its efforts to promote equal housing

through counseling and other referral services. Id. at 379. It further alleged that it "had to devote

significant resources to identify and counteract the defendant's" unlawful housing practices. Id.

The Court held that the alleged impairment to the organization's ability to provide its services,

caused by the defendant's conduct, constituted an injury-in-fact to the organization. The

organization therefore had standing to sue for damages in its own right. Id.

Here, ACORN alleges that it "has spent, and will continue to spend, its limited resources

to help evacuees overcome the notice barriers placed before them by FEMA" unless the plaintiffs

obtain the relief they seek. Compl. ¶ 4. In addition, ACORN alleges that "FEMA's challenged

actions have caused ACORN to redirect its resources from its other projects to assist evacuees."

Id. However, ACORN does not allege what specifically, if anything, defendant has done to

frustrate its efforts or to make them ineffective, as did the plaintiffs in Havens. Nor does

ACORN allege with any specificity what it does to assist evacuees, how it seeks to assist

evacuees in dealing with FEMA, or what other projects from which it has been forced to redirect

its resources. Furthermore, these allegations are not sufficient to establish that ACORN has

suffered direct injury that is fairly traceable to action taken by FEMA, as opposed to the increased volume of housing needs caused by Hurricane Katrina itself. With a national disaster the scope of Hurricane Katrina, it is unsurprising that groups such as ACORN are devoting resources to assist individuals rebuild their lives. However, as laudable as those efforts are, they do not confer upon ACORN standing to bring this action. See Rainbow/PUSH Coalition v. F.C.C., 396 F.3d 1235, 1241-42 (D.C. Cir. 2005) (no organizational standing because plaintiff never stated or explained how the alleged conduct affected its counseling or outreach efforts).

Finally, the allegations in the complaint are insufficient to establish that any direct injury ACORN has suffered would be redressed by a judgment in its favor. Because the allegations upon which ACORN purports to base its standing would have to be resolved on a person-by-person basis, there is no overarching remedy that will ensure that ACORN is freed from its burden of helping its members work to obtain Section 408 assistance. For all of these reasons, ACORN fails to satisfy the requirements for Article III standing.

> **b.    ACORN's Organizational Interests Are Not Within the Zone of Interests Protected by the Stafford Act.**

Even if ACORN could show some injury-in-fact to its ability to function as an organization that is fairly traceable to the actions of defendant and would be remedied by a judgment in its favor, it would still lack standing because its ability to function as an advocacy organizations is not within the "zone of interests protected by the law invoked." See Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 12 (2004) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). A plaintiff cannot meet this test merely by alleging that a regulatory scheme protects or regulates someone else's interests in a way that might indirectly affect his own. See

Air Courier Conference v. Am. Postal Workers Union, 498 U.S. 517, 522-31 (1991); Devlin v. Scardelletti, 536 U.S. 1, 7 (2002) (observing that prudential standing requirements include the "'general prohibition on a litigant's raising another person's legal rights. ...'") (quoting Allen v. Wright, 468 U.S. at 751).  Although the prudential standing requirement is not meant to be "especially demanding," Clarke v. Securities Industry Ass'n, 479 U.S. 388, 399 (1987), ACORN has failed to allege facts sufficient to meet its burden.

        As a general matter, the Stafford Act establishes procedures to "assist the efforts of the . . . States in expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas" affected by disasters.  42 U.S.C. § 5121; see Pub. L. No. 100-707, 102 Stat. 4689 (1988).  The Act makes no "mention of advocacy organizations' interests."  Center for Law and Educ. v. Dep't of Educ. 396 F.3d 1152, 1157 (D.C. Cir. 2005). Nor does it regulate the conduct of advocacy groups.  The concerns of ACORN are therefore not within the zone of interests of the relevant law.  See INS v. Legalization Asst. Proj. of Los Angeles County Fed. of Labor,  510 U.S. 1301, 1305 (1993) (O'CONNOR, J., in chambers) (granting stay of appellate ruling because Supreme Court likely "would grant certiorari and conclude that [organizations that provide legal help to immigrants] are outside of zone of interests" immigration law sought to protect; "fact that the INS regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect").

