IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA), )<br><br>Agency. | CIV. ACTION NO. 06-1521-RJL |

## DECLARATION OF DONNA M. DANNELS

I, Donna M. Dannels, state as follows:

1.  I have worked in various program areas at the Federal Emergency Management Agency (FEMA), a component agency of the Department of Homeland Security (DHS) since 1983. I have worked in the Recovery Division in a management position since June 2001.

2.  From October 1, 2005 to July 7, 2006, I was the Acting Deputy Director of the Recovery Division at the Federal Emergency Management Agency (FEMA), a component agency of the Department of Homeland Security (DHS). In my capacity as the Acting Deputy Division Director, I had oversight responsibility for all Recovery Programs authorized by the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended, 42 U.S.C. §§ 5121 et seq. ("Stafford Act"). This includes all Individual Assistance Programs, including the Individuals and Households Program, and the Public Assistance Program.

3. In addition, I have held the position of Individual Assistance Program Branch Chief within the Recovery Division since April 2006. In this capacity, I oversee the implementation of the Individual Assistance authorities of the Stafford Act.

4. On or about August 29, 2005, as a result of Hurricane Katrina, the President of the United States declared numerous counties and parishes in Louisiana, Mississippi, Alabama, and Florida major disasters triggering Federal disaster assistance. The President authorized FEMA to provide Individual and Household Assistance to residents of Louisiana, Alabama, and Mississippi, and Public Assistance to all four States.

5. Shortly thereafter, the President declared emergencies for forty-four States and the District of Columbia that hosted Hurricane Katrina evacuees and designated Public Assistance for those States.

## THE STAFFORD ACT

6. FEMA is responsible for administering and coordinating the Federal governmental response to Presidentially-declared disasters pursuant to the Stafford Act. 42 U.S.C. §§ 5121 et seq  FEMA's mission is to provide Federal assistance to State and local governments in carrying out their responsibilities in Presidentially-declared disasters and emergencies by providing, *inter alia*, "Federal assistance programs for public and private losses and needs sustained in disasters." 42 U.S.C. § 5121(a)(5); 44 C.F.R. § 206.3(a), (e).

7. The Stafford Act is triggered when a governor of an affected State requests the President of the United States to declare the affected area a "major disaster," and the President does so. 42 U.S.C. § 5170 and 44 C.F.R. § 206.36(a). The governor's request must be based on a finding that "the disaster is of such severity and magnitude that effective response is

beyond the capabilities of the State and the affected local governments and that Federal assistance is necessary." See 42 U.S.C. § 5170; see  44 C.F.R. § 206.36(b).

8.  An emergency is defined as "any occasion or instance for which, in the determination of the President, Federal assistance is needed to supplement State and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States." See 42 U.S.C. § 5121(1).

9.  The President's declaration of an emergency or disaster will designate the areas within a State where Federal assistance may be made available (counties, parishes, or tribal lands) and what specific types of Federal assistance are authorized.  The President may authorize, *inter alia*, Individual Assistance Programs, including Individual and Households Assistance, and various forms of Public Assistance.  42 U.S.C. §§ 5170 – 5189b.

## I.    THE INDIVIDUALS AND HOUSEHOLDS PROGRAM (IHP)

### A.  Type of Assistance Available under Section 408 of the Stafford Act

10. Under section 408 of the Stafford Act (also referred to as the Individuals and Households Program ("IHP")), FEMA may provide financial assistance and direct services to individuals and households "who, as a direct result of a major disaster, have necessary expenses and serious needs in which the individuals and households are unable to meet such expenses, or needs through other means," such as insurance.  42 U.S.C. § 5174.

11. Under section 408, Federal financial assistance is limited to $25,000.00, adjusted annually to reflect changes in the Consumer Price Index for All Urban Consumers.  42

U.S.C. § 5174(h); 44 C.F.R. § 206.110(b).  During the fiscal year in which Hurricanes Katrina and Rita occurred, this cap rose to $26,200.00.

12. Specifically, section 408 authorizes FEMA to provide individuals and households with financial assistance for disaster related needs, such as replacement of personal property, transportation, and medical, dental and funeral expenses—referred to as other needs assistance.  42 U.S.C. § 5174(e).

13. Moreover, section 408 authorizes FEMA to provide four types of housing assistance:  (1) Temporary Housing Assistance; (2) Repair assistance for owner-occupied private residences; (3) Replacement assistance for owner-occupied private residences not to exceed $10,000.00[1]; and (4) Permanent housing construction for "permanent housing in insular areas outside the continental United States . . .." 42 U.S.C. § 5174.

14. There are two types of Temporary Housing Assistance ("THA").  (1), FEMA may provide individuals and households with financial assistance to rent alternative housing-- based on the fair market rent set by Department of Housing and Urban Development ("HUD").  (2), FEMA can provide individuals and households with direct assistance by temporarily housing individuals and households in manufactured housing units.  Id.

15. Typically, FEMA will provide THA "for a period not to exceed 18 months from the date of the declaration" of the major disaster or emergency, unless the President determines that due to extraordinary circumstances an extension would be in the public interest."  44 C.F.R. § 206.110(e); 42 U.S.C. § 5174(B)(ii).

16. FEMA has the discretion to determine what type of THA it will provide individuals and households based on "considerations of cost effectiveness, convenience to the individuals

---

[1] During the fiscal year in which Hurricanes Katrina and Rita occurred, this cap rose to $10,500.00.

and households and the suitability and availability of the types of assistance." 44 C.F.R.
§ 206.110(c); 42 U.S.C. § 5174(b)(2)(B).

17. To qualify for THA, an individual or household must demonstrate, *inter alia*, (1) their
primary residence "has been destroyed, is uninhabitable, or is inaccessible" by a major
disaster, and (2) they are unable to meet their housing needs through other sources, such
as insurance. 42 U.S.C. § 5174(b); 44 C.F.R. § 206.110(h); 44 C.F.R. § 206.113(b)(1);
44 C.F.R. §206.113(b)(6).

18. Typically, FEMA arranges for and inspects the pre-disaster dwelling and will only
provide THA if the dwelling was destroyed or made uninhabitable or inaccessible by the
major disaster. FEMA will not provide THA if the dwelling was not sufficiently
damaged or made inaccessible by the major disaster.

19. Due to the circumstances created by Hurricane Katrina, FEMA waived the inspection
requirement for the initial eligibility determination and exercised its discretion to
expedite its temporary housing assistance. The payment consisted of $2358.00 in
"Transitional Housing Assistance" to eligible applicants whose pre-disaster residences
were located in the most severely damaged areas. The $2358.00 figure is based on the
average fair market rental for a two-bedroom unit for three months. See Exhibit A,
FEMA National Processing Service Center Memorandum on Transitional Housing
Assistance (Sept. 27, 2005). FEMA contracted with a company called Myriad, Inc., to
verify the occupancy and ownership of each residence using, *inter alia*, geo-spatial
mapping and satellite imagery. For verified applicants, FEMA "auto-determined" they
were eligible for $2358 for three months rent. Id. This was the first time that FEMA had

waived the inspection requirement and used geo-spatial mapping to auto-determine assistance for disaster applicants.

