**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN), *et al.* | §<br>§<br>§<br>§ | |
| Plaintiffs, | § | Civil Action No. 06-1521-RJL |
| | § | |
| v. | § | |
| | § | |
| FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA), | §<br>§ | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO
MOTION FOR A PRELIMINARY INJUNCTION**

FEMA correctly observes that "this case presents a straightforward question for this Court's consideration: whether FEMA provided plaintiffs the procedural due process safeguards to which they are entitled when it notified them that they were not eligible for temporary housing assistance under Section 408." Def's Br. 2. FEMA argues that its computer-generated notice letters satisfy due process, even as it admits that thousands of evacuees eligible for Section 408 assistance were initially and erroneously deemed ineligible. *Id.* at 2-3 (explaining that approximately 23 percent of the determinations of ineligibility were reversed following detailed review of the issues). FEMA's admission highlights the harm caused by its insufficiently detailed notices of Section 408 ineligibility: FEMA's failure to explain the basis for its decisions results in the loss of housing assistance for evacuees who could establish their eligibility if only they knew what the problem was and how to correct it. Indeed, the declarations plaintiffs have submitted from advocates and evacuees vividly demonstrate the nature of the problem that calls for prompt relief. *See* TRO Exhs. 7-11, 15, 17. As explained below, due process requires FEMA to notify applicants of the facts that

FEMA relies upon to make its ineligibility decisions, *precisely because* such notice is essential to enable applicants to correct erroneous ineligibility determinations. This court should enter preliminary injunctive relief requiring FEMA to comply with due process so that vulnerable hurricane survivors have the means of ensuring the reliability of FEMA's Section 408 eligibility decisions.

## BACKGROUND

In general, plaintiffs do not dispute FEMA's description of the two relevant provisions of the Stafford Act, nor do plaintiffs dispute FEMA's description of how it has operated the Section 403 and Section 408 programs with respect to Hurricane Katrina and Rita evacuees. Several issues, however, require further explanation.

*First*, although plaintiffs' primary concern is the inadequacy of the notices of denial of temporary housing assistance under Section 408, the Section 403 emergency shelter program is implicated because the notices at issue were sent as part of the effort to transition Katrina evacuees from Section 403 to Section 408. Because Section 403 assistance should continue until after a proper notice of Section 408 ineligibility, evacuees should continue to receive the benefits of Section 403 pending receipt of a Section 408 eligibility determination notice that satisfies due process. *See* Compl., Exh. 2. This case thus involves the propriety of *terminating* Section 403 assistance before providing sufficient notice of the reasons for *denying* Section 408 benefits, and plaintiffs seek a continuation or restoration of housing assistance to evacuees currently deemed ineligible for Section 408 until such time as FEMA provides a lawful notice. Hence, contrary to FEMA's assertion (Def's Br. 30-32), plaintiffs have not conflated the termination of Section 403 benefits with the denial of Section 408 assistance.

*Second*, although FEMA asserts as fact that it "provided multiple sets of notices to all applicants for Section 408 assistance determined to be ineligible for the program to ensure that they understood the basis for FEMA's determination, as well as the process for appealing determinations with which they disagreed" (Def's Br. 10), that statement is FEMA's conclusion on the ultimate issue in this case, and it is not supported by the facts. The declarations submitted by plaintiffs—and not disputed by FEMA—demonstrate that the notices did *not* provide evacuees with a clear understanding of the basis for FEMA's determination, and that the lack of a detailed explanation of the reason for a denial of Section 408 assistance deprived those deemed ineligible of the ability to successfully appeal determinations with which they disagreed.[1]

Indeed, although FEMA emphasizes that the notices of ineligibility or certain attachments thereto informed evacuees that they could appeal by explaining in writing why FEMA's decision was wrong (Def's Br. 12), the record demonstrates that evacuees were prevented from filing effective appeals because FEMA failed adequately to explain the bases of its decisions.[2] Moreover, FEMA

---

[1]*See, e.g.*, TRO Exh 8 (Decl. Of Caseworker Jennifer Jeans ¶ 2) ("The hardest part of my job is trying to figure out why the particular applicant has been determined ineligible by FEMA . . . . Most of the time, these letters from FEMA don't provide any insight as to the specific reason why the client was denied, or what the client needs to do in order to become eligible for assistance."); TRO Exh 17 (Decl. of Caseworker Kirsten Mindrum ¶ 3) ("The notices are so vague [that] FEMA uses them to claim a multitude of problems, one after another. There is no transparency, and information is being withheld which drags out the process of appeal and leads to evictions and homelessness."); TRO Exh 7 (Decl. of Attorney Susanne Sere ¶ 5) ("Many evacuees received vague denial letters from FEMA. Some letters gave the reason for denial as 'other' or 'other reason'. Some letters stated that FEMA was 'sending this letter to help clarify the termination of FEMA's subsidy of your current rental unit' but gave no reason for the denial. Evacuees' attempts to obtain clarification from FEMA frequently resulted in further confusion.").

