UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN), <u>et al.</u>, | ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 06-1521-RJL |
| | ) | |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>DEFENDANT'S MOTION TO DISMISS PURSUANT TO
FED. R. CIV. PRO. 12(b)(1) AND 12(b)(6)</u>**

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    The Stafford Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    The Section 403 Public Assistance Program . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B.    The Section 408 Individuals and Households Program . . . . . . . . . . . . . . . . . . . . 5

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    Hurricane Katrina . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   Plaintiffs' Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    The Court Should Dismiss Plaintiff' Claims Pursuant to Fed. R. Civ. P. 12(b)(1) . . . . . 10

       A.    Plaintiffs' Claims are Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       B.    Plaintiffs' Claims are Barred by Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . 12

       C.    All Plaintiffs Lack Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       D.    Plaintiff ACORN Lacks Standing to Sue on Behalf of its Members
             or on its Own Behalf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

             I.    Plaintiff ACORN Lacks Standing to Sue on Behalf of its Members . . . . 21

             ii.   ACORN Also Lacks Standing to Sue On Its Own Behalf . . . . . . . . . . . 23

                   a.    ACORN Lacks Article III Standing to Sue on its
                         Own Behalf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                   b.    ACORN's Organizational Interests Are Not Within

i

the Zone of Interests Protected by the Stafford Act
for Prudential Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II.     The Court Should Dismiss Plaintiffs' Due Process Claim Because Plaintiffs
Have No Protectable "Property" Interest in FEMA Housing Assistance . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## INTRODUCTION

Plaintiffs – four individual Hurricane Katrina evacuees and one nonprofit entity, the Association of Community Organizations for Reform Now ("ACORN") – have brought suit against the Federal Emergency Management Agency ("FEMA"), alleging that plaintiffs' receipt of FEMA housing assistance in the wake of Hurricane Katrina was terminated in 2006 without sufficient explanation, in violation of the Due Process Clause and the Administrative Procedure Act ("APA").  As explained below, the complaint asserts claims over which the Court lacks subject-matter jurisdiction and as to which no relief could be granted in any case.

The injury that plaintiffs allege is that FEMA terminated the federal benefits which plaintiffs received pursuant to FEMA's Section 403 Apartment Program without providing a sufficiently clear basis for its decision or a sufficiently clear explanation as to how plaintiffs may challenge FEMA's decision.  See, e.g., Compl. ¶¶ 1-3, 55-56, 59-60.  As a remedy, plaintiffs seek prospective injunctive relief requiring defendant to provide more detailed explanations before the termination of that assistance, with the obvious requirement that the provision Section 403 assistance be continued.  See Compl. ¶¶ 63(b).[1] However, the Section 403 Apartment Program – an unprecedented program adopted in response to the unique demands of Hurricane Katrina – ceased to exist as to Katrina evacuees as of September 30, 2006.  Thus, the claims plaintiffs assert – and the remedy they seek – would not affect the parties' rights, now or in the future, and certainly would provide no tangible benefit to plaintiffs.  Thus, plaintiffs' claims are

---

[1] An extension of housing assistance provided by FEMA's Section 403 Apartment Program, described herein and in greater detail in defendants' Memorandum in Opposition to Plaintiffs' Request for Preliminary Injunctive Relief [Docket No. 7], was one core element of the preliminary injunctive relief plaintiffs requested in this action.  See Pls.' Mot. for T.R.O. [Docket No. 3].

moot.

Plaintiffs' claims are also barred by sovereign immunity.  It is axiomatic that plaintiffs cannot sue an agency of the federal government for any claim, constitutional or otherwise, absent an express statutory waiver of the government's sovereign immunity.  Here, the actions that plaintiffs challenge – FEMA decisions as to the provision of disaster assistance, and its efforts to provide notice regarding that assistance – comprise discretionary acts that are barred from review by the APA, which is the only possible waiver of Defendant's sovereign immunity that could apply here.

Further, plaintiffs have not established that they possess standing to bring this action.  Because plaintiffs seek ongoing injunctive relief, they must establish that they face the threat of the future loss of Section 403 assistance without receiving the notice to which they assert they are entitled.  However, because FEMA's Section 403 Apartment Program already has ended with respect to Hurricane Katrina evacuees, plaintiffs can establish no likelihood whatever that they will again be exposed to the allegedly unconstitutional actions they challenge.

Finally, assuming _arguendo_ that some basis for subject-matter jurisdiction exists, plaintiffs' due process claim should be dismissed under Fed. R. Civ. P. 12(b)(6), as plaintiffs have no property interest in FEMA disaster assistance.

## STATUTORY AND REGULATORY BACKGROUND

### I.    THE STAFFORD ACT

The mission of FEMA, as set forth in the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act") and corresponding regulations, is to "assist the efforts of the . . . States in expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas" affected by disasters.  42 U.S.C. § 5121; see Pub. L. No. 100-707, 102 Stat. 4689 (1988).  If the President declares a "major disaster" or emergency, he retains the discretion to determine and designate the type of assistance available and the areas eligible to receive assistance.  This is clear from the language of the Stafford Act, which is written entirely in permissive terms:

> In any major disaster, the President may —
>
> (1) direct any Federal agency . . . to utilize its authorities and the resources granted to it under Federal law . . . in support of State and local assistance efforts . . . [and]
>
> (4) assist State and local governments in the distribution of medicine, food, and other consumable supplies, and emergency assistance.

Id.§ 5170a (emphasis added).

The provisions of the Stafford Act that authorize "Federal assistance to individuals and households" are also written in permissive terms:

> [T]he President, in consultation with the Governor of a State, may provide financial assistance, and, if necessary, direct services, to individuals and households in the State who, as a direct result of a major disaster, have necessary expenses and serious needs in cases in which the individuals and households are unable to meet such expenses or needs through other means.

