UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

NOV 2 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| **ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN)**, *et al.* | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 06cv1521  (RJL) |
| | ) | |
| **FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA)** | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**
(November 29, 2006)

Before the Court is a motion for a preliminary injunction [#3] filed by a national

community organization, the Association of Community Organizations for Reform Now

("ACORN")[1] on behalf of several thousand evacuees of Hurricanes Katrina and Rita[2] and

---

[1] ACORN is a membership organization comprised of low and moderate income families who work to improve public policies necessary to build what members believe to be stronger communities. Since 1970, ACORN has grown to more than 175,000 member families organized in 850 neighborhood chapters in 75 cities across the U.S. and other countries. ACORN's accomplishments include campaigns for better housing, schools, neighborhood safety, health care, job conditions. ACORN members participate in local meetings and actively work on campaigns, elect leadership, and pay the organization's core expenses through membership dues and grassroots fundraisers. ACORN's mission includes helping disaster survivors build strong and stable communities wherever they choose to live. (TRO, Ex. 16, Decl. of Amy Schur at ¶¶ 2-3.)

[2] Hurricane Katrina, which made landfall on August 29, 2005, was "the most destructive and costly natural disaster in U.S. history," killing over 1,800 people, and costing approximately $125 billion. *See, e.g.*, FEMA Disaster Information Page (Aug. 22, 2006), http://www.fema.gov/news/newsrelease.fema; National Oceanic and Atmospheric

four individual Hurricane Katrina evacuees.[3]  In essence, plaintiffs contend that the

Federal Emergency Management Agency ("FEMA") violated the due process rights of

those hurricane evacuees who were denied long-term housing benefits under Section 408

of the Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C.

§ 5174(b), by failing to provide them explanations that were sufficiently detailed to

enable them to file a meaningful appeal.  As a result, plaintiffs seek declaratory and

injunctive relief requiring FEMA to provide adequate, written notice for any decisions to

deny housing assistance to these evacuees under Section 408 and the continuation, or

restoration, of temporary housing assistance until such notice and opportunity to appeal is

provided.  It is unfortunate, if not incredible, that FEMA and its counsel could not devise

a sufficient notice system to spare these beleaguered evacuees the added burden of federal

litigation to vindicate their constitutional rights.  Nevertheless, after due consideration of

the parties' submissions, the relevant law, and the entire record herein, the Court

GRANTS plaintiffs' motion.

---

Administration Report on Katrina, http://www.ncdc.noaa.gov/oa/reports/tech-report-
200501z.pdf.

      Hurricane Rita, which struck on September 24, 2005, was also "one of the most intense
hurricanes ever recorded during the Atlantic Hurricane Season," displacing approximately 37,000
people from Louisiana to Texas and 33,000 people from Texas to other states, as well as costing
FEMA $528 million in aid to those displaced families. *See, e.g.*, FEMA Disaster Information
Pages (Sept. 18-19, 2006), http://www.fema.gov/media/archives/2006/091906b;
http://www.fema.gov/news/newsrelease.fema?id=29981.

      [3] Plaintiffs filed a motion for a temporary restraining order on August 31, 2006. [#3].
This Court denied that motion and converted it into a motion for a preliminary injunction. (*See*
Order of Aug. 31, 2006.)

## BACKGROUND

In 2005, FEMA determined, pursuant to a presidential disaster declaration, that the

evacuees from Hurricanes Katrina and Rita qualify for short-term housing rental

assistance under Section 403 of the Stafford Act, 43 U.S.C. § 5170b.  FEMA immediately

began making payments to those evacuees.  (Def.'s Opp. to Req. Prelim. Inj. ("Def.'s

Opp.") at 4-6.)  Beginning in February 2006, however, FEMA attempted to transfer those

evacuees that were eligible to its longer-term Section 408 housing program, which

provides up to eighteen months of housing assistance to disaster evacuees.  (*Id.* at 8.)

Unlike Section 403, individuals must apply for assistance under Section 408 and meet

certain statutory and regulatory criteria.  (*Id.* at 5 (citing 42 U.S.C. § 5174(b); 44 C.F.R.

