IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSOCIATION OF COMMUNITY )
ORGANIZATIONS FOR REFORM NOW, )
*et al.* )
)  CIV. ACTION NO. 06-1521-RJL
      Plaintiffs, )
)
v. )
)
FEDERAL EMERGENCY )
MANAGEMENT AGENCY (FEMA), )
)
      Agency.

### DECLARATION OF DONNA M. DANNELS

I, Donna M. Dannels, state as follows:

1. I have worked in various program areas at the Federal Emergency Management Agency (FEMA), a component agency of the Department of Homeland Security (DHS) since 1983. I have worked in the Recovery Division in a management position since June 2001.

2. From October 1, 2005 to July 7, 2006, I was the Acting Deputy Director of the Recovery Division at FEMA. In my capacity as the Acting Deputy Division Director, I had oversight responsibility for all Recovery Programs authorized by the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended, 42 U.S.C. §§ 5121 et seq. ("Stafford Act"). This includes all Individual Assistance Programs, including the Individuals and Household Program, and the Public Assistance Program.

3. In addition, I have held the position of Individual Assistance Branch Chief within the Recovery Division since April 2006. In this capacity, I oversee the implementation of the Individual Assistance authorities of the Stafford Act.

4. I have previously submitted declarations in support of FEMA's opposition to plaintiffs' Preliminary Injunction motion and in support of our dismissal motion that explain in greater detail the operation of sections 403 and 408 in general, and more specifically in the case of Hurricane Katrina and Rita evacuees.

**COMPLIANCE WITH THE NOVEMBER 29, 2006 ORDER WILL CAUSE SUBSTANTIAL HARDSHIP TO THE DEFENDANT.**

5. The Court's Order will have an immediate and significantly adverse impact on FEMA's ability to implement its programs in a manner consistent with its statutory authorities, and it creates a number of logistical and administrative burdens. The Order requires FEMA to provide "detailed explanations for denials" of every application for housing assistance under section 408 of the Stafford Act, including the factual and statutory basis for denial, as well as "more fulsome" instructions as to how the applicants can amend their applications to make them potentially eligible or how to appeal. *See* Order at 1.

6. Further, the Court has ordered FEMA to "immediately restore [Stafford Act] section 403 [42 U.S.C. § 5170b] short-term housing assistance benefits to all evacuees who, as of August 31, 2006, had been found ineligible for section 408 benefits" until these applicants receive detailed explanations of their denials and the chance to appeal. *See* Order at 1-2.

7. Finally, the Court has ordered FEMA to retroactively pay the applicants who were denied housing assistance under section 408 the "short term assistance benefits they would have otherwise received from September 1, 2006 through November 30, 2006." *See* Order at 2.

A. ISSUANCE OF DETAILED EXPLANATIONS FOR DENIALS

8. FEMA reviewed the National Emergency Management Information System ("NEMIS") computer database that maintains information on disaster assistance. In a December 5, 2006, review, the Agency identified 10,907 applicants who, as of December 5, 2006, were showing in NEMIS as previously sheltered under Section 403 and had been determined ineligible for § 408 assistance. The 10,989 number cited in paragraph 112 of my previous declaration dated September 11, 2006, represented those applicants who as of September 6, 2006, were determined to be ineligible for section 408 assistance and who reportedly had an unexpired lease at the time of conversion. Eighty-two of those have now been found eligible. As a result of the broader language in the court order, FEMA will need to manually review an estimated additional 6,800 cases of people who were previously in the section 403 program but who left the program prior to the end of section 403 sheltering before the conversion to section 408 occurred. As a result of the December 5 review and considering these additional approximately 6,800 cases, this means that approximately 18,000 cases will need to be reviewed.

The Court's Order requires FEMA to contact each of these applicants to more fully explain why they were found ineligible for section 408 housing assistance, how they can become eligible, and the appeals process.

9. This would be very burdensome because many of these approximately 18,000 applicants are no longer tracked by FEMA. For many of the applicants, the last known address FEMA has is that of the disaster applicant's FEMA-funded shelter (i.e., section 403 funded address), and many no longer reside at that address, or even in its general vicinity.

10. To comply with the November 29 Order, FEMA would have to attempt to contact each applicant by phone to verify that we have the applicant's current address. Three phone calls will be made at different days and times in an attempt to reach each applicant. It will take three to four weeks to reach all the applicants, and we expect that at least 5% of them will never be reached. If there are up to three phone call attempts for each of the approximately 18,000 registrants, the cost will be approximately $257,600.[1]

11. If an applicant cannot be reached by phone, FEMA will send a letter to his last known address asking him to contact FEMA to provide his correct address.

12. If the applicants cannot be contacted through phone or mail, FEMA will be unable to contact the applicants directly. We would then resort to some method of nationwide notification through the media.