## II.    PLAINTIFFS WOULD NOT BE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF EVEN IF THEIR CLAIMS WERE WITHIN THE JURISDICTION OF THE COURT.

A request for emergency injunctive relief is an extraordinary remedy, and the power to issue such an injunction "should be 'sparingly exercised.'" Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (quotation omitted). To obtain emergency injunctive relief, plaintiffs must demonstrate the following: (1) that plaintiffs are substantially likely to succeed on the merits of their suit; (2) that in the absence of an injunction, plaintiffs will suffer irreparable injury for which there is no adequate legal remedy; (3) that the injunction would not substantially harm other parties; and (4) that the public interest favors the grant of relief. See Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1505 (D.C. Cir. 1995); National Treasury Employees Union v. United States, 927 F.2d 1253, 1254 (D.C. Cir. 1991) ("A party is entitled to a preliminary injunction only if [he] proves that [the four factors are met]") (emphasis supplied). In this circuit, the first prong – plaintiffs' likelihood of success on the merits – carries determinative weight:

> Although the preliminary-injunction calculus reflects a sliding-scale approach in which a strong argument in favor of one factor may excuse a relatively weaker showing on another factor [,] absent a "substantial indication of probable success [on the merits], there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review."

American Bankers Ass'n v. Nat'l Credit Union Admin., 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (quoting Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1995)) (other internal cites omitted).

Moreover, plaintiffs seeking a mandatory injunction – that is, one requiring the government to take some affirmative action – face a greater hurdle than plaintiffs seeking a prohibitive injunction. Mylan Pharmaceuticals, Inc. v. Shalala, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). In this Circuit, "the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." Dorfmann, 414 F.2d at 1173; see also Stanley v. University of

28

Southern Cal., 13 F.3d 1313, 1319 (9th Cir. 1994) ("[W]here a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo pendente lite, courts should be extremely cautious about issuing a preliminary injunction.").  The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held."  University of Texas v. Camenisch, 451 U.S. 390, 395 (1981).  Therefore, "where an injunction is mandatory – that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act – the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction."  Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir. 1997); see also Columbia Children's Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997).

Plaintiffs' requested injunctive relief is indisputably mandatory in nature.  Indeed, plaintiffs acknowledge that the notice changes they seek would "require FEMA to mail a full explanation of the reasons for its decisions to each evacuee."  See Pls.' Mot. for T.R.O. at 21. Further, though plaintiffs suggest that their requested modifications would be easy to implement, See id. at 18, the impact upon FEMA's workload would be unduly burdensome. Notwithstanding FEMA's efforts at reducing the number of evacuees deemed ineligible for Section 408 assistance (from roughly 14,265 households in April 2006 to fewer than 10,989 by September 6, 2006), requiring the agency to rework its eligibility notices to more than 10,000 applicants would represent a significant undertaking.  In addition, an injunction requiring FEMA to contact evacuees, landlords, and/or state and city governments to begin funding rents pursuant to Section 408 would be mandatory on its face.  See Mylan Pharmaceuticals, 81 F. Supp. 2d at 36.

Under these principles, plaintiffs' motion for mandatory preliminary injunctive relief should be denied for multiple reasons. First, plaintiffs cannot establish a substantial likelihood that they will succeed on the merits of their claim. Second, plaintiffs do not face irreparable harm, as their substantial delay in seeking relief underscores. Finally, granting the relief that plaintiffs seek would disserve the public interest by undermining FEMA's statutory discretion with respect to disaster assistance.

### A.    Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits.

Plaintiffs' assertion that the Section 408 eligibility notices provided by defendant are constitutionally inadequate under the Due Process clause fails as a matter of law. Assuming arguendo that plaintiffs can prove that they possess a property interest in the provision of FEMA housing assistance, the legal sufficiency of any notices regarding that interest is measured by the balancing test articulated by the Supreme Court in Matthews v. Eldridge, 424 U.S. 319, 335 (1976). Under that test, FEMA provided plaintiffs all the notice they were due.[5]