20. Typically, "FEMA will include all members of a pre-disaster household in a single registration and will provide assistance for one temporary housing residence unless . . . [FEMA] determines that the size or nature of the household requires that we provide assistance for more than one residence."  44 C.F.R. § 206.117(b)(i)(A); see also 44 C.F.R. § 206.117(b)(ii)(B).  FEMA refers to this regulation as the Shared Household Rule.  The purpose of the Shared Household rule is to avoid duplication of assistance for the same damage or injury based FEMA's expectation that families and roommates who choose to live together before a disaster will continue living together afterward.

21. THA is not an alternative to permanent housing and FEMA expects all recipients of THA to "obtain and occupy permanent housing at the earliest possible time."  44 C.F.R. § 206.114(a).  Indeed, for typical disasters, "FEMA generally expects that pre-disaster renters will use their initial rental assistance to obtain permanent housing."  Id. 206.114(b)(3).

22. FEMA may provide rent assistance beyond the initial award "based on need, and generally only when adequate, alternate housing is not available or when the permanent housing plan has not been fulfilled through no fault of the applicant."  44 C.F.R. § 206.114(a); 42 U.S.C. § 5174(c)(B)(ii).

23. To be eligible for continued rent assistance, i.e., assistance beyond FEMA's initial award, individuals and households must provide FEMA with the following:  (1) rent receipts proving they exhausted FEMA's initial award of rent assistance; (2) a permanent housing

plan; and (3) documentation showing they are making efforts to obtain permanent housing. Id. § 206.114(b).

24. An individual or household can appeal FEMA's section 408 eligibility determination-- notice of award or denial of assistance within 60 days of receiving FEMA's determination. 44 C.F.R. § 206.115(a). The appeal must be in writing and explain the reason for the appeal. 44 C.F.R.§ 206.115(b). Individuals and households can appeal the following:

> (1) Eligibility for assistance, including recoupment; (2) Amount or type of assistance; (3) Cancellation of an application; (4) The rejection of a late application; (5) The denial of continued [rental, direct, or other-needs] assistance; . . . (7) Termination of direct housing assistance; . . . or (10) Any other eligibility-related decision."

44 C.F.R. § 206.115(a).

25. FEMA will review its eligibility determination and the appellant's reasons for appealing and provide the appellant with a written decision within 90 days of receiving the appeal. "The decision of the appellate authority is final." 44 C.F.R. § 206.115(f).

**B. Applying for Individuals and Household Assistance**

26. Disaster applicants can register for federal assistance in one of two ways: by calling one of FEMA's National Processing Service Centers (NPSCs) using a FEMA toll-free number, or by accessing the FEMA website via the internet at www.fema.gov. There are four NPSCs,[2] often referred to as call centers, staffed with FEMA full-time employees and temporary Stafford Act Employees.

27. Total staffing for the National Processing Service Centers can reach 2,600 employees at full-capacity, but generally the total number of staff is about 1,600 employees. However,

---

[2] The permanent NPSCs are located in Hyattsville, Maryland; Denton, Texas; Winchester, Virginia; and San Juan, Puerto Rico.

for the response to Hurricane Katrina, FEMA activated a record number of 19 call centers and more than tripled the staff with more than 13,000 agents. Previously, FEMA's largest disaster response took place during the 2004 Hurricane Season, when the NPSCs activated 12 additional call centers and reached a maximum staffing level of just over 4,000 agents.    During the 2004 hurricane season, the NPSCs also broke all previous records by answering more than 4 million calls from August through the end of 2005. This season, FEMA answered more than 4 million calls during the first 40 days of the Katrina response effort (August 29 through October 7), which equates to an average of 100,000 calls per day; in fact, since August 29, 2006, FEMA has answered over 15 million calls in total. More specifically, on FEMA's busiest day during the 2004 Hurricane Season (October 4), the centers processed approximately 64,464 incoming calls. This season, on September 27, FEMA answered 197,037 calls.

28. When a disaster applicant registers for assistance, FEMA requests the following information: name, pre-disaster and current addresses, telephone number, social security number, insurance coverage information, household size and composition, type of incident that occurred and whether the applicant's pre-disaster dwelling suffered any damage. FEMA will then conduct an inspection of the disaster applicant's pre-disaster dwelling to verify that the dwelling was damaged by a disaster.

29. Once an individual or household has registered for Federal disaster assistance, FEMA sends the disaster applicant a publication entitled "Help After a Disaster: Applicant's Guide to the Individuals & Households Program" ("Applicant Guide"), which explains FEMA's Individual and Household Program.  See Exhibit B, Applicant Guide (Aug. 2005).  The Applicant Guide also includes:, *inter alia*, (1) an overview of FEMA's

disaster assistance registration process; (2) a description of the types of assistances available and the eligibility requirements for each type of assistance; (3) an explanation of the reasons an applicant may be determined ineligible for assistance; (4) description of terms and codes FEMA will use in its eligibility letters and other correspondence with the applicants; and (5) notifies the applicant of their right to appeal FEMA's determination.

30. FEMA uses the National Emergency Management Information System (NEMIS), a software computer program, to process applications. After an applicant registers for assistance, FEMA conducts a home inspection to determine whether the pre-disaster dwelling is habitable.[3] Then the application and inspection results are transferred into the NEMIS processing module. Several thousand hard-coded business rules are then applied to the application, comparing all of the applicant and inspection data to the eligibility requirements, routing the application accordingly.

31. One business rule in NEMIS identifies duplicate applications from the same household. NEMIS is programmed to automatically notify FEMA and applicants of the potential of duplicate applications for the same disaster-related need from the same pre-disaster household.

32. If the application meets all the business rules, it can be processed automatically, i.e., without manual intervention, for payment under NEMIS's "auto determination." Approximately, 95 percent of all applications are processed under NEMIS's "auto determination" using the business rules. For most disasters, it takes NEMIS approximately 5 to 10 days from registration, inspection, to eligibility determination to process a disaster application using "auto determination."

---

[3] During the inspection and if the pre-disaster dwelling is uninhabitable, the FEMA inspector will ask the disaster applicant whether the applicant is willing to relocate to another dwelling. If the applicant is unwilling, the applicant will not be determined eligible for Section 408 rental assistance.