[2]*See, e.g.*, TRO Exh 10 (Decl. of Attorney Sasha Moreno ¶ 2) ("[Our clients] have received letters that deny them rental assistance for mysterious reasons without guidance on how to appeal, and they have called FEMA officers on the Disaster Helpline and with each call, they receive a new explanation for their denial, often with conflicting advice on how to move forward

admits that an undeterminable number of evacuees received letters containing only the code "ENC - Eligible No Change" or "INC - Ineligible No Change" with an award amount of $0, and that "[t]hese letters may have resulted in confusion to disaster applicants as they did not list a reason or a dollar amount for an award or denial of an award." Dannels Decl. ¶ 88. FEMA asserts that these letters "were inadvertently mailed to the disaster applicants," and because "FEMA did not have a way to identify which disaster applicants had been accidentally mailed the ENC or INC letters," FEMA attempted to remedy the problem by having helpline operators make on-the-spot eligibility determinations for evacuees who called in with questions. *Id.* But, as demonstrated by plaintiffs' declarations, the FEMA helpline operators often gave inaccurate or conflicting information that only compounded the evacuees' confusion.[3]

---

with an appeal."); TRO Exh. 15 (Decl. of ACORN Member Michael Brumfield ¶ 5) ("FEMA has terminated my rental assistance and determined me to be ineligible. I have made many appeals to this decision without any success. I have found this incredibly frustrating because I have not been unable [sic] to understand the reason why I am ineligible. I have tried to speak with FEMA officers to get more information so that I can write an effective appeal, but every time I speak with a FEMA representative I get a different explanation."); TRO Exh 15 (Decl. of ACORN Member Evacuee Robert Coakley ¶ 3) ("FEMA's lack of furnishing me with an understandable reason were, while blindfolded, like trying to ... [pin] the tail on the donkey. I never knew the cause of the denials, and the appeal process was reduced to a mere guessing game.").

[3]*See*, *e.g.*, TRO Exh 9 (Decl. of Attorney Martha Beard-Duncan ¶ 8) ("We, like our clients, find that FEMA Disaster Helpline agents offer inconsistent reasons as to why clients might have been denied assistance. None of the reasons the helpline agents offer us verbally are given to us, or the clients, in writing."); TRO Exh 17 (Decl. of Caseworker Nova McGiffert ¶ 3) ("[An evacuee] receives contrary information about needed documentation virtually every time he calls FEMA."); TRO Exh 17 (Decl. of Caseworker Kirsten Mindrum ¶ 3) ("I have come across major inconsistencies and contradictory information relayed by FEMA employees in what seems to be a process that intentionally weeds out disaster victims by being unclear about the information that FEMA requires."); TRO Exh 15 (Decl. of Carmen Handy ¶ 5) ("When FEMA is contacted about my request for rental assistance, the reasons I have been given for the termination are not what is in the documents and/or the reasons change each time I call. Every time I call back, the person answering the call knows nothing about what the previous person told me. If the documents from FEMA were more specific and provide[d] more information I believe

Further, FEMA admits that although its "almost fully automated" Section 408 determination process allowed eligibility determinations to be made quickly, the automated system made thousands of mistakes resulting in ineligibility determinations that were reversed only following repeated reviews of the files and having FEMA caseworkers contact applicants to explain the basis for denials and how any deficiencies could be rectified. Def's Br. 13. Thus, the undisputed facts show that FEMA's Section 408 notification procedure failed to provide evacuees the information they needed to understand the reasons for FEMA's eligibility determinations and learn what they could do to fix any problems.

## ARGUMENT

I.    **This Court Has Jurisdiction Over Plaintiffs' Constitutional Claims.**

A.    **FEMA's Sovereign Immunity Argument Is Meritless.**

In their opening brief, plaintiffs anticipated the broad sovereign immunity argument that FEMA has made in previous litigation and explained why that argument has no place in a case where, as here, plaintiffs seek only to enforce constitutional requirements. Pls' Br. 6-8. Rather than respond, FEMA has elected to cut and paste a boilerplate sovereign immunity discussion into its brief. Tellingly, FEMA's brief erroneously lists the Stafford Act among "the statutes that plaintiffs cite as sources of this Court's subject matter jurisdiction." Def's Br. 18. Although other suits against FEMA have been based on the Stafford Act, the plaintiffs in *this case* have neither premised their claims on, nor asserted jurisdiction under, that statute. And, as explained in plaintiffs' opening brief,

---

I could address the problem and be reinstated with rental assistance."); TRO Exh. 15 (Decl. of Kenneth Leach ¶ 5) ("I have called FEMA multiple times to find out more about why my assistance has been terminated. In my experience, I can call three different times a day and get three different answers to my questions about why I am ineligible.").

5

the courts have uniformly concluded that the Act does not bar jurisdiction over constitutional claims because adherence to the Constitution "is not discretionary; it is mandatory," *Rosas v. Brock*, 826 F.2d 1004, 1008 (11th Cir. 1987)—a point to which FEMA simply does not respond.