3

Id. § 5174(a)(1) (emphasis added).  More specifically, the Act provides that the President "may"

provide "[h]ousing assistance" to "individuals and households who are displaced from their

predisaster primary residences or whose predisaster primary residences are rendered uninhabit-

able as a result of damage caused by a major disaster." Id. § 5174(b)(1).  The Act empowers the

President to "determine appropriate types of housing assistance to be provided . . . based on

considerations of cost effectiveness, convenience to the individuals and households, and such

other factors as the President may consider appropriate." Id. § 5174(b)(2)(A).

In this case, the two relevant provisions of the Stafford Act are 42 U.S.C. §§ 5170(b)

and 5192 ("Section 403")[2] and 42 U.S.C. § 5174 ("Section 408").  Section 403 and Section 408

provide different types of assistance; the former provides "essential assistance," including

emergency shelter, while the latter provides financial assistance for disaster-related needs,

including Temporary Housing assistance.  Receipt of Section 403 assistance is neither a

prerequisite for nor a guarantee of an individual's receipt of Section 408 assistance.

**A.    The Section 403 Public Assistance Program.**

Section 403 of the Stafford Act authorizes the President, through FEMA, to provide

short-term "assistance essential to meeting immediate threats to life and property resulting from a

major disaster." Id. § 5170b(a).  Following a major disaster declaration, assistance authorized

under the Section 403 Public Assistance ("PA") Program may be provided directly to States,

---

[2] In the event of a disaster declaration, "essential assistance" is authorized under Section 403 of the Stafford Act.  In the event of an emergency declaration, "essential assistance" is authorized under Section 502 of the Stafford Act.  See 42 U.S.C. § 5192.  However, for clarity's sake, defendant will refer to all essential assistance described herein as Section 403 assistance.

4

local governments, and certain private non-profit facilities that provide essential services of a governmental nature, including emergency shelter.  See 42 U.S.C. §§ 5170b, 5170b(a); see also 42 U.S.C. § 5192.  In providing such measures, FEMA may provide grant assistance or it may perform the work directly through direct Federal assistance.  See 42 U.S.C. §5170a, 5170b, and 5192.  The emergency shelter for Hurricane Katrina victims that has been provided under the Section 403 Public Assistance Apartment program has been provided by grant assistance, with grants issued to affected cities and states.  See Declaration of Donna M. Dannels ("Dannels Decl.") ¶ 60.

### B.    The Section 408 Individuals and Households Program.

Under Section 408 of the Stafford Act, the President, through FEMA, may provide "[h]ousing assistance" to "individuals and households who are displaced from their predisaster primary residences or whose predisaster primary residences are rendered uninhabitable as a result of damage caused by a major disaster."  Id. § 5174(b)(1).  Unlike Section 403, individuals must apply for assistance under Section 408.  To qualify for temporary housing assistance under Section 408, applicants must demonstrate, inter alia, that their primary residences have been rendered uninhabitable by a major disaster and that they are unable to meet their housing needs through other sources, such as insurance.  42 U.S.C. § 5174(b); 44 C.F.R. § 206.110(h); 44 C.F.R. § 206.113(b)(1); 44 C.F.R. §206.113(b)(6).

## FACTUAL BACKGROUND

**I.    HURRICANE KATRINA.**

Section 403 emergency shelter assistance is ordinarily provided for a brief period immediately following a disaster.  Dannels Decl. ¶ 54.  Because of the unique nature of the Katrina disaster, however, including an unprecedented number of evacuees and lack of viable housing in the hurricane-damaged areas, FEMA made Section 403 assistance available for an extended period under a new, unique program.  Id. ¶¶ 60, 62.  With hundreds of thousands of Katrina evacuees relocating throughout the United States, most of them unable to return to their pre-disaster residences for extended periods, FEMA recognized that its traditional method for providing emergency shelter assistance to individuals under Section 403 would not be sufficient. Id. ¶ 59-60.  Accordingly, FEMA developed programs unique to the Hurricane Katrina disaster, including reimbursement to States and local governments for their costs in providing transitional housing to evacuees via rental vouchers and/or direct lease agreements with landlords.  Id. ¶ 61. This was known as the Section 403 Apartment Program.  Id. ¶ 62.

In February 2006, FEMA determined that it no longer could continue the Section 403 Apartment Program as implemented for Katrina evacuees.  FEMA thus determined that evacuees who were in the Section 403 Apartment Program and were eligible for assistance under the Section 408 program would be transitioned into the latter program.  Id. ¶ 71.  Those evacuees receiving Section 403 Apartment Program assistance who did not qualify for Section 408 assistance would cease receiving housing assistance.  Id. ¶ 74.

After two extensions of the program, on July 26, 2006, FEMA extended the entire Section 403 Apartment Program until August 31,  2006, for those state and local governments

still participating in it.  Id. ¶¶ 91-93.  On August 18, 2006, the City of Houston requested an additional extension, through September 30, 2006, for households that had been determined ineligible for Section 408 assistance.  FEMA granted this request upon a limited basis, allowing the additional time only for 113 households that had the potential to be determined eligible for Section 408 assistance.  Id. ¶ 94.  This limited extension of the Section 403 Apartment Program was provided only until September 30, 2006, id. ¶ 94, and the program ceased to exist with respect to Hurricane Katrina evacuees as of that date.