§§ 206.110(h), 206.113(b)(1), 206.113(b)(6)).)  During this process, FEMA would

ultimately deny the Section 408 applications of thousands of evacuees, and after a thirty

day notice period, terminate their Section 403 benefits.  (Pls.' Mot. TRO ("TRO") at 3.)

When FEMA notified the evacuees in March of 2006 of their ineligibility for

Section 408 benefits, they used "standardized" form letters generated by a computer

program that purportedly makes automatic determinations on the evacuees' applications.

Each letter cryptically indicated, by a code or phrase inserted therein, FEMA's decisions

and, if necessary, its purported reason for denying (or terminating) benefits.[4]  (Def.'s

---

[4] For example, the determination letter sent to one applicant, Mr. Douglas, on March 24,
2006 stated as FEMA's determination, "INO-Ineligible-Other."  A second letter to Mr. Douglas
dated May 25, 2006 provides no further detail, stating "INC-Ineligible-No change on appeal,
original ineligible status remains."  Third and fourth letters sent on June 15, 2006 and August 10,

Opp. at 10.)  In addition to the information provided by these letters, evacuees were

provided with, or could obtain, a copy of the evacuee Applicant Guide, entitled "Help

After A Disaster," that provides explanations for the codes and phrases in the letters from

FEMA and provides specific information regarding the processes for appealing adverse

eligibility determinations.  (Def.'s Opp. at 10 (citing Dannel's Decl. ¶¶ 28-29); TRO, Ex.

2.)  Also, attached to each letter was a "notice" that provides non-individualized details

regarding the appeals process.  (Def.'s Opp. at 11-12.)  Beyond the code or phrase

inserted automatically into each letter, FEMA provided little other individual explanation

for its decision to deny or terminate benefits.  To the contrary, FEMA frequently sent

more than one letter to an evacuee containing *contradictory* codes or explanations, *(see,*

*e.g.*, Compl., Ex. 1.), and calls by evacuees to a "toll-free helpline" frequently resulted in

conflicting "review of the applicant's case file on the spot" that plaintiffs found

"confusing and chaotic."  (TRO, Ex. 7; *see also* TRO, Exs. 7-11, 15-17.)[5]

---

2006 declared Mr. Douglas "ENC-Eligible-No change on appeal, original eligible status stands."
Yet, the letter indicates that Mr. Douglas is eligible for a total grant amount "$0."  (Compl., Ex. 1
at 1.)

   [5] *See, e.g.*, TRO, Ex. 15 (Decl. of ACORN Member Evacuee Michael Brumfield ¶ 5)
("FEMA has terminated my rental assistance and determined me to be ineligible. I have made
many appeals to this decision without any success. I have found this incredibly frustrating
because I have not been unable [sic] to understand the reason why I am ineligible.  I have tried to
speak with FEMA officers to get more information so that I can write an effective appeal, but
every time I speak with a FEMA representative I get a different explanation."); TRO, Ex. 15
(Decl. of ACORN Member Evacuee Robert Coakley ¶ 3) ("FEMA's lack of furnishing me with
an understandable reason were, while blindfolded, like trying to ... [pin] the tail on the donkey. I
never knew the cause of the denials, and the appeal process was reduced to a mere guessing
game."); TRO, Ex. 15 (Decl. of ACORN Member Evacuee Carmen Handy ¶ 5) ("When FEMA
is contacted about my request for rental assistance, the reasons I have been given for the

The transition from Section 403 to Section 408 relief, which was conducted

pursuant to a Disaster Specific Guidance, ended up taking months to effectuate. (*See*

Def.'s Opp. at 8-10.) Indeed, FEMA extended its deadline to terminate Section 403

benefits a number of times as a result of requests from local governments and charities.

(*Id.* at 9.) By July 26, 2006, FEMA had extended the entire Section 403 program until

August 31, 2006. (*Id.* at 9-10.) However, when the City of Houston requested a fourth

extension on August 18, 2006 for the thousands of evacuees that had been deemed

ineligible for Section 408 assistance, FEMA granted the request for only 113 of those

households.[6] (*Id.* at 10.)