13. As the applicants contact FEMA asserting their eligibility under the Order, FEMA must then confirm, on a case-by-case basis, whether each applicant fits within the Court's Order. To do so, FEMA will have to manually review each application to identify the bases upon which FEMA determined that the registrant was ineligible for section 408 housing assistance.

14. In order to capture and store this specific information, a database must be designed and developed outside of the NEMIS processing system. Once the database is designed, job aids and training will need to be developed and the case workers doing reviews, trained. Approximately, 200 caseworkers will need to be trained on how to go into NEMIS find the pertinent applicant information and enter it into the new database.

---

[1] 30 minutes per successful call (~17,100 reached) = 8,500 hours X $23.00 per hour = $196,650
6 minutes per attempted/non-successful call
¾ (13,500) X 12 minutes (2 attempts) = 2,700 hrs X $23 = $62,100

4

15. This information will then be entered into FEMA's new database. These processes would take 200 caseworkers 16,000 hours, for a total cost of $368,000. This amount does not take into consideration the creation of the new database requirements discussed in paragraph 14, which will increase both the time and cost involved.

After each case is reviewed, FEMA will be required to draft a personalized letter to each applicant explaining the factual and legal basis for its decision, the information that the applicant would need to provide to overcome the denial or to otherwise become eligible, if possible, and how to appeal a decision denying section 408 assistance. The NEMIS system is not able to prepare individually-tailored letters. Instead, FEMA will have to engage the services of a contractor to develop the language for these personalized letters including an explanation for each ineligible reason, examples of what applicants can provide in order to become eligible and specific information regarding the appeals process. FEMA caseworkers would then have to take the specific applicant information and match it with the newly prepared language in order to create each personalized letter. This would involve, among other things, casework preparation from the database, manual preparation of each letter, two quality control reviews, placing the letters into envelopes, transporting the letters to the post office, and scanning the letters into NEMIS for placement into the applicants' records. This would take approximately 22,576 hours, at a total cost of $571,020.

B. RE-IMPLEMENTATION OF SECTION 403 SHELTER PROGRAM AND PAYMENTS OF BACK BENEFITS

16. The Court's Order also requires FEMA to restore section 403 "short term housing assistance benefits" to all evacuees who, as of August 31, 2006, were determined

5

ineligible for temporary housing assistance under section 408 of the Stafford Act, 42 U.S.C. § 5174, until such time as they have received more detailed explanations for the ineligibility determination and until they have had the requisite time to pursue an administrative appeal. This is unduly burdensome and inconsistent with FEMA's statutory authorities.

17. Section 403 is administered as a public assistance program, with funding through a state or local grantee or subgrantee, and with the activities administered through the grantee/subgrantee. FEMA administered the Apartment Sheltering Program through municipal governments. The localities first agreed to implement a shelter program using privately-owned apartments, arranged with private landlords to lease units, and entered into leases. Administrative costs associated with the program then were reimbursed to the localities by FEMA. Individuals who received assistance through the program never received any Federal or state funds directly. Instead, the local government entity assumed the lease obligations and paid the monthly rent directly to the landlord.

18. Section 403 does not authorize "short term housing assistance benefits." Section 403 provides the authority for an emergency sheltering program whereby FEMA provides public assistance to state and local governments to provide temporary shelter. Section 403 assistance is not provided directly to individual disaster victims. A public grantee, i.e., a state or local government, or an approved charitable organization, must agree to implement the program, and FEMA then reimburses the costs incurred by willing grantees.

19. In addition, the extraordinary section 403 sheltering programs implemented in the wake of Hurricanes Katrina and Rita were discontinued months ago and no longer are in

operation. As discussed in my earlier declaration, in order to create and implement the 403 Apartment Program, Public Assistance ("PA") grantees or subgrantees had to elect to participate and had to enter into leases with private landlords to obtain available units. Typically the PA applicants entered into year-long lease agreements. Currently, there are no PA applicants participating in the 403 Apartment Program. FEMA cannot require any potential PA applicants to undertake the efforts to re-implement the Apartment Program. Assuming that a public entity was interested in setting up the program again, it would need to renegotiate existing leases or find private landlords interested in entering into new lease agreements and allowing evacuees to occupy units as temporary tenants. If a PA applicant entered into such lease agreements, the Federal government would be required to incur relatively long-term lease obligations and would incur significant costs paying for excess housing capacity extending long beyond the emergency period, including lease cancellation penalties if the reinstated section 403 shelter program ends before the new leases terminate.

20. Alternatively, PA applicants may agree to provide other forms of section 403 emergency shelter assistance, such as housing households in congregate shelters. This would require public grantees to locate potential congregate shelter sites, outfit them as shelters, and agree to maintain the shelters for the period of the Court's Order.