As an initial matter, plaintiffs' apparent conflation of Sections 403 and 408 – two distinct forms of assistance with different statutory bases and different purposes – must be corrected. Throughout both their complaint and motion for temporary restraining order, plaintiffs refer to letters they have received from FEMA as "termination notices," see, e.g., Compl. ¶¶ 16-22, 56; Mot. for T.R.O. at 16. This characterization is not correct, and indicates a significant and basic misunderstanding of the two programs at issue. The letters that plaintiffs cite and have attached

---

[5]    Although defendant does not raise this issue here for purposes of opposing plaintiffs' motion for preliminary injunctive relief, defendant does not concede that plaintiffs possess a protectable property right in housing assistance provided by FEMA, particularly under Section 403. Defendant reserves the right to raise this argument at a later date as to both Section 403 and Section 408, should it prove necessary.

30

to their complaint as Exhibit 1 do not "terminate" any benefits to plaintiffs. Rather, they are each letters informing plaintiffs whether or not they have been determined to be eligible for temporary rental assistance under Section 408, and, if not, the basis for that determination and the steps plaintiffs may take to appeal. See Compl., Ex. 1.[6]

This distinction is significant because, inter alia, none of these plaintiffs was receiving Section 408 rental assistance prior to their initial eligibility determination under that program. Instead, each was receiving Section 403 emergency shelter from the city of Austin or San Antonio pursuant to a grant of funding from FEMA under the Section 403 Apartment Program, as set forth supra. Because Section 403 is intended to provide very short-term, essential assistance, rather than longer-term temporary rental housing, it was clear that FEMA would ultimately have to transition as many eligible evacuees as possible into Section 408 assistance. FEMA began this process in early February 2006, Id. ¶ 69, and shortly thereafter began contacting evacuees to notify them whether they had been determined to be eligible for Section 408 assistance or not.

Thus, the letters attached and cited by plaintiffs do not "terminate" any benefits. As indicated supra, plaintiffs – like all other evacuees who needed emergency rental assistance in the wake of Hurricane Katrina – had been receiving Section 403 assistance from city and state

---

[6] To the extent any plaintiffs here may assert that they had previously been determined eligible for Section 408 assistance but subsequently had their eligibility terminated or interrupted, such plaintiffs would be members of the class certified in McWaters v. FEMA. See McWaters v. FEMA, Civ. No. 05-5488, — FRD —, 2006 WL 2257058, **7-8 (E.D. La. June 30, 2006). In such case, the court's ruling in McWaters – that FEMA's notification to class members regarding the termination or interruption of their eligibility for Section 408 assistance satisfied due process requirements, see McWaters v. FEMA, 436 F. Supp. 2d 802, 819-21 (E.D. La. 2006) – would bar on res judicata or collateral estoppel grounds any such claims plaintiffs would raise in this case. See, e.g., Thomas v. Albright, 77 F. Supp. 2d 114 (D.D.C. 1999).

31

governments pursuant to grant funding from FEMA.  That assistance was phasing out pursuant to

FEMA's policy determination that Section 403 funding should be terminated and all evacuees

eligible for assistance under Section 408 should be transitioned into that program, which was

more suitable for longer-term temporary housing needs.  The letters characterized by plaintiffs as

"termination" notices were thus nothing of the sort; rather, they were letters provided to notify

applicants as to whether or not they were eligible for Section 408 assistance, and as to their rights

of appeal in the event they had been determined ineligible.

Irrespective of how plaintiffs characterize the multiple notices each of them received

from FEMA regarding their eligibility for Section 408 assistance, those notices provided all of

the process to which plaintiffs are Constitutionally entitled.  The Supreme Court has emphasized

that due process is "not a technical conception with a fixed content unrelated to time, place and

circumstances," but rather "is flexible and calls for such procedural protections as the particular

situation demands."  Matthews v. Eldridge, 424 U.S. at 334.  Thus, the correct inquiry under

Matthews v. Eldridge requires a balancing of three factors:

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement would
> entail.

424 U.S. at 335.  Weighing the second and third Matthews factors against the first, plaintiffs'

interest in housing, underscores the adequacy of defendant's notice and appeal procedures.