33. If the application does not meet the auto determination business rules, NEMIS routes the application to the appropriate NEMIS queue, where it is assigned to a FEMA caseworker. The FEMA caseworker reviews the application to determine what action is required and makes the appropriate eligibility determination.    This process is called "manual determination."

34. If an eligibility determination must be made using "manual determination," it takes an average of 30 days to process an application.

35. Based on the information provided during the registration and the results of FEMA's inspection of the applicant's pre-disaster dwelling, the NEMIS business auto-determine the types of appropriate assistance--rental assistance, repair or replacement housing assistance, and other needs assistance.

36. If an application is determined eligible, NEMIS generates a letter to be mailed to the applicant informing the applicant that he is eligible for assistance. The letter is a "super letter" with standard instructions and information about disaster assistance. See Exhibit C, Eligibility Determination Super Letter at 1. Disaster applicants may be eligible for more than one category of assistance. In a section in the middle of the page, FEMA includes each category of assistance for which the particular disaster applicant is eligible and the amount(s) of assistance awarded to the applicant for each category. Id.

37. If an applicant is determined ineligible, NEMIS generates a letter to be mailed to the applicant informing him that he is ineligible for FEMA assistance. The letter is the same "super letter" with standard instructions and information about disaster assistance. Id. Disaster applicants may be found ineligible for disaster assistance for more than one reason. In a section in the middle of the page, FEMA includes each category of

10

assistance for which the particular disaster applicant is ineligible and a short code and sentence containing explaining each reason why the disaster applicant is ineligible for disaster assistance.

38. In both the eligible and ineligible determination letters, FEMA refers the disaster applicant to FEMA's Applicant Guide for a more detailed explanation of FEMA's eligibility determination. Id. FEMA also informs the disaster applicant that if the disaster applicant disagrees with the eligibility determination he has the right to appeal within 60 days of the date of the letter. Id.

39. Further, in both the eligible and ineligible determination letters, FEMA instructs the disaster applicant to "**READ THE FRONT AND BACK OF THE 'NOTICES' INCLUDED WITH THIS LETTER FOR ADDITIONAL IMPORTANT INFORMATION.**" Id (emphasis included). The "Notices" Eligibility Insert[4] is a two-page information sheet and includes a list of common ineligibility codes and their meanings, information about what the applicant should do with the assistance he receives, how the disaster applicant must deal with his insurance company before being eligible for disaster assistance and more specific information about the disaster applicant's appeal rights such as how and where to file an appeal. Id at 2-3.

40. As stated above, FEMA provides all applicants who register for Federal disaster assistance with an Applicant Guide. The Applicant Guide contains a list of FEMA's standard explanations and codes contained in the determination letters generated by NEMIS. Some common examples of ineligible codes listed in the Applicant Guide are:

---

[4] There are two versions of the "Notices" information insert. The other version is a slightly shorter one-page document that FEMA sends along with its appeal decisions. However, any applicant who is appealing a Section 408 eligibility determination would have received the two-page document with his first eligibility determination letter.

a.  IAW – Ineligible – Assisted with Household Member:  Our records show that another member of your pre-disaster household applied and received help for your losses. See Applicant Guide at 7 -9.

b.  IDUPA – Ineligible Duplicate Application– This category applies when FEMA's records "show that a member of [the evacuee's] pre-disaster household has already registered for help." FEMA processes one application and all other applications are determined ineligible and assigned this code. Id.

c.  IID – Ineligible Insufficient Damages – The Applicant Guide explains that this code means: "There was not enough damage to [the applicant's] home or property for [the applicant] to qualify for this program." Id.

d.  INC- Ineligible – No change on appeal, original ineligible status stands – The Applicant Guide explains that this category applies when the evacuee "is not eligible for any further assistance" and the "file is now closed." Id. at 8. The evacuee applicant can call the FEMA Helpline to inquire as to the reason for ineligibility. Id.

e.  IINSI – Ineligible:  All categories have appropriate insurance excluding flood, inspection completed – Your insurance should cover your disaster-related losses. Id.

f.  INFI – Ineligible – Has Flood Insurance:  Your insurance should cover your disaster-related losses. Id.

g.  INO – Ineligible – Other:  Your application for assistance is denied.  Please see specific reason on letter. Id.

h.  INP – Ineligible – Not Primary Residence:  You have not provided enough documentation to prove the home that was damaged was the home where you were living at the time of the disaster.  Id.

i.  INS- Ineligible Insured –Namely, the applicant has insurance to cover the loss for which he is now seeking Federal assistance.  Id.  Further, the Notices eligibility Insert states: "Your insurance should cover your disaster related losses.

j.  W69D – Withdrawn - Signature Not Obtained (90-69D) – This category represents another relatively common basis for an ineligibility determination.  The Applicant Guide and Notices Insert provided with the ineligible letter expressly inform the applicant that his "application has been withdrawn because we have not received the required signature or documents requested."

k.  WNC – Withdrawn No Contact – Application has been withdrawn because FEMA was unable to contact the applicant. Id.

l.  WVO – Withdrawn Voluntarily – This code means that at the request of the applicant, FEMA has withdrawn their application for assistance.  An applicant can reinstate his application by calling FEMA's 1800 Helpline.  Id.

41. For example, in FEMA's ineligibility letter sent to Plaintiff Kenneth Leach, FEMA informed him that he was ineligible for assistance for the following reason:  "IID Ineligible Insufficient Damage" and referred Plaintiff Leach to the Applicant Guide for more detail.  See Plaintiffs' Compl. Exhibit 1. Specifically, the letter stated:

> For a more detailed explanation of this decision, please refer to "HELP AFTER A DISASTER", the FEMA Applicant's Guide which was mailed to you after you applied for assistance.  The section entitled "If You Are/Are Not Eligible for Help" (pages 6-9) explains the reasons which support our decision.  You may also

access  "HELP  AFTER  A  DISASTER"  online  at
www.fema.gov/about/process.

See Plaintiffs' Compl. Exhibit 1.

42. In the event that none of the specific ineligibility codes capture the exact reason for an applicant's ineligibility, FEMA uses the code "INO" meaning "Ineligible—Other," and then the FEMA caseworker manually inputs the reason for the eligibility determination. See Exhibit D, Memo to All Processing Staff from NPSC Coordination Team regarding "IHP Manual Letter Text for INO & IOR Decisions."

**C.  Modification of Certain Section 408 Assistance Due to Hurricane Katrina**

43. FEMA had never encountered a disaster response similar to Hurricane Katrina where members of pre-disaster households were separated as a result of the mass evacuations and lack of adequate housing. On September 19, 2005, to remedy the problem, FEMA modified its Shared Household Rule and established a Separated Households Policy permitting THA for more than one resident from the same pre-disaster household provided the household was displaced and members of the households were "living in different geographic locations from one another **as a result of Hurricane Katrina**." Exhibit E, FEMA Memo. (Sept. 19, 2006) (emphasis added).