**B.    ACORN Has Standing To Pursue Its Constitutional Claims Against FEMA.**

FEMA's attack on ACORN's standing is likewise meritless because ACORN satisfies the familiar three-part *Hunt* test for associational standing. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

**1.  ACORN Members Have Standing.**

To satisfy the first prong of the *Hunt* test, ACORN must prove only that it has at least "one" member who has standing to sue in his or her own right. *Id.* at 342. Although FEMA's brief (at 22) criticizes the complaint for failing to name particular ACORN members, and makes the wild suggestion (at 23) that ACORN must show that "every one of its members" would have standing, that is not the law. In fact, there is no requirement that an organization provide the names of individual members at all—let alone plead them in the complaint—to establish standing to sue on their behalf. *See Public Citizen v. F.T.C.*, 869 F.2d 1541, 1551-52 (D.C. Cir. 1989) ("[I]t is not necessary for us to know the names of injured persons in order to be assured beyond any reasonable doubt that they exist, and that the organizations to which they belong may pursue this action on their behalf."); *see also Brock v. UAW*, 477 U.S. 274, 276 (1986) (finding associational standing in a case where "several," but by no means all, of the association's members were affected). In any event, ACORN has filed the declarations of thirty-five of its hurricane survivor members, each of whom received inadequate notices of Section 408 ineligibility (TRO Exh. 15), and FEMA does not

challenge these ACORN members' standing, even though FEMA has data on all applicants for Section 408 benefits.

### 2. ACORN Seeks to Protect Interests Germane to Its Purposes.

*Hunt*'s second prong requires that the organization seek to protect an interest germane to its purposes. 432 U.S. at 343. FEMA rightly acknowledges ACORN's advocacy for the fair treatment of its members, including protection of their rights to housing benefits, and ACORN's operation of a Katrina Survivor's Association to further these goals on behalf of hurricane survivors. Defs' Br. 23; *see also* TRO Exh. 16 ¶ 4 ("The ACORN Katrina Survivors Association . . . has over 5,000 members" and "is the first nationwide organization of displaced New Orleans residents and other Katrina survivors."). Yet FEMA contends that this is too "broad and diffuse" a "set of organizational goals," that ACORN's goals are not sufficiently "focus[sed] on advocating for their members who have been denied housing assistance by FEMA," and that ACORN has not shown what "particular quality makes it suited as an organization" to advocate for its members' benefits. Def's Br. 23-24. These arguments have no basis in existing law. The *Hunt* test does not ask courts to scrutinize an organization's mission or decide whether it is "suited as an organization" to pursue the goals it sets for itself. Rather, the D.C. Circuit—in recognition of the Supreme Court's having "strongly endors[ed] associational standing," given associations' ability to offer "specialized expertise and research resources" that individual plaintiffs may lack—adopts a "modest functional interpretation" of *Hunt*'s second prong as "mandating mere pertinence between litigation subject and organizational purpose." *Humane Soc'y v. Hodel*, 840 F.2d 45, 55-56, 58 (D.C. Cir. 1988); *see Am. Ins. Ass'n v. Selby*, 624 F. Supp. 267, 271 (D.D.C. 1985) ("[A]n association's litigation interests

must be truly unrelated to its organizational interests before a court will declare that those interests

are not germane.").

### 3. Individual Participation Is Not Indispensable.

Under the third prong of the *Hunt* test, associational standing is inappropriate if "the claim

asserted [or] the relief requested requires the participation of individual members in the lawsuit." 432

U.S. at 343; *see also Warth v. Seldin,* 422 U.S. 490, 511 (1975) ("[S]o long as the nature of the claim

does not make the individual participation of each injured party indispensable to proper resolution

of the cause, the association may be an appropriate representative of its members."). The Supreme

Court has explained that "the third prong of the associational standing inquiry" is not "of

constitutional character," but is rather a prudential inquiry that is ordinarily relevant only in damages

suits. *United Food and Commercial Workers v. Brown Group*, 517 U.S. 544, 1535-37 (1996).

"[I]ndividual participation is not normally necessary when an association seeks prospective or

injunctive relief for its members," but is "required in an action for damages to an association's

members." *Id.* at 546.[4]

---

[4]"[L]ower federal courts have consistently rejected association assertions of standing to seek monetary, as distinguished from injunctive or declaratory, relief on behalf of the organization's members." *Telecomm. Research & Action Ctr. v. Allnet Commc'n Servs., Inc.*, 806 F.2d 1093, 1094-95 (D.C. Cir. 1986); *compare Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987) (allowing standing "because the [organization] seeks declaratory and prospective relief rather than money damages [and thus] its members need not participate directly in the litigation") *with United Union of Roofers v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir. 1990) (denying standing because "individual Union members will have to participate at the proof of damages stage"). Indeed, the only lower court case that FEMA cites, *Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv.*, 78 F.3d 1360 (9th Cir. 1996), was a suit by a boat owners' association that sought restitution of marina fees. The court denied standing on the grounds that each "member's amount of restitution may differ, since each member paid a per foot fee based on length of slip or length of boat, whichever was greater." *Id.* at 1367.

In this case, "the declaratory and injunctive relief requested . . . is clearly not of a type that requires the participation of any individual member." *Humane Soc'y.*, 840 F.2d at 53; *see also Telecomm. Research & Action Ctr. v Allnet Commc'n Servs., Inc.*, 806 F.2d 1093, 1095 (D.C. Cir. 1986) ("[T]he need for 'individual participation'" means "something more than individual in-court testimony to establish the fact and extent of injury."). On the contrary, the facts here are undisputed, the plaintiffs request only declaratory and injunctive relief, and the resolution of the case requires only that the Court decide whether FEMA's notice procedures comply with due process. As in *Brock*, "[t]he suit raises a pure question of law" and "the relief requested . . . leaves any questions regarding the eligibility of individual [Section 408] claimants" to the appropriate officials. 477 U.S. at 287. "Thus, though the unique facts of each [ACORN] member's claim will have to be considered by the proper [FEMA officials] before any member will be able to receive the benefits allegedly due him, [ACORN] can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" *Id.* (quoting *Warth*, 422 U.S. at 515).