## II.    PLAINTIFFS' COMPLAINT.

Each of the four individual plaintiffs – Mr. Kenneth Leach, Mr. Joseph Douglas, Ms. Doris Mitchell, and Ms. LaTonya Burton – alleges that he or she was terminated from receipt of housing assistance through the Section 403 Apartment Program without sufficient explanation of the basis for that decision, and was thus denied due process of law.  See, e.g., Compl. ¶¶ 1-3, 21, 55-56.  Plaintiff ACORN alleges that it has been injured by the same actions "because [it] has spent, and will continue to spend, its limited resources to help evacuees overcome the notice barriers placed before them by FEMA unless the relief sought in this lawsuit is granted.  Id. ¶ 4. Plaintiffs also allege that FEMA's actions in issuing the letters terminating their housing assistance under the Section 403 Apartment Program violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA").  Id. ¶¶ 59-60.

To remedy these alleged violations, plaintiffs seek prospective injunctive relief that would require Defendant to provide a detailed, written basis for the termination of Section 403 assistance for any Hurricane Katrina or Rita evacuee before any such assistance is terminated, see

7

Compl. ¶ 63(b)(i), and provide "a written description of what plaintiffs may do to challenge any proposal to terminate housing assistance . . . before terminating any housing assistance to an evacuee," <u>see</u> Compl. ¶ 63(b)(ii).

## STANDARDS OF REVIEW

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a claim or action on the ground that the court lacks jurisdiction over the subject matter of that claim or action. Fed. R. Civ. P. 12(b)(1). It is axiomatic that the federal courts are courts of limited jurisdiction and possess only that power which is authorized to them by the Constitution and by federal statute. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). For that reason, plaintiffs bear the burden of demonstrating that the federal court has jurisdiction over their claims. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 182 (1936) ("It is incumbent upon the plaintiff properly to allege the jurisdictional facts, according to the nature of the case."). Where plaintiffs have failed to fulfill their obligation to allege facts sufficient to support the court's subject matter jurisdiction, the Court should dismiss the case. See Ruhrgas AG v. Marathon Oil, 526 U.S. 574, 583 (1999) ("[S]ubject-matter [jurisdiction] must be policed by the courts on their own initiative . . . .") (citing Fed. R. Civ. P. 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

Similarly, the Court may dismiss a complaint for failure to state a claim upon which relief may be granted if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Fed. R. Civ. P. 12(b)(6); see also Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Atchinson v. District of Columbia, 73 F.3d 418, 421 (D.C. Cir. 1996). In deciding such a motion, the court should accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. "At the same time, we are not to accept inferences drawn by [plaintiff] if they are unsupported by the alleged facts, nor will we accept purely legal conclusions masquerading as factual allegations." See Maljack Prods. v.

9

Motion Picture Assn., 52 F.3d 373, 375 (D.C. Cir. 1995); see also Taylor v. F.D.I.C., 132 F.3d

753, 762 (D.C. Cir.1997) (court need not accept as true the plaintiff's legal conclusions).


## ARGUMENT

I.    **THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS PURSUANT TO FED. R. CIV. P. 12(b)(1).**

### A.    Plaintiffs' Claims Are Moot.

Plaintiffs seek an order that would require defendant to provide them with certain

information before defendant could terminate their assistance under the Section 403 Apartment

Program. The problem for plaintiffs is that the Section 403 Apartment Program for evacuees of

Hurricane Katrina no longer exists. In other words, plaintiffs want the Court to order FEMA to

provide them with the reasons they were terminated from a disaster assistance program that was

itself terminated approximately a month ago. The Court does not have jurisdiction to do so

because plaintiffs' claims are moot.

Article III limits federal courts to deciding "actual, ongoing controversies." Clarke v.

United States, 915 F.2d 699, 700-01 (D.C. Cir. 1990) (citing Honig v. Doe, 484 U.S. 305, 317

(1988)). Article III's mootness doctrine is jurisdictional in nature:

> Article III denies federal courts the power to decide questions that cannot affect
> the rights of litigants in the case before them, and confines them to resolving real
> and substantial controvers[ies] admitting of specific relief through a decree of a
> conclusive character, as distinguished from an opinion advising what the law
> would be upon a hypothetical state of facts.

Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990) (citing North Carolina v. Rice, 404

U.S. 244, 246 (1971)) (internal quotes and citations omitted)). Thus, the mootness doctrine

requires that a federal court "refrain from deciding [a case] if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future,'" even where a case may have posed a live controversy when it was filed. <u>Clarke</u>, 915 F.2d at 701 (quoting <u>Transwestern Pipeline Co. v. FERC</u>, 897 F.2d 570, 575 (D.C. Cir. 1990)).

Under these standards, plaintiffs' claims are moot. Taken at face value, plaintiffs' complaint alleges that defendant terminated plaintiffs' housing assistance under the Section 403 Apartment Program without providing an explanation of the termination decision that satisfied due process and the APA, or an adequate explanation of how to challenge such decisions. <u>See</u> Compl. ¶¶ 1-3, 56, 59-60. To remedy this alleged violation, plaintiffs seek an injunction requiring, <u>inter alia</u>, that defendant provide a detailed, written basis for the termination of Section 403 assistance for any Hurricane Katrina or Rita evacuee before any such assistance is terminated, <u>see</u> Compl. ¶ 63(b)(I), and provide "a written description of what plaintiffs may do to challenge any proposal to terminate housing assistance . . . before terminating any housing assistance to an evacuee," <u>see</u> Compl. ¶ 63(b)(ii).