---

termination are not what is in the documents and/or the reasons change each time I call. Every time I call back, the person answering the call knows nothing about what the previous person told me. If the documents from FEMA were more specific and provide[d] more information I believe I could address the problem and be reinstated with rental assistance."); TRO, Ex. 15 (Decl. of ACORN Member Evacuee Kenneth Leach ¶ 5) ("I have called FEMA multiple times to find out more about why my assistance has been terminated. In my experience, I can call three different times a day and get three different answers to my questions about why I am ineligible."); TRO, Ex. 9 (Decl. of Attorney Martha Beard-Duncan ¶ 8) ("We, like our clients, find that FEMA Disaster Helpline agents offer inconsistent reasons as to why clients might have been denied assistance. None of the reasons the helpline agents offer us verbally are given to us, or the clients, in writing."); TRO, Ex. 10 (Decl. of Attorney Sasha Moreno ¶ 2) ("[Our clients] have received letters that deny them rental assistance for mysterious reasons without guidance on how to appeal, and they have called FEMA officers on the Disaster Helpline and with each call, they receive a new explanation for their denial, often with conflicting advice on how to move forward with an appeal."); TRO, Ex. 17 (Decl. of Caseworker Kirsten Mindrum ¶ 3) ("I have come across major inconsistencies and contradictory information relayed by FEMA employees in what seems to be a process that intentionally weeds out disaster victims by being unclear about the information that FEMA requires. . . . The notices are so vague [that] FEMA uses them to claim a multitude of problems, one after another. There is no transparency, and information is being withheld which drags out the process of appeal and leads to evictions and homelessness.").

[6] But see transcript of September 15, 2006 that describes 113 *individuals* receiving Section 403 benefits in September 2006. (Tr. of Sept. 15, 2006 at 18.)

Thus, on August 31, 2006, plaintiffs filed a TRO with this Court seeking an order restraining FEMA from terminating that day the temporary housing benefits to thousands of evacuees who had applied unsuccessfully for long-term assistance under Section 408. The Court heard oral arguments from both sides via teleconference call, denied the TRO, set a briefing schedule for the preliminary injunction opposition and reply briefs, and set a hearing for oral argument on the preliminary injunction for September 15, 2006. Although the Court denied the TRO, it specifically warned FEMA that if they went ahead and terminated the evacuees' short-term housing benefits *prior* to this Court's ruling on the preliminary injunction, the Court may order back-payments from September 1, 2006 through the appeals process should this Court ultimately agree with plaintiffs' constitutional claims. Notwithstanding the Court's warning, FEMA terminated the short-term benefits that day for all but the 113 households and two of the named plaintiffs, for which FEMA extended benefits until September 30, 2006. (*See* Tr. of Sept. 15, 2006 at 18; Def.'s Opp at 10; Mot. Dismiss at 7.)

## ANALYSIS

Initially, FEMA advances two procedural challenges to plaintiffs' lawsuit: (1) this Court lacks subject matter jurisdiction over plaintiffs' claims; and (2) ACORN lacks standing to bring this suit on behalf of the thousands of evacuees in its organization. For the following reasons, the Court disagrees with both.

## I. Subject Matter Jurisdiction

FEMA argues that this Court lacks subject matter jurisdiction because Congress

has not waived sovereign immunity for claims brought pursuant to the Stafford Act or the

Administrative Procedures Act ("APA").  (Def.'s Opp. at 17-21.)  Specifically, both the

Stafford Act and the APA provide that acts that are taken within the discretion of the

federal agency are not reviewable in court.[7]  FEMA's suggestion, however, that the

procedure and notice FEMA employed "to notify disappointed applicants of their status"

are barred from review is, at best, a stretch.  (*See* Def.'s Opp. at 21).  Plaintiffs challenge

under the Due Process Clause is to FEMA's notice of their ineligibility, not to FEMA's

eligibility decision itself.  Because "adherence to constitutional guidelines is . . .

mandatory," FEMA is not immunized from judicial review of alleged constitutional

violations.  *Rosas v. Brock*, 826 F.2d 1004, 1008 (11th Cir. 1987)[8]  Accordingly, this

---

[7] *See* 5 U.S.C. § 701(a)(1), (2) (stating that the APA does not provide for review of agency action to the extent that "agency action is committed to agency discretion by law"); 42 U.S.C. § 5148 (stating that under the Stafford Act, "the Federal Government shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions of this Act").