21. FEMA only provides the grant money to run the section 403 program and the state and local governments determine whether or not they want to participate and further decide how to run the program on behalf of persons residing in their community. FEMA cannot direct the type of shelter each participating state or local government decides to use, assuming any state or local government is willing to participate in the program. FEMA

cannot guarantee that the affected individuals would be able to continue residing in the geographic area where they currently are located.

22. An enormous number of individuals from the Gulf Coast were displaced as a result of Hurricanes Katrina and Rita, and FEMA acted as expeditiously as it could to adapt and revise shelter and housing programs and to process applications, particularly for section 408 housing assistance. FEMA initially notified applicants of the determinations on their applications using standard procedures, given the need to expedite applications and their vast numbers. In addition FEMA contracted with a service to make auto-dialed recorded calls to the phone numbers listed by the applicants to advise them that an eligibility decision had been made and that they would be notified of that decision by mail. Because of the unique circumstances surrounding this event (e.g., large evacuee populations and the confusion inherent in communicating and transitioning evacuees from section 403 shelter apartments to section 408 temporary housing), FEMA made extraordinary efforts to locate and make personal contacts with large numbers of section 403 shelter populations in order to explain why they were found ineligible and what was required of them to change that determination. These efforts are described in paragraphs 82 through 85 and 101 through 102 of my previous declaration dated September 11, 2006. *dmd*

23. Despite the extraordinary efforts FEMA made in contacting these applicants and explaining the process the court found that the notifications were confusing.

24. The Court is also requiring FEMA to make cash payments to ineligible applicants for 408 housing assistance in an amount equal to the section 403 assistance they would have received from September 1, 2006 through November 30, 2006 if the section 403 program

8

had been operating during the period. Because of the reasons cited below, this is also unduly burdensome and would require FEMA to act contrary to the law.

25. Section 403 sheltering assistance is funding that FEMA provides exclusively to state and local governments, not to individuals. Section 403 authorizes only public assistance programs funded through a public entity; it does not authorize payment to individuals.

26. In addition, the Court orders FEMA to pay evacuees based on what each individual would have received in benefits. FEMA reimbursed municipalities up to the Fair Market Rent, so each apartment may have been leased at a different rate. FEMA would need to verify through the grantee the rate paid for each individual evacuee that FEMA would be able to identify.

27. The Court's Order now requires FEMA to provide cash payments directly to approximately 18,000 ineligible section 408 applicants for the benefits they would have received if FEMA had not decided to end the section 403 sheltering program, without regard to where they have actually been living since that time. The monthly section 403 rent per apartment is based on the Department of Housing and Urban Development's calculation of fair market rent in a geographic area. Assuming lease payments for section 403 sheltering of approximately $786 per month (the national average Fair Market Rent) for three months, the Court order requires FEMA to expend approximately $41,701,000.00 in funds that it would not otherwise spend. The payments are not authorized under any statute or available under any program, are not made available to any other disaster victims, and would be distributed in a manner without any eligibility criteria.

28. For example, applicants in the section 408 housing program are entitled to continuing rent payments based on presentation of receipts showing actual costs for rent, up to a monthly cap. The Court's Order, however, fails to take into account the actual expenses of evacuees, and potentially makes available windfall payments in excess of any expenses actually incurred for housing costs.

29. By law, FEMA cannot reimburse these applicants for those months out of section 408 housing assistance money because they are not eligible for section 408 assistance.

30. The Court also orders FEMA to "immediately restore section 403 short-term housing assistance benefits to all evacuees who, as of August 31, 2006, had been found ineligible for section 408 benefits until such time as they have received the more detailed explanation and have had the requisite amount of time to pursue an administrative appeal thereof."

31. The cost of administering section 403 assistance for approximately 18,000 registrants for six months at the prevailing national Fair Market Rent would be approximately $83,402,000.00. This amount is the three months of section 403 assistance the Court has ordered FEMA to reimburse combined with the three months of section 403 assistance FEMA would have to provide the states while the notification procedure is enacted pursuant to the Order. This amount does not account for the administrative costs FEMA would have to pay the government entities to reinstate the program. If FEMA had to comply with the November 29 Order, these administrative costs could be approximately $2,800,000.00.

32. It will cost FEMA a total of approximately $87,401,840 to comply with the order.

33. By ordering FEMA to pay evacuees benefits under the authority of section 403, the Court is requiring FEMA to act outside of its statutory authority and to re-establish an emergency shelter program without regard to FEMA's inability to compel state governments and landlords to re-initiate the shelter program.

In accordance with 28 U.S.C. § 1746, I hereby declare and affirm under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

Signed this 5th day of December 2006

*Donna M. Dannels*
Donna M. Dannels
Individual Assistance Program Branch Chief
Federal Emergency Management Agency
Department of Homeland Security