The second factor favors defendant for at least three reasons.  First, the notices provided

to all applicants deemed ineligible for Section 408 assistance clearly identify the basis for

32

FEMA's determination.  The letters sent to each applicant provides a code setting forth the basis

for ineligibility; each also contains a sentence briefly explaining the code, as well as a reference

to the Applicant Guide – which FEMA also sent to every applicant for Section 408 assistance –

for more detailed explanations.  <u>See</u> Compl. Ex. 1 (Letters sent to plaintiffs Douglas, Mitchell,

Burton, and Leach).  For example, the FEMA letter transmitted on February 27, 2006, to Mr.

Kenneth Leach, a plaintiff in this case, contains the code "IID" followed by the phrase "Ineligible

– Insufficient Damage."  <u>See</u> Compl. Ex. 1 (Letter to Kenneth Leach, February 27, 2006).

Immediately below that section, the letter states:

> For a more detailed explanation of this decision, please refer to
> "HELP AFTER A DISASTER", the FEMA Applicant's Guide
> which was mailed to you after you applied for assistance.  The
> section entitled "If You Are/Are Not Eligible for Help" (pages 6-9)
> explains the reasons which support our decision.  You may also
> access "HELP AFTER A DISASTER" online at
> **www.fema.gov/about/process**.

<u>See</u> <u>id.</u>  The category "IID – Ineligible – Insufficient Damage" represents a relatively common

basis for a determination that an applicant is not eligible for assistance, as one major cornerstone

requirement for Section 408 assistance is a showing that the applicant's primary residence has

been rendered uninhabitable by a major disaster (and that the applicant cannot meet his or her

housing needs through other sources such as insurance).  42 U.S.C. § 5174(b); 44 C.F.R. §

206.110(h); 44 C.F.R. §§ 206.113(b)(1), (6).  The Applicant Guide provides additional

explanation for what the code and explanatory phrase mean: "There was not enough damage to

[the applicant's] home or property for [the applicant] to qualify for this program."  Applicant

Guide at 7.

Second, FEMA provides an extensive appeals process for Section 408 ineligibility

determinations. Each ineligibility letter transmitted by FEMA contains a brief discussion of applicants' right to appeal adverse decisions, accompanied by an attached "Notices" page that describes the appeals process, including the substantive information applicants should provide, identifies the address to which appeals should be directed, and sets forth the timetable that appeals must follow. Dannels Decl. ¶ 39. In and of itself, this extensive appeals process "provides sufficient avenues of redress and rectification to meet the requirements of due process." Lepre v. Dep't of Labor, 275 F.3d 59, 71 (D.C. Cir. 2001) (citations omitted); see also Hudson v. Palmer, 468 U.S. 517, 531-33, 533 (1984) (even unauthorized, intentional deprivation of property by a state employee does not constitute due process violation "if a meaningful postdeprivation remedy for the loss is available"); Stuto v. Fleischman, 164 F.3d 820, 825-27 (2d Cir. 1999) (termination of workers compensation benefits did not constitute due process violation where plaintiff had post-deprivation remedies); Raditch v. United States, 929 F.2d 478, 480-82 (9th Cir. 1991) (same).

Finally, FEMA's successful outreach work between March and August 2006 further demonstrates the efficacy of its undertaking to ensure that all Hurricane Katrina evacuees were fully aware of the eligibility requirements of Section 408. In particular, this effort rebuts any suggestion by plaintiffs of the probable value of additional or substitute safeguards. See Matthews, 424 U.S. at 335. By virtue of FEMA's efforts alone, roughly 23 percent of the evacuees in Texas deemed ineligible for Section 408 assistance as of April 2006 have subsequently been determined to be eligible. See Dannels Decl. ¶ 112.

Similarly, the third Matthews factor – the government's interest, including the likely burdens entailed by the substitute safeguards plaintiffs propose – also favors defendant. The

34

unprecedented magnitude of Hurricane Katrina's effects on the populations of Louisiana and Mississippi's gulf coasts – forcing the long-term evacuation of more than 250,000 persons – imposed significant burdens upon FEMA as well.  Responding to the disaster with a workforce and computer system that never previously had been tested against a disaster response of that scale, FEMA processed tens of thousands of applications for disaster assistance with the goal of providing such assistance as quickly as possible.  See Dannels Decl. ¶¶ 27-34, 100.  That process remains ongoing, with the emphasis still on the fast provision of disaster assistance.  Id. ¶ 100.  Mandatory injunctive relief requiring FEMA to rewrite its eligibility determination notices at this point would immeasurably slow FEMA's progress on this score.