44. Many pre-disaster renters were determined ineligible for FEMA assistance on the grounds that they suffered insufficient damage--"IID"--to their pre-disaster dwelling and personal property. Several months after Hurricane Katrina, FEMA discovered that many renters in the disaster area were displaced from, and unable to return to, their pre-disaster dwelling for reasons other than disaster-related damage. For example, some landlords re-rented undamaged or minimally damaged apartments to other tenants rendering the units

unavailable to the pre-disaster tenants who had been determined ineligible due to insufficient damage by FEMA.

45. As such, on June 19, 2006, FEMA issued a Disaster Specific Guidance for Displaced Renters (Displaced Renter DSG) to address ineligible renters in this situation.  <u>See</u> Exhibit F, Displaced Renter DSG) Specific Guidance, Displaced Renter Eligibility Determinations (June 19, 2006).

46. The Displaced Renter DSG establishes a policy to enable applicants to receive THA and other needs assistance who were initially denied assistance because FEMA's post-disaster inspection resulted in a determination of insufficient damage. <u>Id.</u>   To be eligible for THA under this DSG, the applicant must demonstrate: "(1) Their pre-disaster residence is no longer available, AND: (2) The applicant does not own a secondary or vacation home within reasonable commuting distance of their pre-disaster residence." <u>Id.</u>  Further, to be eligible for other needs assistance for personal property, the applicant must demonstrate: (1) the previous conditions were met; "(2) the personal property was not retrieved after the disaster; AND (3) there is a continuing need for personal property that has not been met through any other means." <u>Id.</u> at 2.   To satisfy these requirements, disaster applicants can submit "signed certification that the qualifying criteria apply" to them. <u>Id.</u>

47. In June 2006, FEMA began contacting applicants who were pre-disaster renters[5] and were initially denied assistance due to "IID – Insufficient Damage" and informed them that they may be eligible for assistance pursuant to the Displaced Renter DSG.

48. Through a combination of phone calls and letters, FEMA informed applicants of the requirements necessary to become eligible for assistance under the Displaced Renter

---

[5] FEMA contacted all pre-disaster renters determined IID with the exception of disaster applicants who were in direct housing units because those applicants' housing needs were already being met.

DSG and, as a courtesy, provided applicants with a certification form to be filled out and returned to FEMA.

## II.     PUBLIC ASSISTANCE UNDER THE STAFFORD ACT

### A.  Emergency and Essential Assistance

49. Communities are responsible for responding to, and protecting residents from disasters and emergencies.  The purpose of the Stafford Act is to provide State and local governments with Federal assistance to supplement State and local efforts in responding to a disaster and emergency when the disaster or emergency is of such severity and magnitude that "effective response is beyond the capabilities of the Sate and the affected local governments." 42 U.S.C. § 5170.

50. The Public Assistance (PA) program provides grants to eligible State, and local and tribal governments.  A State applying for Public Assistance is called the Grantee and the local government applying for the assistance is called the Subgrantee. Indian tribes may opt to be either a Grantee or Subgrantee.  FEMA also refers Grantees and Subgrantees as PA Applicants.

51. As a result of Hurricane Katrina, the President made available Public Assistance in the form of emergency and essential assistance available under the PA program to meet the immediate threat to life and property for the four States declared major disasters and the 44 States and the District of Columbia declared to be in a state of emergency and hosting Hurricane Katrina evacuees.

52. Essential assistance includes search and rescue, emergency medical care, emergency mass care, emergency shelter, and provision of food, water, medicine, and other essential

needs, including movement of supplies or persons (referred to as "Section 403 assistance").[6]

53. FEMA categorizes "essential assistance" as "emergency work" under the PA program.

54. Emergency work, including essential assistance, must be completed within six (6) months from the date that a major disaster or emergency is declared.    44 C.F.R. § 206.204(c)(1). Extensions may be granted based on "extenuating circumstances or unusual project requirements beyond the control of the sub-grantee...."  44 C.F.R. § 206.204(c)(2)(ii).

55. One example of an essential assistance for which a PA applicant can apply is emergency sheltering.  The most common form of emergency shelter is congregate or mass shelter, which is a private or public facility, such as a school, gym, church, or stadium, that provides contingency congregate shelter to evacuees for a very short time period.

56. Because Section 403 assistance is provided to State and local governments for emergency circumstances, evacuees do not have to apply or qualify for assistance to shelter in State and local government provided emergency shelters.

57. To be eligible for Public Assistance, the project or work for which the grant is sought must be:  (1) a result of the declared disaster or emergency; (2) must be located in an area designated by the President as eligible for assistance; (3) must be the legal responsibility of the PA applicant; and (4) not be eligible for assistance under another Federal program. To be reimbursed for eligible PA work, an eligible PA applicant must file a Request for Public Assistance.  44 C.F.R. § 206.202(c).  The PA applicant must then submit to FEMA a Project Worksheet that includes the eligible scope of work, an estimated cost of

---

[6] In the event of a disaster declaration, "essential assistance" is authorized under Section 403 of the Stafford Act. In the event of a emergency declaration, "essential assistance" is authorized under Section 502 of the Stafford Act. See 42 U.S.C. §5192. However, for clarity's sake, FEMA will refer to all essential assistance described in this brief as Section 403 assistance.

the work, and any relevant information with respect to insurance coverage. 44 C.F.R. § 206.202(d). FEMA will then obligate funds to the PA applicant based on the approved Project Worksheet. 44 C.F.R. 206.202(e).

58. A PA applicant may "appeal any determination previously made related to an application for or the provision of Federal assistance" as set in FEMA's regulations, 44 C.F.R. § 206.206.

**B. Section 403 Apartment Program**

59. Immediately before and after Hurricane Katrina, hundreds of thousands of residents of Louisiana, Mississippi, and Alabama (the overwhelming majority of whom were pre-disaster residents of Louisiana and Mississippi) evacuated their homes. Some of these evacuees moved to other locations within Louisiana and Mississippi, while others moved to other locales throughout the United States, including to approximately 1,600 shelters throughout the United States. Approximately 185,000 evacuees were living in as many as 1,355 shelters in 28 states, and the balance of the evacuees were sheltered in other states.

60. Due to the sheer number of evacuees and the devastation caused by Hurricane Katrina, it soon became clear to FEMA and the States hosting Hurricane Katrina evacuees that traditional forms of emergency shelter would not meet the needs of evacuees or permit FEMA sufficient time to process applications for individual and household assistance, i.e., section 408 assistance. As such, FEMA permitted State and local governments to apply for Public Assistance grants to provide shelter to evacuees for a longer period than sheltering would last in typical disaster situations.