All three requirements for associational standing are thus satisfied and there are no barriers, constitutional or prudential, to proceeding to the merits. FEMA, however, spends nearly three pages of its brief arguing that ACORN has no standing to sue on its own behalf. Def's Br. 24-26.[5] FEMA

---

[5]ACORN, in any event, has made more than a sufficient showing that it has "had to devote significant resources to identify and counteract the defendant's" inadequate notice policies and has thus suffered injury-in-fact in its own right. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). ACORN's National Campaign Director, Amy Schur, states that ACORN's resources devoted to assisting Katrina evacuees include "two to three full-time staff in Houston for the past twelve months, one full time staff person in San Antonio and Dallas, and a staff of 9-12 in New Orleans who dedicate nearly 100% of their time to this effort." TRO Exh. 16 ¶ 5; *see also id.* ¶ 6 (describing Katrina-related activities of ACORN staff in Little Rock, Arkansas; Jackson, Mississippi; and Atlanta, Georgia). Ms. Schur explains that "[b]ecause of the

also spills ink arguing that ACORN's interests fall outside the relevant zone of interests.[6]  Because

ACORN has established associational standing, the Court need not address these arguments.

**II.    Plaintiffs Are Entitled to Preliminary Injunctive Relief.**

The parties agree on the four factors that the court must weigh to determine whether plaintiffs

are entitled to preliminary injunctive relief.  *Compare* Pls' Br. 8-9 *with* Def's Br. 28.  The parties

also agree that in balancing these factors, likelihood of success on the merits carries determinative

weight.  Def's Br. at 28.  Further, the parties agree that to prove a violation of their due process

rights, plaintiffs must show that: (1) they have a property interest in Section 408 housing assistance,

---

vague notices and inconsistent information we receive on the phone with FEMA, we have wasted valuable time and resources that we could have used to provide other services for our members. FEMA's process problems have directly caused ACORN to shift resources away from other priorities.  If not for the problems our members have had with FEMA, and the staff time dedicated to addressing these problems, we would have well over $1 million in organizational funding to devote to" other priorities.  *Id.*  In short, because FEMA's policies have "impaired [ACORN's] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury-in-fact.  Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests," and under such circumstances, it would be "improper for the District Court to dismiss for lack of standing the claims of the organization in its own right." *Havens*, 455 U.S. at 379.

[6]FEMA—again apparently borrowing from a brief in another case—argues that ACORN lacks prudential standing because its "interests are not within the zone of interests protected by the Stafford Act." Def's Br. 26 (capitalization altered).  The problem with this argument, of course, is that this case does not involve claims under the Stafford Act.  Because the zone-of-interests test is determined by reference "to the particular provision of law upon which the plaintiff relies," FEMA's argument is irrelevant.  *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997).  In any event, the zone-of-interests test "is not demanding," *PDK Labs., Inc. v. U.S. Drug Enforcement Admin.,* 362 F.3d 786, 791 (D.C. Cir. 2004), and ACORN and its members plainly "assert a harm to their *own* interest[s] in receiving due process of law" rather than those of third parties. *Ctr. for Reprod. Law and Policy v. Bush,* 304 F.3d 183, 196 (2d Cir. 2002) (emphasis added).

and (2) FEMA's notices of denial of Section 408 benefits are inadequate under the three-part balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In their opening brief, plaintiffs demonstrated that they have a constitutionally protected property interest in Section 408 housing assistance. Pls' Br. 9-14. At least for purposes of this motion, FEMA concedes this issue. Def's Br. 30 & n.5. Although FEMA states that it "reserves the right" to dispute this issue in later proceedings, it provides no indication that it has any legal or factual authority with which to dispute plaintiffs' showing.

Turning to what process is due, FEMA does not address the first *Mathews* factor, thus conceding that the private interest in receiving Section 408 housing assistance is within the highest category of interests. Def's Br. 32; *see also* Pls' Br. 15. FEMA's merits argument is based entirely on its assertion that weighing the second and third *Mathews* factors against the first shows that FEMA's Section 408 denial notices "provided all of the process to which plaintiffs are Constitutionally entitled." Def's Br. 32.[7]