Plaintiffs' complaint cannot meet the "actual, ongoing controversy" requirement of Article III because the actions they are challenging were part of a program that no longer exists as to Hurricane Katrina evacuees. FEMA essentially created the Section 403 Apartment Program to respond to the unique demands created by Katrina, which required an unprecedented number of evacuations from affected areas. Dannels Decl. ¶ 61. Although the program was still in effect on August 29, 2006, when plaintiffs filed this action, it was ended as to all but 113 evacuee households in Houston as of August 31, 2006. <u>Id.</u> ¶ 94. That limited extension was only until

September 30, 2006, id., and FEMA ended the program with respect to Hurricane Katrina evacuees as of that date.  Thus, any decision by this Court as to plaintiffs' request for an injunction requiring FEMA to provide them with certain information before terminating their assistance under the Section 403 Apartment Program can have no present or future effect on the parties' rights, as no assistance under that program is available to any persons affected by Hurricane Katrina.  See Clarke, 915 F.2d at 701; see also Public Utilities Comm'n of the State of California v. FERC, 236 F.3d 708, 713-14 (D.C. Cir. 2001) (if events occur while case pending on appeal such that court cannot grant "any effectual relief whatsoever" to prevailing party, case must be dismissed as moot) (quoting United States v. Weston, 194 F.3d 145, 147-48 (D.C. Cir. 1999) (other citations omitted).

In these circumstances, the injunction plaintiffs seek would amount to nothing more than an abstract pronouncement regarding the constitutionality of Defendant's actions.  See Lewis v. Continental Bank Corp., 494 U.S. 472, 477-80 (1990).  Because the Section 403 Apartment Program no longer exists as to Hurricane Katrina evacuees, there is no likelihood whatsoever that plaintiffs would receive any benefit from a ruling in their favor.  Thus, plaintiffs have no stake in the injunctive relief they request in their complaint.  See id. at 479-80 (proper inquiry under Article III mootness analysis is whether plaintiff has stake in the requested remedy).

**B.      Plaintiffs' Claims are Barred by Sovereign Immunity.**

Even if plaintiffs' claims had not been rendered moot by the expiration of the Section 403 Apartment Program, they would be barred by sovereign immunity.  The housing assistance programs administered by Defendant, including the Section 403 Apartment Program created as a

specific response to Hurricane Katrina, represent textbook examples of the type of discretionary function that is immune from suit under the APA, the only legislative provision that could otherwise waive Defendant's sovereign immunity.

The United States is immune from suit, except where it has consented to be sued. United States v. Mitchell, 445 U.S. 535, 538 (1980). Sovereign immunity bars both statutory causes of action and claims arising from alleged violations of Constitutional rights. Lynch v. United States, 292 U.S. 571, 582 (1934); Bartlett v. Bowen, 816 F.2d 695, 722 (D.C. Cir. 1987). The bar of sovereign immunity also extends to actions seeking injunctive relief. See United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 547 (10th Cir. 2001). Unless Congress has expressly waived sovereign immunity, claims against the United States are thus outside the subject matter jurisdiction of federal courts. F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994). This rule applies to both constitutional and statutory claims. See id. at 480-83.

In cases challenging government action, plaintiffs bear the burden of establishing not only that Congress has waived the United States' sovereign immunity, but that the waiver upon which they rely encompasses their claims. See Lundeen v. Mineta, 291 F.3d 300, 304 (5th Cir. 2002). Such a waiver "must be unequivocally expressed in the statutory text . . . and will not be implied." Lane v. Peña, 518 U.S. 187, 192 (1996) (citations omitted). Further, the waiver of sovereign immunity must "be strictly construed, in terms of its scope, in favor of the sovereign." Id.

Plaintiffs cannot satisfy this requirement. Neither of the two statutes plaintiffs could offer as potential sources of the Court's subject matter jurisdiction – the Stafford Act and the APA – contains waivers that would encompass plaintiffs' claims. The APA, which under limited

13

circumstances may represent a waiver of sovereign immunity, states that it does not provide

review of agency action to the extent that "statutes preclude judicial review" or "agency action is

committed to agency discretion by law." 5 U.S.C. § 701(a)(1), (2). The Stafford Act, in turn,

provides that the federal government "shall not be liable" for any claim based on a federal

agency's or employee's "exercise or performance of or the failure to exercise or perform a

discretionary function or duty." 42 U.S.C. § 5148. Congress included this language to ensure

that if "mistake[s]" were made in the administration of federal disaster relief, "the Government

may not be sued . . . [and] that there shall be no liability on the part of the Government." See 96

Cong. Rec. 11895, 11912 (1950) (statement by chairman of House Public Works Committee).

As explained by the United States Court of Claims:

> This provision, on its face, clearly precludes federal governmental liability for its
> action or inaction in providing disaster relief. . . . Congress clearly manifested its
> intent to raise a statutory barrier to judicial review . . . . Additionally, the emer-
> gency assistance given under the Act constitute[s] a gratuity. Liability should not
> be imposed on the federal government for discretionary acts or omissions of its
> agencies or employees in distributing benefits under such gratuitous programs.

Ornellas v. United States, 2 Cl. Ct. 378, 379-80 (1983).