[8] *Rosas*, 826 F.2d at 1008 (holding in regards to a precursor to the Stafford Act, the Disaster Relief Act of 1974, that "Congress had no such intention [of precluding judicial review of unconstitutional acts] when it enacted 42 U.S.C. § 5148.  That statute prohibits judicial review of discretionary actions.  There is no reason to believe that Congress ever intended to commit to an agency's discretion the question of whether . . . to act constitutionally."); *see Czerkies v. Dep't of Labor*, 73 F.3d 1435, 1439 (7th Cir. 1996); *McWaters v. FEMA*, 436 F. Supp. 2d 802, 812-13 (E.D. La. 2006).

Court finds that it has the authority to review plaintiffs' constitutional challenge to FEMA's notice.

## II. Standing

FEMA's second procedural challenge is its contention that ACORN lacks standing to sue on behalf of its members, (Def.'s Opp. at 21-27), because the due process claims asserted by ACORN must by litigated as to each individual applicant, and because the claims related to housing benefits are not germane to ACORN's purpose.  The Court disagrees and, for the following reasons, concludes that ACORN has sufficiently demonstrated its legal basis to sue on behalf of these evacuees.

For an organization to sue on behalf of its members, it must meet the three part test for associational standing as set out by the Supreme Court, namely, that:  "(a) its members would otherwise have standing to sue in their own right; (b) the interest it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *see also Truckers United for Safety v. Mead*, 251 F.3d 183, 188-89 (D.C. Cir. 2001).

To satisfy the first prong of the *Hunt* test, ACORN must show that "its members, or any one of them," *Hunt*, 432 U.S. at 342, (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)), have standing to sue on their own behalf.  In this case, ACORN filed the declarations of numerous members who were each denied Section 408 benefits via letters

from FEMA that they claim provide insufficient explanation. It is clear that each of those

individuals have standing to challenge those letters from FEMA as providing insufficient

due process, and, thus, this first prong is easily satisfied.

As to the second *Hunt* prong, FEMA's argument that the issues in this case are not

germane to ACORN's "self-described mission" is, at best, disingenuous. FEMA, by its

own admission, recognizes that ACORN advocates for the fair treatment of its members,

including for the protection of their right to housing benefits, and, as part of that mission,

is operating a Katrina Survivor's Association[9] to further these goals on behalf of

hurricane survivors. (Def.'s Opp. at 23; *see also* TRO, Ex. 16.) Thus, as the

germaneness prong requires only "mere pertinence between litigation subject and

organizational purpose," *Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir.

1988), ACORN's purposes are more than sufficiently related to the subject matter of this

lawsuit to satisfy this factor.

Finally, FEMA argues that the third prong is not satisfied because "individual

participation [is] necessary here to determine, *inter alia*, whether an ACORN member

---

[9] The ACORN Katrina Survivors Association is created by ACORN and is composed of displaced New Orleans residents and other Katrina survivors. It has over 5,000 members and is the first nationwide organization of displaced New Orleans residents and other Katrina survivors. The Katrina Survivors Association unites members who seek more effective relief efforts and a voice in the rebuilding process. The ACORN Katrina Survivors Association engages in activities ranging from counseling individual survivors about emergency housing options to conducting dialogue with elected officials and public policy experts to protect the interests of families affected by the disaster. ACORN seeks a voice for survivors in the rebuilding of New Orleans, the resources needed for families to survive while rebuilding efforts are undertaken, and a rebuilding plan that builds stronger communities. (TRO, Ex. 16, Decl. of Amy Schur at ¶¶ 4.)