The above analysis underscores the fact that the Section 408 ineligibility notices provided to Hurricane Katrina evacuees, the extensive appeals process made available to all such evacuees, and FEMA's own continuing outreach efforts provided a comprehensive basis for plaintiffs to understand FEMA's decisions as their eligibility for Section 408 assistance, and thus satisfied the requirements of due process under Matthews v. Eldridge.  As the Matthews Court emphasized, "due process is flexible and calls for such procedural protections as the particular situation demands."  424 U.S. at 334 (internal citations omitted).  The particular situation here demanded that FEMA be able to work with individual evacuees, state and local governments, and other entities and make eligibility determinations as quickly as practicable, while informing plaintiffs of their right to appeal adverse determinations, and how and when to do so.  Significantly, the effectiveness of the appeals process is demonstrated by the fact that the vast majority of evacuees originally deemed ineligible for Section 408 assistance ultimately obtained such assistance.

35

This conclusion is further reinforced by recent holdings of the district court in McWaters v. FEMA on similar issues.  That court recently addressed similar notice claims on behalf of a putative class of Hurricane Katrina evacuees and held that the plaintiffs had not stated a claim for a violation of their due process rights.  McWaters, 436 F. Supp. at 820.  While the McWaters court opined in dicta that FEMA could and should have improved its notices as to the specific claims asserted by plaintiffs, it concluded that "FEMA is not legally required to notify applicants or recipients of assistance about what FEMA provides or how to obtain such assistance."  Id. at 820-21 (emphasis in original).

Subsequent to that written determination, and with the benefit of an extensive administrative record and a two-day bench trial on the merits, the McWaters court recognized that many of the plaintiffs' complaints about the manner in which FEMA processed applications for Section 408 assistance were due to "the voluminous number of Katrina-related housing applications," and were "inevitable due to the sheer practicalities of the circumstances wrought by the aftermath of the storm."  McWaters, 436 F. Supp. 2d at 818-19  On that basis, the McWaters court dismissed those claims with prejudice.  Given the heavy burden that plaintiffs here bear in seeking a mandatory preliminary injunction, the fact that another court has considered the extensive administrative record, as well as the evidence adduced at a hearing, and denied a permanent injunction, leaves little doubt that plaintiffs are unlikely to succeed on the merits of their claims.

**B.    Plaintiffs Have Not Satisfied The Irreparable Harm Requirement.**

Any delay by the plaintiffs in seeking a preliminary injunction constitutes a relevant

factor when considering whether plaintiffs have met their burden to show irreparable harm.  "An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."  Newdow v. Bush, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (suit filed over one month after plaintiff had purchased ticket to attend inauguration, which he claimed violated his rights); see also Fund for Animals v. Frizzell, 530 F.2d 982, 987 (D.C. Cir. 1975) (plaintiffs had waited 44 days until after final regulations were issued although they had notice of a public comment period).

Here, plaintiffs' delay in bringing this action and in moving for preliminary injunctive relief undermines their claim of imminent irreparable injury.  Plaintiffs themselves have been on notice about the pending phase-out of Section 403 assistance, and the transition to Section 408 assistance, since at least late March 2006, when FEMA transmitted its first Disaster Specific Guidance ("DSG") to state and local governments regarding the conversion from Section 403 to Section 408.  The initial DSG instructed that FEMA funding for the Section 403 apartment plan would cease effective March 31, 2006.  See Dannels Decl. ¶ 74.  FEMA extended this deadline on April 7, 2006, when it informed evacuees who had been determined ineligible for Section 408 assistance of their ineligible status and instructed them to wait for notification from their landlords as to when their Section 403 apartment leases would terminate.  Id. ¶ 84.  In these same letters, FEMA provided such evacuees an additional period in which to appeal their ineligibility determinations.  Id.  FEMA took this action out of concern that some of those evacuees had failed to appeal their Section 408 ineligibility determinations during the original period because they had been provided apartments under Section 403.  Id. ¶ 84, n.9.  FEMA subsequently provided additional extensions of Section 403 funding upon requests by PA Applicants,

37

including Houston, Austin, and San Antonio, ultimately extending Section 403 assistance for all

remaining Section 408 ineligibles through August 31, 2006, with an extension for a limited

subset of Section 408 ineligibles through September 30, 2006.  Id. ¶¶ 91-94.