61. On September 9, 2006, FEMA published its Disaster Specific Guidance for Eligible Costs for Emergency Shelter ("DSG for Emergency Shelter"). See Exhibit G, DSG for Emergency Shelter. The DSG informed potential PA applicants that they could apply for emergency assistance to provide "Interim Sheltering." Id. at 4. The DSG for Emergency Shelter stated:

> In support of FEMA's housing strategy, [PA] applicants are attempting to reduce the burden of traditional sheltering activities by providing interim shelters for evacuees. The costs incurred by a [PA] applicant to support such activities are eligible. Reimbursement will be for eligible shelter victims (i.e., evacuees) from the disaster affected States (LA, MS, AL) at the Fair Market Rate. These costs include the lease of properties, including apartments or hotels and will be reimbursed for a period of up to 12 months.

Id.

62. The DSG for Emergency Shelter authorized PA applicants to lease apartments up to 12 months to shelter evacuees. This program is referred to as the section 403 Apartment Program. FEMA had not provided assistance in this form before; the Section 403 apartment program is unique and was developed solely to address the circumstances surrounding Hurricane Katrina.

63. Not all States hosting evacuees participated in this program. Thirty two States applied for PA assistance to shelter evacuees in apartments and leased approximately 60,000 apartments nationwide.

64. On September 29, 2005, FEMA provided additional information regarding section 403 shelter in a Frequently Asked Questions publication on Section 403 Sheltering. See Exhibit H, FAQ Section 403 Sheltering (Sept. 29, 2005) In response to a question regarding whether to enter 12 month leases, FEMA stated PA "Applicants are

19

encouraged to contract for a shorter renewable lease period (e.g. 3 months) to allow evacuees maximum flexibility in making long-term housing decisions." Id. at 7.

65. On November 14, 2005, FEMA published a Disaster Specific Guidance entitled "Hurricanes Katrina and Rita Transitional Housing Strategy" ("DSG on Transitional Housing). See Exhibit I, DSG Re: Traditional Housing Strategy. The DSG announced FEMA's plan to transition evacuees sheltering in section 403 shelters, including hotels and apartments, to section 408 Temporary Housing Assistance ("THA") as soon as practicable. Id. The DSG stated FEMA's intent to begin transitioning evacuees sheltering in hotels to THA by December 1, 2006 and then focus on transitioning evacuees sheltering in section 403 apartments to THA. Id. at 2.

66. As such, FEMA notified all PA Applicants that as of December 1, 2005, "no new or extended State and local apartment leases will be reimbursable under the 403 program." Id. FEMA notified PA Applicants that it expected to transition all evacuees sheltering in the section 403 Apartment Program to THA no later than March 1, 2006, and as such, FEMA would stop reimbursing PA Applicants for apartment rents no later than March 1, 2006. Id. at 2.

67. On January 20, 2006, FEMA notified PA applicants that they were not required to terminate leases for section 403 apartments until FEMA expressly informed them to do so. See Exhibit J, Letter to PA Applicants (January 20, 2006). Moreover, FEMA informed PA Applicants that if FEMA were unable to convert evacuees to section 408 THA by March 1, it would reimburse the PA Applicants for additional rent assistance.

68. In the January 20, 2006 letter, FEMA requested that the PA applicants provide lists to FEMA with certain individual and sheltering information about each evacuee housed in

section 403 apartments within each PA applicant's jurisdiction. This was necessary for FEMA to obtain in order to identify the individual in NEMIS and make an appropriate eligibility determination for the purpose of converting the individual from Section 403 to Section 408 rental assistance. However, FEMA encountered significant obstacles in obtaining the information from the PA applicants, including, but not limited to, PA applicants transmitting lists of evacuees who were no longer sheltering in 403 apartments, lists with misspellings, lack of evacuees' social security numbers, lack of landlord data, and lack of lease end date data.

69. In February 2006, FEMA started developing a transition program to enable evacuees to remain in their section 403 apartment and permit FEMA to provide their section 408 rent assistance directly to the landlord as payment for rent on behalf of the evacuees eligible for Section 408 rental assistance. This program became known as the Direct Landlord Payment Program.

70. FEMA hired a contractor ("CLC") to work with interested landlords and evacuees to transition the evacuee in to the Direct Landlord Payment Program.

C.    Section 403 Apartment Program Conversion

71. On February 22, 2006, FEMA sent the PA applicants a letter stating it would not continue to reimburse PA applicants for rents paid for units with leases set to expire on February 28, 2006. See Exhibit K, FEMA Letter to PA Applicant (Feb. 22, 2006). For all leases beyond March 1, 2006, FEMA informed PA applicants that FEMA would continue to reimburse the PA applicant while FEMA transitioned eligible evacuees to section 408 rental assistance.[7] Id.

---

[7] On March 4, 2006, FEMA sent a similar letter to all PA Applicants in Texas.

72. On or about March 1, 2006, to the extent FEMA knew the individual and sheltering information about each evacuee housed in section 403 apartments, FEMA sent letters to the evacuees notifying them of their section 408 eligibility status.[8]

73. On or about March 1, 2006, FEMA sent a letter to all evacuees eligible for section 408 assistance ("eligible evacuees") informing them that they were eligible for rent assistance or participation in FEMA's Direct Landlord Payment Program.    See Exhibit L, Template Letter to Eligible Evacuees (Mar. 1, 2006). FEMA also explained how to apply for or be recertified for continued rental assistance.

74. On or about March 1, 2006, FEMA sent letters to ineligible evacuees informing them that they were ineligible for rental assistance and notified them of their right to appeal FEMA's determination. See Exhibit M, Template Letter to Ineligible Evacuees (Mar. 1, 2006). Additionally, FEMA informed the ineligible evacuee that FEMA would provide them subsidized rent in their section 403 apartment until March 31, 2006 to enable them to make alternative housing arrangements. Id.

75. Shortly thereafter, some State and local government PA applicants contacted FEMA and objected because FEMA was directly sending notice to the evacuees. The PA applicants were concerned that FEMA and/or CLC were making notifications about when the leases would end and how the leases would be transitioned. The PA applicants contended that since they were responsible for the leases, any communication with the landlords about termination dates or transition of lease requirements should come from them. FEMA

---

[8] Notably, any evacuee who had previously registered for disaster assistance and whose eligibility status had been determined should have already been aware of his/her eligibility status. The date of the initial determination letter for each evacuee varies based on when the evacuee applied for assistance. Therefore, the letters transmitted on or after March 1, 2006, would be at least the second notification that evacuees received regarding their Section 408 eligibility status.

agreed and decided to provide the eligibility information directly to the PA applicants for their action.