---

[7]FEMA begins its *Mathews* analysis by observing that the notices at issue are *denials* of Section 408 assistance rather than *termination* notices. Def's Br. 30-32. Plaintiffs do not disagree. *See* Pls' Br. 14 ("The present motion focuses exclusively on the content of FEMA's housing assistance denial notices for Katrina and Rita evacuees, such as those reproduced in Complaint Exhibit 1."). Nor have plaintiffs conflated Section 403 and Section 408. Rather, because the Section 408 denial notices were sent as part of an effort to transition evacuees to Section 408 as Section 403 ended, the denial of Section 408 coincided with the termination of Section 403. Regardless, the requirements of due process do not depend on whether plaintiffs' circumstances are characterized as a "denial" of an application for benefits or a "termination" of ongoing benefits. *Kapps*, 404 F.3d at 115 ("Every circuit to address the question, however, has concluded that applicants for benefits, no less than current benefits recipients, may possess a property interest in the receipt of public welfare entitlements."); *see also Flatford v. Chater*, 93 F.3d 1296, 1304 (6th Cir. 1996); *Mallette v. Arlington County*, 91 F.3d 630, 639-40 (4th Cir. 1996); *Daniels v. Woodbury County*, 742 F.2d 1128, 1132-33 (8th Cir. 1984); *Griffeth v. Detrich*, 603 F.2d 118, 119-21 (9th Cir. 1979); *Basel v. Knebel*, 551 F.2d 395 (D.C. Cir. 1977); *Chu Drua Cha v. Levine*, 696 F.2d 594, 600-02 (8th Cir. 1982) (describing notice requirements when benefits are transferred between two closely related programs).

**A.    The Second *Mathews* Factor Favors Plaintiffs Because FEMA's Current Procedures Carry a Demonstrated Risk of Erroneous Deprivation.**

FEMA offers three reasons to support its claim that the denial notices at issue carry minimal risk of erroneous deprivation of Section 408 housing assistance and that providing additional details in the notices would do little to improve the Section 408 eligibility determination process. *See Mathews*, 424 U.S. at 335.

First, FEMA claims that "the notices provided to all applicants deemed ineligible for Section 408 assistance clearly identify the basis for FEMA's determination." Def's Br. 32-33. A review of the actual notices at issue, however, demonstrates that this claim is false. *See, e.g.,* Compl. Exh. 1, TRO Exh. 15. FEMA's letters contain a code and a vague phrase such as "Ineligible—Other." FEMA asserts that a reference to an Applicant Guide distributed some six months before the denial notice is sent can lead an evacuee to a more detailed explanation of the code, but the Applicant Guide does no more than the notice to inform an evacuee as to the specific facts FEMA relied upon to determine the applicant's ineligibility for Section 408 assistance. *See* TRO Exh. 2 at 7-9.

Numerous courts have concluded that due process requires an agency to include in its benefit denial notices the facts on which the agency bases its determination. *E.g., Kapps v. Wing*, 404 F.3d 104, 123-24 (2d Cir. 2005); *Ortiz v. Hazel*, 794 F.2d 889, 892-94 & n.4 (3d Cir. 1986); *Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir. 1980). In *Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980), for example, a public housing applicant "was not provided with an adequate statement of the basis for the housing authority's determination that he was ineligible for public housing." The court explained that, to comply with due process, "[s]uch a statement must be sufficiently specific for it to enable an applicant to" know how to respond and prepare evidence in support of the applicant's

position.  *Id.*  Accordingly, "equivalent detail" to that necessary to arrive at the determination itself is required "in the statement of reasons given the rejected applicant . . . in order to enable him to test the veracity of the agency's findings against him."  *Id.*  Applying these principles, the court found it insufficient that "the housing authority merely parrotted the broad language of the regulations" in its letter.  *Id.*; *see Wolf v. McDonnell*, 418 U.S. 539, 564 (1974)  ("Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact.").[8]

Due process, in short, requires that agencies notify benefit applicants of the specific facts relied upon to deny benefits because applicants need these facts to determine whether and how to appeal erroneous agency applications of eligibility standards to the facts in individual cases.  *See Goldberg v. Kelly*, 397 U.S. at 297 (holding due process requires "timely and adequate notice detailing the reasons" for proposed adverse administrative action whenever the action may be "challenged . . . as resting on incorrect or misleading factual premises or on misapplication of rules

---

[8]*See also Grijalva v. Shalala,* 152 F.3d 1115, 1112 (9th Cir. 1998) ("fail[ure] to provide adequate explanation for the denials" weighs in favor of greater procedural protections for beneficiaries because this "failure creates a high risk of erroneous deprivation of medical care;" "Due Process requires notice that gives an agency's reason for its action in sufficient detail that the affected party can prepare a responsive defense."); *Vargas v. Trainor*, 508 F.2d 485, 489-90 (7th Cir. 1974) (where "the notice advised the recipient that he could learn the reason for the proposed reduction or termination of benefits by inquiring of his caseworker, [s]uch a notice does not . . . meet the requirement laid down in the foregoing authorities that before public assistance benefits can be reduced or terminated the recipient be given a notice stating the reasons for the proposed actions"); *Magyar v. Tuscon Unified Sch. Dist.*, 958 F. Supp. 1423, 1445 (D. Ariz. 1997) ("Without sufficient detail, parents cannot make an informed decision as to whether to appeal or whether an appeal would even be successful.  Whenever important interests are at stake, timely and adequate notice detailing the reasons for the proposed action must be given to prevent the occurrence of erroneous decisions."); *Edgecomb v. Melan*, 824 F. Supp. 312, 315 (D. Conn. 1993) ("The notice sent to plaintiffs does not indicate which family member committed proscribed acts, what the nature of the alleged crime was, or when the relevant acts were committed . . . . The notice merely restated the regulation relied on[, so it] is insufficient.").