In determining whether actions performed by FEMA fall within this provision of the

Stafford Act, courts have employed a two-part test. First, the court examines "whether the act

involves an element of judgment or choice." Dureiko v. United States, 209 F.3d 1345, 1351

(Fed. Cir. 2000) (citations omitted); see also Sunrise Village Mobile Home Park, L.C. v. United

States, 42 Fed. Cl. 392, 399 (1998) (citing Berkovitz v. United States, 486 U.S. 531, 536-37

(1988)).[3] An agency action "does not involve an element or judgment or choice if it is

_____

[3] In Dureiko, the court concluded that the discretionary function exception did not bar a
breach of contract claim against FEMA because the contractual terms mandated FEMA's course

14

mandatory, i.e., if a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." See Dureiko, 209 F.3d at 1351 (citations and internal punctuation omitted); Sunrise Village, 42 Fed. Cl. at 399 ("The first prong is satisfied when a choice or judgment is involved in the performance of that function, and that choice or judgment is not tempered by a statute, regulation or policy which mandates a particular course of action."). If, however, the agency's actions involved an element of judgment or choice, the court moves to the test's second prong, which addresses "whether that judgment is of the kind that the discretionary function exception was designed to shield." Dureiko, 209 F.3d at 1351 (citations omitted). Under this second prong, the court examines whether the governmental actions and decisions at issue were "based on considerations of public policy." Id. (citations omitted).

Taken at face value, the factual allegations in plaintiffs' complaint – that FEMA's Section 403 housing assistance termination notices did not provide clear enough statements explaining why plaintiffs had been determined ineligible for Section 408 temporary rental assistance or describing how those plaintiffs could appeal such determinations – fall squarely within the Stafford Act's discretionary function exception. First, the actions challenged obviously involve some degree of "judgment or choice." FEMA is responsible for fashioning a system to communicate with various audiences about disaster assistance, particularly with those individuals affected by a disaster and requiring assistance quickly. However, potential disaster applicants are typically unaware of FEMA's programs prior to needing assistance, so FEMA has a competing goal of educating disaster applicants about FEMA programs. To educate disaster

---

of conduct. See id. at 1353. Here, by contrast, Plaintiffs do not allege that they have entered into a contract with FEMA.

applicants about disaster assistance, FEMA developed the Applicant Guide to be sent to

applicants immediately upon registration.  Dannels Decl. ¶ 29.  Then, FEMA determined, in its

discretion, that the most efficient manner of providing notice of each decision pertaining to

disaster applicants' applications would be to allow NEMIS, FEMA's computer system, to

automatically process disaster applications (a process called "auto determination").  Id. ¶ 30.  It

takes an average of five to ten days to auto-determine a disaster applicant's request for assistance;

comparatively, it takes an average of thirty days to process the application manually.  Id. ¶¶ 32,

34.  Notably, this decision was not tempered by any statutory guidance – or even any statutory

requirement to provide notice in the first place.  See McWaters v. FEMA, 436 F. Supp. 2d 802,

819-22 (E.D. La. 2006).  Thus, the actions challenged here involve the exercise of judgment "not

tempered by a statute, regulation or policy which mandates a particular course of action."  The

first prong of the discretionary function test therefore is satisfied here.  Sunrise Village, 42 Fed.

Cl. at 399.

As to the second prong of the Stafford Act's discretionary function exception, the

manner and extent of the assistance and notices provided to recipients of FEMA disaster relief is

"grounded in social, economic, and political policy."  See Sunrise Village, 42 Fed. Cl. at 399.

FEMA's decision to substantially modify previous Section 403 assistance programs to create the

Section 403 Apartment Program reflected a policy determination by FEMA that it needed to find

a way to deliver emergency rental assistance to as many Katrina evacuees as possible for a period

longer than that provided for under typical circumstances requiring Section 403 assistance.  See

Dannels Decl. ¶¶ 30, 32, 34.  Likewise, FEMA's decision to adopt a standardized system for

determining eligibility for Section 408 disaster assistance reflected a policy determination to

emphasize expedition in responding to a huge number of requests.  <u>Id.</u> ¶¶ 32, 34 (using NEMIS computer system to "auto-determine" disaster assistance requests takes an average of five days, compared to an average thirty-day turnaround for manually processed requests).

In sum, because the actions complained of by Plaintiffs fall within the discretionary function exemption of the Stafford Act, and are thus also outside the waiver provision of the APA, the Court lacks subject matter jurisdiction over Plaintiffs' claims.  The Court should dismiss Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(1).

C.      **All Plaintiffs Lack Standing.**

Finally, plaintiffs are not entitled to the mandatory, prospective injunctive relief they

seek because they lack standing to assert their claims.  In Allen v. Wright, 468 U.S. 737 (1984),

the Supreme Court identified the limiting factors that must guide a federal court's determination

of when it can and should invoke its power over a plaintiff's claim:

> Is the injury too abstract, or otherwise not appropriate, to be
> considered judicially cognizable?  Is the line of causation between the
> illegal conduct and injury too attenuated?  Is the prospect of obtaining
> relief from the injury as a result of a favorable ruling too speculative?
> These questions and any others must be answered by reference to the
> Art. III notion that federal courts may exercise power only in the last
> resort, and as a necessity, and only when adjudication is consistent
> with a system of separated powers and [the dispute is one]
> traditionally thought to be capable of resolution through the judicial
> process.

468 U.S. at 752 (internal quotations and cites omitted).  These principles have been reduced to a

three-part test to meet Article III's standing requirements.  First, plaintiffs must establish that

they have suffered an injury-in-fact – one that is concrete, particularized, and actual or imminent,

rather than merely conjectural or hypothetical.  Lujan v. Defenders of Wildlife, 504 U.S. 555,

560 (1992).  Second, plaintiffs must establish a causal connection between the injury and the

alleged conduct.  Id.  Third, plaintiffs must show that it is "'likely,' as opposed to merely

'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. (citing Simon v.

Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 41-42 (1976)); see also Steel Co. v. Citizens

for a Better Environment, 523 U.S. 83, 102-04 (1998).  At the pleading stage, plaintiffs must

allege specific, concrete facts demonstrating both that the challenged action or policy harms them

18

and that the relief sought would benefit them in a tangible way.  Warth v. Seldin, 422 U.S. 490, 508 (1975).