who was deemed ineligible for Section 408 assistance had received notice of his or her

eligibility status or had been timely advised of his or her appeal rights." (Def.'s Opp. at

23.) FEMA is incorrect. First, the Supreme Court has explained that "individual

participation is not normally necessary when an association seeks prospective or

injunctive relief for its members," even though it may be "required in an action for

*damages* to an association's members." *United Food and Commercial Workers v. Brown

Group*, 517 U.S. 544, 546 (internal quotations omitted) (emphasis added). Second, since

this suit raises questions regarding the constitutionality of FEMA's notice procedures, not

"the eligibility of individual . . . claimants." *Brock*, 477 U.S. at 287. Therefore, in this

case, "the declaratory and injunctive relief requested . . . is clearly not of a type that

requires the participation of any individual member." *Humane Soc'y*, 840 F.2d at 53.

Accordingly, this Court finds that all three requirements for associational standing

are satisfied, and ACORN may bring this action on behalf of its members.

## III. Preliminary Injunctive Relief

To prevail in a request for a preliminary injunction, the plaintiffs "must

demonstrate:  1) a substantial likelihood of success on the merits; 2) that [they] would

suffer irreparable injury if the injunction were not granted, 3) that an injunction would not

substantially injure other interested parties, and 4) that the public interest would be

furthered by the injunction." *Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir.

2001) (internal quotations omitted). Because these four factors "interrelate on a sliding

scale," the Court must balance the strengths of the factors against each other. *Serono Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). Accordingly, if there is a particularly strong argument for one factor, an injunction may be issued even if there are weaker arguments for the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury."). On the other hand, a particularly weak argument for one factor may be more than the other factors can compensate for. *See, e.g. Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (finding that "given the inadequacy of [the plaintiff's] prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief"). For the following reasons, the Court holds that plaintiffs have made a particularly strong argument for most, if not all, of these factors.

*A. Substantial Likelihood of Success on the Merits*

For the plaintiffs to succeed on the merits, they must establish: (1) that they possess a property interest in the housing assistance benefits that is protected by the Due Process Clause, and (2) that FEMA's termination and denial letters were constitutionally insufficient notice of the reasons for FEMA's decisions and failed to provide the requisite opportunity for appeal. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). In this Court's judgment, plaintiffs have established both.

11

As to plaintiffs' property interests, the Fifth Amendment guarantees that the government will not deprive its citizens of property without due process of law. *See* U.S. Const. amend. V. Indeed, "[p]rocedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). "Property" in this context, of course, extends beyond real estate or physical possessions and can include rights to government benefits. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254 (1970), *Mathews v. Eldridge*, 424 U.S. 319 (1976). Moreover, it is well-established that government benefits create constitutionally protected property interests if an applicant has a "legitimate claim of entitlement to it," rather than mere expectation. *See, e.g., Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997). Here, FEMA, by its own admission, administers its disaster housing assistance programs without discretion as to which persons will ultimately be deemed eligible for long-term housing benefits. *See* 42 U.S.C. § 5151(a); 44 C.F.R. §§ 206.11, 206.42(5). Thus, all of those receiving short-term assistance under Section 403 may apply for long-term assistance under Section 408, and until FEMA rules on which applicants are entitled to receive Section 408 benefits pursuant to the published criteria established by law, all are accorded the same procedural system and rights. Accordingly, the evacuees here have a protectable property right in the housing assistance administered by FEMA, which cannot be deprived without due process of law.

To determine whether constitutionally adequate notice has been provided, the

Supreme Court has set forth three factors that must be considered in evaluating the

alleged due process given:

> First, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest, including the function
> involved and the fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.  For the following reasons, all three factors weigh heavily in

favor of the plaintiffs in this case.

First, as to the nature of plaintiffs' private interest in continued housing assistance,

it could not be more fundamental and overarching than it is here.  Indeed, the Supreme

Court itself has explained that where the discontinuation of benefits would "deprive an

eligible recipient of the very means by which to live while he waits" for reconsideration,

the private interest at stake is highest. *Mathews*, 424 U.S. at 340-41.  Thus, as FEMA

acknowledges, (Def.'s Opp. at 32), plaintiffs have a high private interest in the

perpetuation of their housing throughout the Section 408 application and FEMA appeals

process.