Likewise, counsel for plaintiffs have been signaling their intent to litigate over the

pending transition to Section 408 assistance for at least four weeks.  By letter dated July 31,

2006, counsel for plaintiffs acknowledged the last of FEMA's universal Section 403 assistance

extensions, thanking FEMA for extending the deadline for its provision of Section 403 assistance

from July 31, 2006, to August 31, 2006.  See Pls.' Mot. for T.R.O., Ex. 5 (Letter of July 31,

2006, from Robert Doggett, Texas RioGrande Legal Aid, Inc., to John D'Araujo, Jr., FEMA).  In

the same letter, however, counsel requested that FEMA provide an additional Section 403

extension for all evacuees still deemed ineligible for Section 408 assistance and furnish certain

information to counsel by no later than 10 a.m. CST, August 3, 2006.  Id.  Counsel expressly

stated that failure to reach a resolution of plaintiffs' requests would result in the filing of a

request for a temporary restraining order.  Id.

Despite this knowledge – and despite counsel's express statement of July 31, 2006, of

plaintiffs' intent to seek injunctive relief should FEMA fail to satisfy certain of their concerns by

August 3, 2006 – plaintiffs waited until August 29, 2006, to file suit.  Even then, plaintiffs waited

an additional two days, until August 31, 2006, before moving for a temporary restraining order.

Notably, by virtue of plaintiffs' delays, the emergency injunctive relief that plaintiffs sought – an

order compelling FEMA to extend Section 403 assistance through September 30, 2006 – would

have come too late to forestall the alleged imminent harm upon which plaintiffs relied, the

possible evictions of Section 408 ineligibles from rental housing paid for by local governments

including Houston, Austin, and San Antonio with Section 403 funding from FEMA. Plaintiffs could thus have sought relief several months ago, and are not entitled to extraordinary emergency relief due merely to their own delay. Plaintiffs' own approach to this litigation fundamentally undermines any assertion that they are in sufficient danger of imminent injury to merit such relief.

**C.    The Preliminary Relief Requested Here Would Harm Defendant And The Public Interest.**

Notwithstanding that plaintiffs have demonstrated no substantial likelihood – and, indeed, have no likelihood – of prevailing on the merits, the preliminary relief they request here would harm defendant and the public interest. Congress deliberately gave the government the broadest possible discretion in the Stafford Act, in order to ensure that the government's resources could be put to use in emergency situations as effectively as possible. Permitting this action to proceed, and granting the emergency relief requested in plaintiffs' Complaint or their motion for temporary restraining order, would dramatically undermine the government's ability to do so, and would transfer authority for implementing the Stafford Act from the Executive Branch to the plaintiffs and the Court. Additionally, a decision that FEMA may not terminate the Section 403 emergency housing program would establish a precedent that could potentially constrain the agency in a number of disaster situations. FEMA must be free, and remain so, to administer its resources without such interference. As noted earlier, "[i]f every applicant could litigate a denial of eligibility the purpose of sovereign immunity would be defeated. FEMA's resources would be diverted to defending eligibility decisions." City of San Bruno, 181 F. Supp. 2d at 1015.

40

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' claims for lack of subject

matter jurisdiction.  In the alternative, the Court should deny plaintiffs' motion for preliminary

injunctive relief.

Dated: September 11, 2006                     Respectfully submitted,

                                              PETER D. KEISLER
                                              Assistant Attorney General

                                              KENNETH L. WAINSTEIN
                                              United States Attorney


                                                 */s/ Christopher R. Hall*
_____
                                              MICHAEL SITCOV
                                              CHRISTOPHER R. HALL
                                              Trial Attorneys
                                              U.S. Department of Justice
                                              Civil Division
                                              Federal Programs Branch
                                              P.O. Box 883
                                              Washington, D.C.  20530

                                              (202) 514-4778

41