76. On March 26, 2006, FEMA issued a Disaster Specific Guidance entitled Conversion of Assistance - 403 to 408 ("Conversion DSG") to explain the manner and timeline in which FEMA would convert eligible evacuees to section 408 assistance and terminate the section 403 Apartment Program.  See Exhibit N, Conversion DSG (Mar. 26, 2006).

77. On March 27, 2006, FEMA transmitted the Conversion DSG to the PA applicants along with a letter explaining the DSG.  See Exhibit O, Public Assistance Applicant Letter (Mar. 27, 2006).

78. As initiated in January 2006, the DSG required PA Applicants to provide FEMA with certain individual and sheltering information about each evacuee housed in section 403 apartments within each PA applicant's jurisdiction.

79. Upon receipt of the individual and sheltering information about each evacuee housed in section 403 apartments, FEMA would use NEMIS to determine whether the evacuee had registered for disaster assistance and check their eligibility status or encourage the evacuee to register for assistance.  To the extent that FEMA was able to match the data in the PA applicant's list with NEMIS, FEMA would then provide the eligibility status of each evacuee to the PA applicant.

80. Once FEMA provided the PA applicant with a list of ineligible evacuees, the Conversion DSG gave the PA applicants 15 day notify the landlord that the landlord must issue a 30-day lease termination.  The ineligible evacuee was then free to vacate the property at the end of the 30-day notice period or assume the remaining lease obligations him or herself.

81. The Conversion DSG stated, FEMA "will make every effort to notify PA Applicants of ineligibles well before April 15[th]. The PA Applicant (State) must notify . . . evacuees of lease termination no later than April 30, 2006." Id.

82. For evacuees who were determined eligible for Section 408 rental assistance, the PA applicant was responsible for notifying the landlord that the PA Applicant was terminating the lease and, if interested, the landlord and evacuee were eligible to participate in FEMA's Direct Landlord Payment Program. If the evacuee or landlord were not interested in participating is this program, FEMA could provide the eligible applicant with traditional rent assistance, e.g, financial assistance provided by check or electronic deposit to their bank account.

83. On or about April 7, 2006, to the extent that the PA applicant had provided FEMA the individual and sheltering information about each evacuee housed in section 403 apartments, FEMA sent evacuees letters informing them of their section 408 eligibility status.

84. For ineligible evacuees, the April 7th letter again informed the evacuee that they were ineligible for section 408 assistance and retracted the March 31, 2001 deadline set out in FEMA's March 1, 2006 letter. See Exhibit P, FEMA Letter to Ineligibles (Apr. 7, 2006). In that letter, FEMA provided ineligible evacuees with a second opportunity to appeal FEMA's decision.[9]

---

[9] FEMA only provides one appeal period that runs from the date of FEMA's initial determination. However, FEMA provided a second opportunity to appeal for evacuees in the section 403 Apartment Program out of concern that the ineligible evacuee did not act on FEMA's initial ineligibility determination for Section 408 rental assistance because they were being provided housing through the section 403 Apartment Program.

85. For eligible evacuees, the April 7th letter informed them that they were eligible for assistance and FEMA was in the conversion from 403 to 408 was in progress. See Exhibit Q, FEMA Letter to Eligible (Apr. 7, 2006).

   1.  **NEMIS Process for Converting Evacuees.**

86. Since the conversion program was unique to Katrina and NEMIS does not have business rules to convert individuals from section 403 to Section 408 rental assistance, FEMA had to develop a process outside of NEMIS to convert a disaster applicant from Section 403 to 408 assistance and then identify and change or append the applicants' eligibility status in NEMIS to identify and code the disaster applicants.  This often required a NEMIS system "work around" because NEMIS automatically generated a letter to be printed - that needed to be destroyed and not mailed to the disaster applicant.  These letters contained the codes typically used to respond to disaster applicants on appeal –either "ENC –Eligible No Change" or INC –"Ineligible No Change" – with an award amount of $0.  In this fashion, FEMA was able to convert disaster applicants from Section 403 to Section 408, and "transport" eligible applicants to CLC for the conversion.

87. These ENC and INC letters were for internal administrative purposes only, and were not intended to be sent to applicants, despite their categorization as "letters." See, e.g., June 15, 2005 Letter to Joseph Douglas.

88. Unfortunately, in some instances, the ENC or INC letters were not destroyed and were inadvertently mailed to the disaster applicants.  These letters may have resulted in confusion to disaster applicants as they did not list a reason or a dollar amount for an award or denial of an award.  FEMA did not have a way to identify which disaster applicants had been accidentally mailed the ENC or INC letters, so FEMA instructed its

agents working on the 1-800 helpline who encountered a disaster applicant who called with questions about an ENC or INC letter to review the disaster applicant's case to determine the reason for his eligible or ineligible determination and advise the applicant of the eligibility determination and reason.

### 2.    Extension of the Deadlines During the 403 Conversion

89. The Conversion DSG stated FEMA would not reimburse the PA Applicant for ineligible evacuees beyond May 31, 2006, unless FEMA was unable to provide the PA applicant with a list of ineligible evacuees with sufficient time to enable the PA applicant to provide 30-day notice to landlords and evacuees. See Conversion DSG at VI.A.2.b(1).

90. The opportunity to request an extension was available to all PA applicants.

91. Sixteen PA applicants nationwide[10] requested extensions beyond the initial May 31, 2006 deadline to June 30, 2006 and FEMA granted every request.

92. Several jurisdictions in Texas requested extensions beyond the June 30, 2006 deadline to July 31, 2006 and FEMA granted every request.

93. Finally, on July 26, 2006, FEMA extended the section 403 Apartment Program until August 31, 2006 for all participating PA applicants. See Exhibit R, Sheltering (403) Extension Option (July 26, 2006).

94. On August 18, 2006, the City of Houston requested a fourth extension through September 30, 2006, for ineligible evacuees. FEMA denied the request in part, and granted it, in part, for 113 households for whom additional documents could be submitted that may change their section 408 status to eligible.

## III    FEMA COMMUNICATIONS WITH DISASTER APPLICANTS

---

[10] Ohio, South Dakota, Indiana, Minnesota, Utah and 11 jurisdictions in Texas (Houston, Ark-Tex Council of Governments, City of Austin, Dallas Housing Authority, City of San Antonio, Bell County, City of Lubbock, City of Grand Prairie, City of Amarillo, City of Arlington,and the City of El Paso)

95. Every disaster is unique, and the manner in which FEMA coordinates its notification and outreach efforts is tailored to the demands of each specific disaster. FEMA maintains some degree of flexibility in its response to each disaster so that it can respond in the quickest and most effective way.

96. In any disaster, FEMA uses a number of sources to provide residents of disaster areas with information concerning disaster assistance and how to register for assistance.