or policies to the facts of particular cases.").[9]  When agencies fail in this regard, the risk of erroneous

deprivation is high, and the second *Mathews* factor weighs *against* the agency.  *Id.*  FEMA does not

cite a single case holding that an agency may withhold benefits and comply with due process even

though it does not provide each applicant with written individual notice of the facts that it uses to

deny benefits.[10]

　　　FEMA's second reason for claiming that the risk-of-erroneous-deprivation factor weighs in

its favor is its argument that "FEMA provides an extensive appeals process for Section 408

ineligibility determinations."  Def's Br. 33-34.  FEMA cites four cases in an attempt to support its

claim that "*In and of itself*, this extensive appeals process 'provides sufficient avenues of redress and

rectification to meet the requirements of due process.'"  Def's Br. 34 (emphasis added).  This is a

misstatement of the law.  The only issue in FEMA's lead case, *Lepre v. DOL*, 275 F.3d 59 (D.C. Cir.

---

[9]A related reason cited by several courts—and one that is particularly relevant here— is
that agencies, without a detailed notice of the reasons for each agency denial of benefits,
may switch their reasons for denying benefits and confound any attempt to ascertain the truth about
each applicant's eligibility.  *See Grier v. Bloch*, 402 F. Supp. 2d 876, 935 (M.D. Tenn. 2005)
("[F]undamental due process requires that a person be informed in advance of the issues to be
addressed at a hearing, so that he or she can be prepared to present evidence and arguments that
address those issues, and switching issues from those stated in the notice violates this basic
principle."); *Ortiz v. Eichler*, 616 F. Supp. 1046, 1063 (D. Del. 1985) (same); *see also Memphis
Light*, 436 U.S. at 14 & n.14 (when repeated efforts are frequently necessary to determine
whether a dispute exists and how to resolve it, notice adequacy is questionable).  FEMA does not
dispute plaintiffs' extensive record evidence that FEMA frequently switches the reasons that it
claims justify its denial of the Section 408 assistance at issue in this case, resulting in repeated
efforts becoming necessary to resolve eligibility disputes.  TRO Exhs. 5-11, 15, and 17.

[10]To the extent FEMA seeks to use the enormity of the disasters at issue here to
distinguish this case from those cited above, that argument must fail because: (1) FEMA's
Applicant Manual and computerized system for generating eligibility determinations was in place
before these disasters, *see* TRO Exh. 2, 12; Def's Br. 10-11; and (2) FEMA had over six months
to develop procedures to provide adequate notice of Section 408 determinations before it began
transitioning evacuees from Section 403 to Section 408, *see* Def's Br. 6-10.

2001), was the sufficiency of notice by mail (not the adequacy of notice), and because the plaintiff actually received the notice, the court merely observed that if the notice had been lost in the mail, due process would still be satisfied because of post-deprivation procedures. *Id.* at 70-71. Neither *Lepre*, nor any of the three other cases cited by both *Lepre* and FEMA, hold that notice may be supplanted by a post-deprivation hearing "in and of itself." As FEMA concedes, this case concerns the *adequacy* of *predeprivation* notice and thus *Lepre* is inapposite.

"The right to a hearing is meaningless without notice." *Walker v. City of Hutchinson*, 352 U.S. 112, 115 (1956). Applicants for government benefits need adequate notice so that they may make informed decisions about whether to begin the appeal process, regardless of the quality of that process. *Grijalva*, 152 F.3d at 1122; *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996) (to deprive individual of protected interest, government must provide adequate notice *and* meaningful opportunity to be heard); *Gen. Elec. Co. v. E.P.A.*, 53 F.3d 1324 (D.C. Cir. 1995) (holding due process requires that parties receive fair notice before being deprived of property). Such informed decisions benefit both applicants and the government alike, and thus serve the public interest.

Finally, FEMA claims that the second *Mathews* factor weighs in its favor because its "successful outreach work between March and August 2006 further demonstrates the efficacy of its undertaking to ensure that all Hurricane Katrina evacuees were fully aware of the eligibility requirements of Section 408." Def's Br. 34. True as this may be, it only confirms that the second *Mathews* factor weighs in plaintiffs' favor because FEMA admits that it sent erroneous ineligibility determinations at least 3,276 times. Def's Br. 13. FEMA's admission that thousands of hurricane survivors were erroneously deprived of Section 408 benefits is underscored by the declarations of

employees of numerous social service agencies who report that when they eventually ascertain the reasons for FEMA's Section 408 ineligibility determinations, they are often able to secure benefits for disaster survivors.  TRO Exhs. 5-11, 17.   In light of these facts, as well as the many cases holding that notice of the factual basis for a benefits cut-off is necessary to reduce erroneous denials of such benefits, FEMA's eligibility determination notices carry a high risk of erroneous deprivation of Section 408 assistance.

### B.    FEMA's Claim of Administrative Burden Under the Third *Mathews* Factor Is Unsubstantiated and, In Any Event, Insufficient.

FEMA argues that the third *Mathews* factor weighs in its favor, but it cites no law or fact in support. Def's Br. 34-35.  Instead, FEMA offers only the conclusory statement that "relief requiring FEMA to rewrite its eligibility determination notices at this point would *immeasurably slow* FEMA's progress" in providing disaster assistance. *Id*. (emphasis added).  Several reasons show that this bald assertion is insufficient to shift the entire *Mathews* balance to FEMA.