Here, plaintiffs fail to meet Article III's standing requirements for prospective relief claims for at least two independent reasons.  First, plaintiffs have failed to satisfy the injury-in-fact and causation requirements for prospective relief claims, because they fail to allege that they face immediate or imminent injury caused by Defendant's actions.  For injunctive relief claims, the Supreme Court has emphasized that "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects.'"  City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)).  For such claims, past wrongs may help provide relevant evidence regarding "'whether there is a real and immediate threat of repeated injury.'"  Id.  But plaintiffs must show a likelihood that they "'will again be subjected to the alleged illegality'" to satisfy the injury-in-fact requirement.  Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1274 (D.C. Cir. 1994) (citing Lyons, 461 U.S. at 109)).

Plaintiffs cannot satisfy this requirement for the simple reason that the Section 403 Apartment Program no longer exists as to any person displaced by Hurricane Katrina; thus, there is no likelihood whatever that they will again be subjected to the harm they have alleged – the termination of those precise benefits.  See Fair Employment Council, 28 F.3d at 1274.  The D.C. Circuit's decision in Fair Employment Council is instructive on this point.  There, two plaintiffs sought injunctive relief enjoining racially discriminatory practices by defendant BMC, which operated a District of Columbia employment agency.  28 F.3d at 1270.  The plaintiffs, African-American "testers" employed by the Fair Employment Council (also a plaintiff in the action),

19

went with white testers to seek employment referrals from BMC; in each instance, the white

testers received referrals, but the plaintiffs did not.  Id.  Citing Lyons, the D.C. Circuit concluded

that it was implausible that the plaintiffs would ever return to BMC as bona fide job seekers.  Id.

at 1274.  For this reason, the Circuit held, the likelihood of future injury was too remote to confer

upon the plaintiffs standing to maintain claims for either injunctive or declaratory relief.  Id.; see

also Armstrong v. Turner Industries, Inc., 141 F.3d 554, 562-64 (5th Cir. 1998) (plaintiff, former

job applicant, lacked standing to seek injunctive relief enjoining employer from continuing to

violate ADA).

　　Like the tester plaintiffs in Fair Employment Council, plaintiffs are complaining

exclusively about past alleged violations, and there is no likelihood that plaintiffs will be subject

to similar alleged violations in the future, as the Section 403 Apartment Program no longer exists

as to evacuees of Hurricane Katrina.  This fact is fatal to plaintiffs' claim for prospective

injunctive relief, see City of Los Angeles v. Lyons, 461 U.S. at 102, as well as plaintiffs' request

for a declaratory judgment, cf. Lewis v. Continental Bank Corp., 494 U.S. at 477-80 (lack of

"specific live grievance" fatal even to declaratory relief claim).

　　For the same reasons, plaintiffs cannot satisfy the redressability criterion of standing,

because neither the injunction nor the declaratory judgment they seek would redress the harms

allegedly sustained.  Plaintiffs may not seek an injunctive order for their past harms because

injunctive relief is not appropriate to redress such harms.  Steel Co., 523 U.S. at 108 (holding

that the plaintiff failed to satisfy standing's redressability requirement because injunctive relief

"cannot conceivably remedy any past wrong"); see also National Bank of Commerce of San

Antonio v. Marshall, 628 F.2d 474, 479 (5th Cir. 1980) (holding that the plaintiff was not entitled

to "an after-the-fact reprimand by injunctive order" because an injunction cannot "eradicate an

injury [the plaintiff] has already suffered").

### D.    Plaintiff ACORN Lacks Standing to Sue on Behalf of its Members or on its Own Behalf.

Even if plaintiffs' claims were not moot and the named plaintiffs had standing to assert

their claims, ACORN would lack standing.

### i.    ACORN Lacks Standing to Sue on Behalf of its Members.

To possess standing to sue as a representative of its membership, ACORN must satisfy

three elements.  First, it must identify actual members who have suffered an injury "of the sort

that would make out a justiciable case had the members themselves brought suit."  Warth v.

Seldin, 422 U.S. 490, 511 (1975).  Second, ACORN must show that "neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit."  United

Food & Commercial Workers Local 751 v. Brown Group, Inc., 517 U.S. 544, 553 (1996)

(quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).  Finally, it must

show that "the interests it seeks to protect are germane to [its organizational] purpose."  Id.

(quoting Hunt, 432 U.S. at 343).  ACORN meets none of these tests here.

Here, even assuming that ACORN has identified any individual member with a

potentially justiciable claim for relief, resolution of that claim would require the participation of

that individual.  Associational standing does not exist in situations where "claims are not

common to the entire membership, nor shared by all in equal degree," but where, instead,

"whatever injury may have been suffered is peculiar to the individual members concerned, and

both the fact and extent of the injury would require individualized proof." Lake Mohave Boat

Owners Ass'n v. Nat'l Park Serv., 78 F.3d 1360, 1367 (9th Cir. 1996) (citing Warth, 422 U.S. at

515-16, and Associated Gen. Contractors, Inc. v. Coal. for Econ. Equity, 950 F.2d 1401, 1408

(9th Cir. 1991)).  In this case for prospective injunctive relief, individual participation would be

necessary to determine, inter alia, whether an applicant whose benefits under the Section 403

Apartment Program were terminated had received sufficient notice or had been timely advised of

his or her appeal rights, and if not, precisely how his or her injury would be remedied.  Those

questions necessarily turn on facts specific to each individual who allegedly was denied due

process by FEMA.  Thus, for numerous reasons, the "individual participation of each injured

party" would be "indispensable to proper resolution of the case."  Warth, 422 U.S. at 511.