Second, as to the risk of erroneous deprivation, many courts have acknowledged

that that risk significantly increases as the notice given becomes less detailed and more

vague.  Indeed, because "adequate notice lies at the heart of due process," as our Circuit

noted in *Gray Panthers v. Schweiker*, the risk of erroneous deprivation is enhanced when

parties are not adequately informed of the reasons for the denial of a legal interest.  652

F.2d 146, 168 (D.C. Cir. 1980).  Guessing by an applicant from among several

explanations for ineligibility does not serve the fundamental purposes of due process.  *See,*

*e.g., Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 599 (D.C. Cir. 1993).

As such, many courts have concluded that due process requires an agency to include in the

notice provided to the applicant the reasons and factual support for the denial of benefits.

*See, e.g., Kapps v. Wing*, 404 F.3d 104, 123-24 (2d Cir. 2005); *Ortiz v. Hazel*, 794 F.2d

889, 892-94 (3d Cir. 1986); *Dilda v. Quern*, 612 F.2d 1055, 1057 (8th Cir. 1980);

*Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980).

Here, plaintiffs contend that the notices sent by FEMA to those deemed ineligible

for housing assistance were "unnecessarily vague" such that they created a "significant

risk of erroneous deprivations of property interest." (TRO at 15; *see, e.g.* sources cited

*supra* at note 4.)  Indeed, plaintiffs contend that they are unable to address, let alone,

intelligently appeal, decisions they cannot understand. (*Id.* at 5.)  The Court agrees.  A

review of a sample of the letters sent by FEMA demonstrates that they do not adequately

communicate FEMA's reasoning for its determinations to deny benefits.  In general, the

letters contain only a cryptic code and a phrase such as "Ineligible–Other." (Compl., Ex.

1, TRO, Ex. 15.)  Also, despite FEMA's suggestion that the Applicant Guide provides

"additional explanation for what the code and explanatory phrase mean," (Def.'s Opp. at

33), this Guide is also vague and nonindividualized, and, in the "Other" context, the Guide

14

redundantly refers the applicant back to the "specific reason on letter." (TRO, Ex. 2 at 13.) Moreover, plaintiffs have submitted numerous declarations from various evacuees deemed ineligible for housing assistance and those attempting to assist them. (TRO, Exs. 7-11, 13, 15-17.) The declarations detail experiences with the ambiguous and unintelligible nature of the letters, and the contradictory and confusing interactions with and responses from FEMA. (*Id.*) Indeed, FEMA itself even admits that there has been confusion in application denials as thousands of applicants were *erroneously* ruled ineligible for benefits only to have them reinstated weeks later. (Def.'s Opp. at 13.)

Moreover, FEMA's argument that its "extensive appeals process for Section 408 ineligibility determinations" mitigates the lack of individual notice provided to the evacuees misses the mark completely. (Def.'s Opp. at 33-34.)[10] Our Circuit Court has made it clear that, "[u]nless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose . . . . Without notice of the specific reasons for denial, a claimant is reduced to guessing what evidence can or should be submitted in response and driven to responding to every possible argument against denial at the risk of missing the critical one altogether." *Gray Panthers*, 652 F.2d at 168-69. Here, where the letters sent by FEMA do not provide adequate explanation of FEMA's decisions, it is disingenuous, at best, for FEMA to base the appeals process upon the *applicant's*

---

[10] FEMA provides no description of this appeals process beyond explaining that FEMA provides a notice to those denied benefits that tells them to "[e]xplain in writing why you feel FEMA's decision is wrong. Send any new or additional information that you have to show the Appeals Officer that you are eligible for this money." (Def.'s Opp. at 12.)

explanation for why he/she believes that decision was wrong. Therefore, FEMA's notice

provisions are unconstitutionally vague and uninformative, and a more detailed statement

of FEMA's reasons for denying long-term housing benefits, including the factual and/or

statutory basis for the decision, must be provided in order to: (1) diminish the risk of

erroneous deprivation; (2) restore the appellate review process to the valuable safeguard it

was intended to be; and (3) free these evacuees from the "Kafkaesque" application process

they have had to endure. *See Wash. Legal Clinic*, 107 F.3d at 35.