97. One resource for disaster applicants is a Disaster Recovery Center (DRC), which is a readily accessible facility or mobile office where applicants may go for information about FEMA or other disaster assistance programs, or for questions related to a disaster victim's particular case. A disaster victim can register for assistance at a DRC. Some of the services that a DRC may provide include:

   a. Guidance regarding disaster recovery;
   b. Clarification of any written correspondence received;
   c. Housing Assistance and Rental Resource information;
   d. Answers to questions, resolution to problems and referrals to agencies that may provide further assistance;
   e. Status of applications being processed by FEMA; and
   f. SBA program information if there is a SBA Representative at the Disaster Recovery Center.

98. Another resource for obtaining information or assistance regarding FEMA programs is the FEMA Helpline at 1(800)-621-FEMA. There is another number provided for the speech– or hearing-impaired as well at 1(800)462-7585.

99. An additional resource for information and assistance is the FEMA website at www.fema.gov. FEMA provides a wealth of information to disaster victims, including, *inter alia*, the Applicant Guide, FEMA press releases, FEMA fact sheets, frequently asked questions, forms that the applicant might need to submit for application processing and other information on FEMA assistance programs and how to apply for them.

Disaster applicants can register for assistance on the website, and they can also email FEMA for information or assistance at FEMA-Correspondence-Unit@dhs.gov.

100.    The unique nature of the Katrina disaster, including the unprecedented numbers of disaster victims seeking assistance, has required FEMA to utilize its flexibility to develop a plan for communicating with individuals on a mass scale. FEMA faced the formidable challenge of educating millions of people about its disaster assistance programs, instructing potential applicants how to apply, communicating on an ongoing basis with applicants about additional information they needed to submit, and providing timely decisions regarding eligibility.

A. **Notice and Outreach to Disaster Applicants in the Section 403 Apartment Program**

101.    Hurricane Katrina presented unique challenges with respect to communicating with the evacuees, who were spread throughout the country and FEMA often did not have updated or current contact information for the evacuee. Communicating with evacuees about the individual circumstances of their particular applications required this type of contact information and could not be accomplished through mass media. Therefore, FEMA's communications with evacuees and its outreach efforts extended far beyond merely mailing out the Applicant Guide and eligibility determination letters. FEMA redoubled its efforts to communicate with the disaster applicants, particularly in the Section 403 apartment program, in order to advise them regarding how to obtain assistance and/or become eligible for FEMA programs.

102.    However, the exceptional circumstances resulting from Hurricane Katrina and the Section 403 apartment program presented FEMA with a formidable challenge of providing notice to evacuees in Section 403 apartments that the program was ending and

28

assisting the eligible evacuees in converting to Section 408 rental assistance. This was a particularly difficult problem because PA applicants had not provided FEMA with a comprehensive list of individual and sheltering information about each evacuee housed in section 403 apartments prior to the conversion. Therefore, FEMA undertook a major outreach campaign directed at the 403 apartment program population. The goal of this campaign was to provide notice to the evacuees that the 403 apartment program was ending in order to give them ample opportunity to prove their eligibility for Section 408 rental assistance.

103.    FEMA utilized the media to contact disaster applicants. For example, in Texas, FEMA issued press releases to media outlets (approximately 575 newspapers, both daily and weekly) to emphasize the need for evacuees to communicate with FEMA about their cases. See Exhibit S, August 7, 2006 FEMA Press Release. FEMA also recorded four public service announcements released to the media in Texas (approximately 230 television stations and 250 radio stations) during August 2006, stating a variation of the message:

> Are you a hurricane evacuee receiving FEMA rental assistance? Have you been notified your rental assistance will end soon? Help FEMA help you. Call 1-800-621-FEMA with your housing history...a long-term housing plan...and send copies of rent receipts. FEMA wants to help but we need your help.

FEMA also translated its media into Vietnamese and Spanish and distributed it to the appropriate audiences. See Exhibit T, FEMA PSAs.

104.    FEMA also conducted multiple "call-outs" to various sections of the Section 403 apartment program populations from the months of March through August to obtain

additional data not provided by the states or to gather information from the applicant that would help in processing the applicant's eligibility determination.

105.       Further, FEMA's authority to provide housing assistance to disaster applicants is governed by laws, regulations and eligibility criteria. Given these constraints, FEMA went to extraordinary lengths to assist those who met FEMA's eligibility criteria to demonstrate that they were eligible for Section 408 rental assistance. To assist evacuees in demonstrating their eligibility for section 408 assistance, FEMA NPSCs reviewed and re-reviewed FEMA's initial ineligibility determinations to determine what each evacuee needed to do to become eligible. The caseworker called the applicants during these reviews to again explain what was required in order to receive Section 408 rental assistance. Despite FEMA's best efforts, there are some evacuees who cannot convert to Section 408 rental assistance because they simply are not eligible.

106.       Since March 2006, FEMA's Virginia NPSC has conducted and continues to conduct multiple and extensive nationwide reviews of certain populations of applicants housed in the Section 403 apartment program who were determined ineligible for Section 408 rental assistance. These reviews were undertaken to determine if the original classification of "ineligible" was correct for each evacuee applicant, with the goal of ensuring every applicant the opportunity to demonstrate whether they were eligible for Section 408 rental assistance.

107.       FEMA reviewed the eligibility determinations of the Section 403 apartment program disaster applicants with INO and INC ineligibility codes and those disaster applicants whose leases had expired to ensure that the applicants were receiving sufficient rental assistance. The NPSC also reviewed the disaster applicants with IID,

WVO, WNC, IDUPA, IAW ineligibility determinations and contacted those missing certain release forms to re-send the applicants the forms. In June, the NPSCs conducted another review of disaster applicants with an IID determination. In July, the NPSCs called all eligible 403 apartment program disaster applicants nationwide whose 403 benefits were set to end and explained the recertification process.

108.    In addition, FEMA went to extreme efforts to help the population understand its program and demonstrate eligibility for Section 408 rental assistance. Upon review, FEMA, if appropriate and among other measures, conducted a second inspection on the applicants' pre-disaster dwelling, re-sent the disaster applicant the release form to sign, contacted the disaster applicant's insurance company to be sure that the disaster applicant's needs were being met, and reviewed those applicants listed as INO or WVO to ensure the accuracy of the non-coded ineligibility reason.

109.    FEMA called evacuees participating in the Section 403 apartment program who had been determined "IID" to explain the new policy and read the applicant a series of questions to assist the evacuee in completing a self-certification form.[11]    FEMA then mailed the completed self-certification form to the disaster applicant to sign and return.