*First*, courts uniformly reject administrative burden defenses when the other *Mathews* factors indicate that an agency proposes to deny benefits without stating the facts that it relies upon to do so in each individual case, even in benefit programs with many thousands of applicants.  *See, e.g.*, *Kapps*, 404 F.3d at 124-25 (over 600,000 eligibility decisions are made annually in New York under the Low Income Energy Assistance program, *see Kapps v. Wing*, 283 F. Supp. 2d 866, 870 (E.D.N.Y. 2003)); *Ortiz*, 794 F.2d at 893-95 & n.4 (for thousands of applicants for AFDC, Food Stamps, and Medicaid, despite the agency's administrative burden objection, the agency "must set forth the calculations it used to arrive at its decision, i.e., explain what funds it considers the claimant to have and what the relevant eligibility limits are"); *Goldberg*, 397 U.S. at 266 (cost alone is

16

insufficient compared to the risk of erroneous deprivations that may be wrought by inadequate procedures for denial of benefits).

*Second*, FEMA's administrative burden argument is too vague and unsupported to be accorded any weight. "Immeasurably slow" can mean anything, including "not slow very much," or even "not at all slow."

At bottom, FEMA does not discuss, let alone prove, how sending adequate notices would slow its progress in providing needed housing assistance, especially considering that the vast majority of applications are approved automatically by computer, and the proposed injunctive relief would only apply to the subset of applications that the automated system initially denies.[11]  FEMA does not allege any facts regarding the process that would be required for FEMA to set forth in writing its reasons (which presumably are already known to the agency) for denying Section 408 assistance in the 10,989 cases remaining.  *Cf. Garcia-Rubio v. INS*, 703 F. Supp. 859, 862 (S.D. Calif. 1988) (administrative burden of requiring an agency to print known items in its notices is "minimal" under *Mathews*).  Nor does FEMA allege that it lacks the resources necessary to accomplish this task.  Thus, FEMA has failed to substantiate its claim that it would be seriously harmed by the administrative burden of sending adequate denial notices.  *See Salling v. Bowen*, 641 F. Supp. 1046, 1069-70 (W.D. Va. 1986) (third *Mathews* factor will not weigh in agency's favor

---

[11]FEMA repeatedly emphasizes that hundreds of thousands of families were displaced by Hurricanes Katrina and Rita, but this number vastly overstates the administrative burden at issue in this case.  The injunctive relief sought by plaintiffs would require FEMA to write the facts that it relies upon in the subset of cases in which it *denies* Section 408 benefits.  Moreover, the *timing* of any denials and attendant administrative burden is within FEMA's control because FEMA decides how long to provide Section 403 housing assistance before transitioning disaster survivors to Section 408 assistance.  Def's Br. 8-10.

17

when evidence supporting the agency's position is within its control and the agency does not provide the evidence).

In sum, plaintiffs are likely to succeed on the merits of their due process claim because FEMA concedes that plaintiffs have a constitutionally protected property interest in access to Section 408 housing assistance, FEMA concedes that the first *Mathews* factor favors plaintiffs, and FEMA has failed to substantiate its arguments that the second or third *Mathews* factors favor FEMA. Thus, the *Mathews* balance tips decidedly in plaintiffs' favor, demonstrating that plaintiffs are likely to succeed on the merits of their due process claim.[12]

---

[12]FEMA contends (at 36) that the district court in *McWaters v. FEMA*, 436 F. Supp. 2d 802 (E.D. La. 2006), "recently addressed similar notice claims on behalf of Hurricane Katrina evacuees." Not so. The *McWaters* litigation involved a raft of allegations, but none of them included a due process challenge to the constitutional sufficiency of the letters notifying evacuees of the denial of benefits. The allegations to which FEMA refers challenged FEMA's failure to publish, and notify evacuees of, its generally applicable "policies and procedures regarding re-certification for continued rental assistance, the availability of increased levels of assistance, requirements for certain assistance, and the like." *Id.* at 820; *see* Pls' Post-Hearing Brief in *McWaters v. FEMA*, Civ. No. 05-5488 (E.D. La.), filed March 15, 2006 (arguing that "FEMA has no published guidelines or regulations stating when or how evacuees must seek re-certification.").

Although the *McWaters* court declined to require FEMA to publish and distribute such policies, it was harshly critical of FEMA's tight-lipped approach to disaster relief. "It defies reason," the court observed, "that a federal agency whose exclusive provision—and indeed, sole reason for existence—is to assist fellow Americans in a time of natural disaster, would fail to notify people of the available services and the requirements for engaging those services, in some, clear consistent, and accessible way." 436 F. Supp. 2d at 820. "Rather than hiding behind bureaucratic double-talk, obscure regulations, outdated computer programs, and politically loaded platitudes such as 'people need to take care of themselves,' as the face of the federal government in the aftermath of Katrina, FEMA's goal should have been to foster an environment of openness and honesty with all Americans affected by the disaster. Sharing information in simple, clear, and precise terms and delineating the terms and conditions of available assistance in an up-front and forthright manner does just that." *Id.* at 821.