　　　　As to the third element necessary to establish associational standing, ACORN has not

alleged that the representation of individuals whose assistance under the Section 403 Apartment

Program for Hurricane Katrina evacuees is germane to its organizational purpose.  According to

the complaint, ACORN works in more than seventy-five cities "to improve housing conditions

for the economically disadvantaged, increase community safety, secure living wages for all

workers and improve the quality of local schools."  Compl. ¶ 4.  In addition, ACORN alleges that

its "overall mission and purpose" is "to advocate for fair government treatment of its members,

including protecting their rights to housing benefits."  Id.  Finally, ACORN alleges that it

operates the "ACORN Katrina Survivor's Association."  Id.  This is a particularly broad and

diffuse set of organizational goals.  However, ACORN's stated goals do not focus on advocating

for their members whose emergency housing assistance has been terminated; ACORN certainly

does not allege with any specificity exactly how it works to protect its members' housing

benefits, or what particular quality makes it suited as an organization to do so. Further, the fact

that ACORN operates a "Katrina Survivor's Association" does not imply that it is particularly

engaged in or equipped to advocate for members whose assistance under the Section 403

Apartment Program was terminated by FEMA. The issues in this case are therefore not germane

to ACORN's self-described mission, at least not in any way distinguishable from the goals of any

other group interested in housing issues.

### ii.    ACORN Lacks Standing to Sue On Its Own Behalf.

For an organization to sue on its own behalf, it "must, like any other plaintiff, satisfy the

constitutional and prudential considerations of standing." J.L. v. Social Sec. Admin., 971 F.2d

260, 268 n.8 (9th Cir. 1992). Here, ACORN fails both tests. First, ACORN has alleged no

concrete injury fairly traceable to the eligibility notifications provided by FEMA and likely to be

redressed by a judgment in its favor. As a result, ACORN lacks Article III standing. Second,

ACORN's interests are not within the zone of interests protected or regulated by the Stafford

Act. Therefore, even if ACORN could demonstrate constitutional standing, its claims should be

dismissed as a prudential matter.

### 1.    ACORN Lacks Article III Standing to Sue on its Own Behalf.

An organization may sue on its own behalf only if the challenged conduct directly

conflicts with the organization's mission and has directly harmed its ability to provide its

services. As with individuals, the injury suffered by the organization cannot be conjectural,

hypothetical, speculative or abstract; it must be "'certainly impending.'" National Treasury

Employees Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quoting Whitmore v.

Arkansas, 495 U.S. 149, 158 (1990)).[4]  Furthermore, the organization's actual or threatened injury must be "fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."  Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir.1990).

The leading decision on an organization's standing to sue in its own right is Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982).  In Havens, the plaintiff was a nonprofit organization whose purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area."  Id. at 368.  The organization sued the owner of an apartment complex for engaging in racial steering in violation of the Fair Housing Act.  Id.  The organization alleged that the defendant's illegal housing practices frustrated its efforts to promote equal housing through counseling and other referral services.  Id. at 379.  It further alleged that it "had to devote significant resources to identify and counteract the defendant's" unlawful housing practices.  Id.  The Court held that the alleged impairment to the organization's ability to provide its services, caused by the defendant's conduct, constituted an injury-in-fact to the organization.  The organization therefore had standing to sue for damages in its own right.  Id

Here, ACORN alleges that it "has spent, and will continue to spend, its limited resources to help evacuees overcome the notice barriers placed before them by FEMA" unless the plaintiffs obtain the relief they seek.  Compl. ¶ 4.  In addition, ACORN alleges that "FEMA's challenged actions have caused ACORN to redirect its resources from its other projects to assist evacuees."  Id.  However, unlike the plaintiffs in Havens, ACORN does not allege what specifically, if anything, defendant has done to frustrate its efforts or to make them ineffective.  Furthermore,

---

[4]  Thus, for the reasons discussed earlier, supra at Part I.A., ACORN's claims on its own behalf would be no less moot than the claims of the individual plaintiffs.

these allegations are not sufficient to establish that ACORN has suffered direct injury that is fairly traceable to action taken by FEMA, as opposed to the increased volume of housing needs caused by Hurricane Katrina itself, an unprecedented disaster in this nation's history.  With a national disaster of the scope of Hurricane Katrina, it is unsurprising that groups such as ACORN are devoting resources to assist individuals rebuild their lives.  However, as laudable as those efforts are, they do not confer upon ACORN standing to bring this action.  See Rainbow/PUSH Coalition v. F.C.C., 396 F.3d 1235, 1241-42 (D.C. Cir. 2005) (no organizational standing because plaintiff never states or explains how the alleged conduct affected its counseling or outreach efforts).

Further, the allegations in the complaint are insufficient to establish that any direct injury ACORN has suffered would be redressed by a judgment in its favor.  Because the allegations upon which ACORN purports to base its standing would have to be resolved on a person-by-person basis, there is no overarching remedy that will ensure that ACORN is freed from its burden of helping its members work to obtain housing assistance.  For all of these reasons, ACORN fails to satisfy the requirements for Article III standing.

> **2.     ACORN's Organizational Interests Are Not Within the Zone of Interests Protected by the Stafford Act for Prudential Standing.**

Even if ACORN could show some injury-in-fact to its ability to function as an organization that is fairly traceable to the actions of defendant and would be remedied by a judgment in its favor, it would still lack standing because its ability to function as an advocacy organizations is not within the "zone of interests protected by the law invoked."  See Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 12 (2004) (quoting Allen v. Wright, 468 U.S. 737,

751 (1984)).  A plaintiff cannot meet this test merely by alleging that a regulatory scheme

protects or regulates someone else's interests in a way that might indirectly affect his own.  See

Air Courier Conference v. Am. Postal Workers Union, 498 U.S. 517, 522-31 (1991); Devlin v.