Finally, in balancing the increased burden and cost to the government to more fully

explain their denials against these first two factors, the increased burden and cost do not

begin to outweigh the high private interest of those evacuees facing eviction and the

considerable risk of erroneous determinations caused by vague and cryptic explanations.

FEMA's conclusory rebuttal that "relief requiring FEMA to rewrite its eligibility

determination notices at this point would immeasurably slow FEMA's progress" in

providing disaster relief is woefully inadequate. (Def.'s Opp. at 35.) Indeed, its purported

additional burden is not only "immeasurably" vague, but highly questionable considering:

(1) the numerous letters FEMA has already sent to each evacuee applicant; (2) the

existence of an up-to-date case file as to each ineligible applicant, and (3) an in-place

computer system that enables FEMA to readily input additional data into the denial letters.

Simply stated, FEMA has failed to demonstrate that sending more detailed explanations of

ineligibility would pose a burden or cost too great to offset the obvious benefits it would so readily yield.

Accordingly, plaintiffs having demonstrated a clear advantage in the application of the Supreme Court's three factors, and the Court, thus, concludes they are highly likely to succeed on the merits of their due process claim.

*B.  The Three Remaining Factors for Preliminary Injunctive Relief*

The plaintiffs assert that they have additionally established the three remaining factors for preliminary injunctive relief:  (1) irreparable harm to the plaintiffs; (2) no substantial injury to other parties; and (3) a furtherance of the public interest.  The Court agrees.

With respect to the first, FEMA offers no rebuttal to plaintiffs' claim that they will suffer irreparable harm.  In sum, their objection is the contention that "plaintiffs' delay in bringing this action and in moving for preliminary injunctive relief undermines their claim of imminent irreparable injury." (Def.'s Opp. at 37.)  While this "delay argument" might have had some value regarding plaintiffs' TRO, it is of no avail regarding the preliminary injunction.  Indeed, as a result of FEMA's decision, over this Court's warning, to terminate all short-term benefits *prior* to this Court's ruling on the preliminary injunction, the irreparable injury to the evacuees has already occurred, and, thus, the Court's injunctive powers are now being sought to stop and reverse the harm.  In essence, each

additional day plaintiffs go without assistance, they are harmed further. Accordingly, the necessary irreparable harm element is overwhelmingly established.

As to the final two factors, FEMA's arguments are also unpersuasive. As previously noted, FEMA has failed to demonstrate any substantial harm to the government if it were required to provide additional detailed information regarding an applicant's lack of eligibility. And, as to the public interest requirement, our Circuit Court has clearly articulated that the public has an interest in the government maintaining procedures that comply with constitutional requirements. *See O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992). Therefore, as this Court has found that FEMA's procedures for the denial of Section 408 benefits to Hurricane Katrina and Rita evacuees do not comport with the Due Process Clause of the Constitution, the interest of the public weighs strongly in favor of a preliminary injunction.

## CONCLUSION

Accordingly, for the foregoing reasons, plaintiffs' motion for a preliminary injunction is GRANTED. An Order is attached requiring FEMA to provide, as soon as possible, more detailed explanations for the denials of evacuees' eligibility for housing assistance benefits under Section 408, including the factual and statutory basis for the denial and more fulsome instructions as to how each evacuee may either cure their ineligibility problem(s) or proceed with an appeal. In addition, FEMA is ordered in the meantime to immediately restore Section 403 short-term housing assistance benefits to all

evacuees who, as of August 31, 2006, had been found ineligible for Section 408 benefits until such time as they have received the more detailed explanations and have had the requisite amount of time to pursue an administrative appeal thereof. Finally, FEMA is also ordered to pay to each of these evacuees the short-term assistance benefits they would have otherwise received from September 1, 2006 through November 30, 2006.

RICHARD J. LEON
United States District Judge

19