110.    The City of Houston had the largest population of evacuees participating in the Section 403 apartment program, with a population of approximately 35,000 evacuees. Therefore, FEMA developed a Houston Ineligibles Support Strategy specific to the city with the goal of ensuring that those applicants who had been determined ineligible for Section 408 assistance have been provided "additional opportunity to demonstrate eligibility, to convert all those who are eligible [to the Section 408 program], to marshal

---

[11] FEMA also sent nationwide letters enclosing the self-certification form to displaced renters who were not in the 403 apartment program to assist them in becoming eligible for Section 408 disaster assistance.

alternate resources of assistance for those who are not [eligible for 408 assistance], and [to] ensure these efforts are externally communicated and understood." See Exhibit U, Houston Ineligibles Support Strategy.

111.    Further, on August 14, 2006, FEMA extended Section 403 assistance until September 30, 2006 for several hundred disaster applicants housed in the Section 403 apartment program in the city of Houston who had been determined IID, but had not yet returned the self-certification form. FEMA extended these disaster applicants to allow them time to mail the self-certification form back to FEMA.

112.    FEMA's extensive outreach efforts resulted in significant increases in Section 408 eligibility determinations. In April, when FEMA initially began converting the evacuees in the Section 403 apartment program to Section 408 assistance, there were approximately 14,265 households who were ineligible for Section 408 assistance. As of September 6, 2006, that number had been reduced to 10,989.

## V.    ASSISTANCE TO NAMED PLAINTIFFS

113.    My staff pulled from NEMIS information regarding the status of the Named Plaintiffs' applications. The NEMIS data shows as follows:

   a. Latonya Burton applied for assistance on August 31, 2005. On October 10, 2005, an Applicant Guide was mailed to her. See Exhibit V, October 10, 2005 Letter to Latonya Burton. She was awarded $2000 in Expedited Assistance on September 9' $2358.00 in Rental Assistance (3 months) on September 25. On November 7, 2005, FEMA sent a letter to Ms. Burton with its initial eligibility determination that she was ineligible for assistance under the Section 408 program, along with an attached set of notices regarding her rights of appeal and other important information. See Exhibit W, Letter to Latonya Burton (November 7, 2006). Ms. Burton is ineligible for assistance because of insufficient damage (IID). The letter also explained that Ms. Burton was entitled to appeal FEMA's determination, described the necessary information to be included in the appeal, and identified the address

and deadline for submission of the appeal letter, if any. This information was also contained in the notice attached to the letter. Ms. Burton left her Section 403 apartment in May, has no intention of returning to New Orleans, and is currently staying with friends or relatives. Accordingly, Ms. Burton does not qualify for any further assistance, and her housing needs have been met.

b.  Joseph Douglas applied for assistance on September 9, 2005. On September 15, 2005, FEMA approved an award of $2,000 in expedited rental assistance for Mr. Douglas. On September 16, 2005, FEMA provided Mr. Douglas a copy of the Applicant Guide by mail. See Exhibit X, Letter to Joseph Douglas (September 16, 2005). On January 10, 2006, FEMA sent a letter to Mr. Douglas with its initial eligibility determination that he was ineligible for assistance under the Section 408 program, along with an attached set of notices regarding his rights of appeal and other important information. See Exhibit Y, Letter to Joseph Douglas (January 10, 2006). The letter of January 10, 2006, identified IID as the basis for Mr. Douglas' ineligibility. The letter also explained that Mr. Douglas was entitled to appeal FEMA's determination, described the necessary information to be included in the appeal, and identified the address and deadline for submission of the appeal letter, if any. This information was also contained in the notice attached to the letter. FEMA continued to ask for documentation from Mr. Douglas to process his application; however, at this time, Mr. Douglas has not been able to verify occupancy at his pre-disaster dwelling address and is still ineligible for assistance. Of note, Mr. Douglas presented a drivers license as proof of occupancy that contains a different address than that of his claimed pre-disaster dwelling.

c.  Kenneth Leach applied for assistance on September 9, 2005. On September 15, 2005, an Applicant Guide was mailed to him. See Exhibit Z September 15, 2005 Letter to Kenneth Leach. On January 6, 2006, FEMA sent a letter to Mr. Leach with its initial eligibility determination that he was eligible for assistance under the Section 408 program, along with an attached set of notices regarding his rights of appeal and other important information. See Exhibit AA, Letter to Kenneth Leach (January 6, 2006). The letter also explained that Mr. Leach was entitled to appeal FEMA's determination, described the necessary information to be included in the appeal, and identified the address and deadline for submission of the appeal letter, if any. This information was also contained in the notice attached to the letter. Mr. Leach lived in a Section 403 apartment and he was awarded $2000 in Expedited Assistance on Sept 9, 2005; $2358 in Rental Assistance on

November 2, 2005 (3 months); $1689.00 in Rental Assistance on January 3rd (3 months); a supplemental payment of $339.00 for rental assistance on January 22, 2005 to bring applicant's previous rental assistance up to current FMR; $1350.00 in Rental Assistance on May 16, 2006 (3 months). Mr. Leach is currently ineligible for continued assistance because his pre-disaster rent was $500, and his current rental amount is $450. His income has not changed, and he is still receiving the same social security benefits as before the disaster.

d. Doris Mitchell applied for assistance on September 7, 2005. On September 20, 2005, an Applicant Guide was mailed to her. <u>See</u> Exhibit BB, September 20, 2005 Letter to Doris Mitchell. On January 9, 2006, FEMA sent a letter to Ms. Mitchell with its initial eligibility determination that she was ineligible for assistance under the Section 408 program, along with an attached set of notices regarding her rights of appeal and other important information. <u>See</u> Exhibit CC, Letter to Doris Mitchell (January 9, 2006). The letter of January 9, 2006, identified W69D as the basis for Ms. Mitchell's ineligibility. The letter also explained that Ms. Mitchell was entitled to appeal FEMA's determination, described the necessary information to be included in the appeal, and identified the address and deadline for submission of the appeal letter, if any. This information was also contained in the notice attached to the letter. Ms. Mitchell lived in a Section 403 apartment and was awarded $2000 Expedited Assistance on September 9, 2005; $2358.00 Rental Assistance (3 months) on September 25, 2005; $2376 in rental assistance on February 8, 2006 (3 months). Ms. Mitchell has been approved for HUD subsidized housing and, as of September 1, 2006, she became a Section 8 recipient. Since FEMA is prohibited by law from duplicating benefits under HUD Section 8, Ms. Mitchell no longer qualifies for FEMA assistance and her housing needs have been met.

In accordance with 28 U.S.C. § 1746, I hereby declare and affirm under penalty of perjury that the

above statements are true and correct to the best of my knowledge, information, and belief.

Signed this _11_ day of _September_ 2006

_Donna M Dannels_

Donna M. Dannels
Individual Assistance Program Branch Chief
Federal Emergency Management Agency
Department of Homeland Security