**C.    In Addition to Showing a Likelihood of Success on the Merits, Plaintiffs Have Met Their Burden Regarding the Other Three Preliminary Injunctive Relief Factors.**

Plaintiffs explained in their opening brief that, absent emergency injunctive relief, plaintiffs will suffer irreparable harm because their loss of housing assistance is actual and not theoretical, and the resulting injury cannot be remedied. Pls' Br. 18-21. Significantly, FEMA does not dispute plaintiffs' claim that constitutional rights violations constitute irreparable harm, or that the threat of eviction and the realistic prospect of homelessness constitute irreparable injury. Rather, FEMA asserts only that plaintiffs inexcusably delayed the filing of this action and their motion for emergency injunctive relief, and that such delay undermines plaintiffs' claim of imminent irreparable injury. Def's Br. 36-39. Contrary to FEMA's claims, plaintiffs did not unreasonably delay the filing of this action or this motion.

As soon as the deficiencies in FEMA's Section 408 denial letters was discovered, plaintiffs and their advocates began working with individual evacuees on a case-by-case basis to prevent the loss of housing assistance as the individuals were transitioned from Section 403 to Section 408. Although FEMA originally announced that Section 403 assistance would terminate by March 2006, FEMA responded to the chaos in the transition program by repeatedly extending Section 403 assistance month after month from March through August. For example, on July 27, 2006, just four days before Section 403 assistance was expected to terminate, FEMA announced an extension through August 31, 2006. Compl. Exh. 4. On August 18, 2006, the City of Houston requested another extension of Section 403 benefits for 3,641 Houston households that were projected to lose rental assistance on August 31, 2006. TRO Exh. 13. On August 24, 2006, FEMA rejected that extension request for all but 113 households. TRO Exh. 14. Plaintiffs filed this action on August

29, 2006, only five days after it became clear that thousands of evacuees were likely to face eviction in early September, and plaintiffs requested emergency injunctive relief forty-eight hours later. Thus, plaintiffs did not delay in bringing this action, and waiting until FEMA announced that, for most evacuees, there would be no further extensions of Section 403 assistance does not imply that plaintiffs will not be irreparably harmed by the loss of housing assistance. Indeed, plaintiffs and their advocates engaged in extensive negotiations with FEMA throughout August in an attempt to resolve these issues without resort to litigation.

Finally, with respect to whether an injunction would harm FEMA and whether the injunction would serve the public interest, FEMA argues only that FEMA should be free to run its programs however it sees fit. Def's Br. 39. This argument must fail because plaintiffs ask only that FEMA comply with due process, and the public has a clear interest in ensuring that the government respects the constitutional rights of its citizens.

**III.    Plaintiffs Seek Relief That Is Limited, Necessary, and Proper.**

Because the Court denied plaintiffs' request for a temporary restraining order and is treating plaintiffs' motion as one for a preliminary injunction, the precise relief sought by plaintiffs must be modified in part. That is because denial of the proposed temporary restraining order ended the status quo of continued Section 403 assistance to several thousand people to whom FEMA sent the challenged Section 408 ineligibility notices. Nevertheless, plaintiffs have been clear throughout this case that they seek injunctive relief to require FEMA (1) to provide disaster evacuees with adequate notice and an opportunity to respond *before* FEMA denies their applications for Section 408 assistance, and (2) to maintain or restore temporary housing assistance until FEMA provides

adequate notice of a Section 408 denial.  *See* Proposed Temporary Restraining Order (attached to Doc. No. 3).

As for the first part of the relief sought, FEMA has stated that there are at least 10,989 people who have been terminated from Section 403 assistance and denied Section 408 assistance.  FEMA should be ordered to send each of these individuals a written notice of the facts that FEMA relied upon to deny them Section 408 assistance.  The new notice must provide sufficient detail to enable the applicant to make an informed decision as to whether to appeal.  Also, the notices must contain a complete list of FEMA's bases for its ineligibility finding, so that evacuees who have already waited too long to receive adequate notice do not have to correct one deficiency only to be later told of another.  These notices must be mailed as soon as possible because Section 408 assistance is limited to 18 months.  As for the second part of the relief sought, plaintiffs urge the court to order FEMA to take all steps reasonably available to it to restore some form of rental assistance to these individuals until such time as they receive an adequate notice of the reasons for FEMA's denial of Section 408 benefits.

## CONCLUSION

The court should grant plaintiffs' motion for preliminary injunctive relief.

Respectfully submitted,

*s/ Michael T. Kirkpatrick*

_____

Michael T. Kirkpatrick
    (DC Bar No. 486293)
    mkirkpatrick@citizen.org
Deepak Gupta
    (DC Bar No. 495451)
    dgupta@citizen.org

21

Brian Wolfman
    (DC Bar No. 427491)
        brian@citizen.org
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC 20009
(202) 588-1000
(202) 588-7795 (fax)

Robert W. Doggett
    (TX Bar No. 05945650)
        rdoggett@trla.org
Jerome W. Wesevich
    (TX Bar No. 21193250)
        jwesevich@trla.org
Texas RioGrande Legal Aid, Inc.
4920 North Interstate Highway 35
Austin, Texas 78751
(512) 374-2725
(512) 447-3940 (fax)

Dated: September 14, 2006                    *Attorneys for Plaintiffs*

22