Scardelletti, 536 U.S. 1, 7 (2002) (observing that prudential standing requirements include the

"'general prohibition on a litigant's raising another person's legal rights. ...'") (quoting Allen v.

Wright, 468 U.S. at 751).  Although the prudential standing requirement is not meant to be

"especially demanding," Clarke v. Securities Industry Ass'n, 479 U.S. 388, 399 (1987), ACORN

has failed to allege facts sufficient to satisfy it.

    As a general matter, the Stafford Act establishes procedures to "assist the efforts of the

. . . States in expediting the rendering of aid, assistance, and emergency services, and the recon-

struction and rehabilitation of devastated areas" affected by disasters.  42 U.S.C. § 5121; see Pub.

L. No. 100-707, 102 Stat. 4689 (1988).  The Act makes no "mention of advocacy organizations'

interests."  Center for Law and Educ. v. Dep't of Educ. 396 F.3d 1152, 1157 (D.C. Cir. 2005).

Nor does it regulate the conduct of advocacy groups.  The concerns of ACORN are therefore not

within the zone of interests of the relevant law.  See INS v. Legalization Asst. Proj. of Los

Angeles County Fed. of Labor,  510 U.S. 1301, 1305 (1993) (O'CONNOR, J., in chambers)

(granting stay of appellate ruling because Supreme Court likely "would grant certiorari and

conclude that [organizations that provide legal help to immigrants] are outside of zone of

interests" immigration law sought to protect; "fact that the INS regulation may affect the way an

organization allocates its resources . . . does not give standing to an entity which is not within the

zone of interests the statute meant to protect").

II.     **The Court Should Dismiss Plaintiffs' Due Process Claim Because Plaintiffs Have No Protectable "Property" Interest in FEMA Housing Assistance.**

Even if the Court determines that plaintiffs' claims are within its subject-matter jurisdiction, their due process claim is without merit because FEMA housing assistance does not constitute "property" under the Due Process Clause.  The Due Process Clause applies to governmental benefits only if they may be classified as "property."  However, a benefit constitutes property only where the plaintiff possesses a "legitimate claim of entitlement to it."  Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  As the D.C. Circuit has emphasized:

> It is well understood that, under the Fifth Amendment Due Process clause, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it.  He must, instead [] have a legitimate claim of entitlement to it."

Roth v. King, 449 F.3d 1272, 1284 (D.C. Cir. 2006) (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, — (2005)); see also Blackburn v. City of Marshall, 42 F.3d 925, 941 (5th Cir. 1995) (same true for continuation of benefit).

The courts have repeatedly held that plaintiffs can possess no "legitimate claim of entitlement" to a governmental benefit if discretion is exercised in providing the benefit.  See Roth v. King, 449 F.3d at 1285.  For example, in Washington Legal Clinic for the Homeless v. Barry, 107 F.3d 32 (D.C. Cir. 1997), the court held that local government officials retained sufficient discretion in determining which eligible persons would receive emergency shelter provided by the city, even though statutory and regulatory guidelines determined basic eligibility. 107 F.3d at 36-37; see also PDK Labs Inc. v. Reno, 134 F. Supp. 2d 24, 32 (D.D.C. 2001) (no property interest created "where a statute leaves discretion with the government in awarding benefits").  Similarly, in Hill v. Group Three Housing, 799 F.2d 385, 389-92 (8th Cir. 1986), the

Eighth Circuit held that private property owners retain sufficient discretion in selecting tenants for Section 8 housing that eligible persons possess no protectable property interest in such benefits – despite the fact that federal guidelines somewhat circumscribed that discretion.  799 F.2d at 389-92.

As pointed out supra, the provision of federal disaster assistance represents a textbook example of governmental discretion.  The Stafford Act itself is replete with discretionary rather than mandatory language: the President "may" declare a major disaster, 42 U.S.C. § 5170, and FEMA "may" provide financial assistance or direct services to individuals and households after a major disaster, id. § 5174(a)(1), "may" provide financial assistance to address other needs, id. § 5174(e), and "may" provide other essential assistance, id. § 5170b(a).  This language has none of the "mandatory quality" that creates legitimate property interests under the Due Process Clause. See Soeken v. Herman, 35 F. Supp. 2d 99, 105 (D.D.C. 1999).  Consistent with that conclusion, the courts have held that FEMA exercises discretion in providing assistance under the Act.  See Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392, 399 (1998); City of San Bruno v. FEMA, 181 F. Supp. 2d 1010, 1014-15 (N.D. Cal. 2001); Ornellas v. United States, 2 Cl. Ct. 378, 379-80 (1983).  Thus, plaintiffs can possess no "legitimate claim of entitlement" – and no constitutionally protected property interest – in federal disaster assistance or in receiving notice regarding the termination of such assistance.

28

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' claims for lack of subject matter jurisdiction.  In the alternative, the Court should deny plaintiffs' motion for preliminary injunctive relief.

Dated: October 30, 2006                                   Respectfully submitted,

                                                          PETER D. KEISLER
                                                          Assistant Attorney General

                                                          JEFFREY A. TAYLOR
                                                          United States Attorney


                                                          */s/ Christopher R. Hall*
_____
                                                          MICHAEL SITCOV
                                                          CHRISTOPHER HALL
                                                          Trial Attorneys
                                                          U.S. Department of Justice
                                                          Civil Division
                                                          Federal Programs Branch
                                                          P.O. Box 883
                                                          Washington, D.C.  20530

                                                          (202) 514-4778